## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS RIEL, DIANE THOMPSON   )
and FRED PYSHER,   )
  )       Civil Action No. 04-90 Erie
           Plaintiffs,   )
  )
       v.              )
  )
CITY OF BRADFORD,   )
  )
          Defendant.   )

### <u>MEMORANDUM OPINION</u>

McLAUGHLIN, SEAN, J.

      Plaintiffs Thomas Riel, Diane Thompson and Fred Pysher brought this action under 42

U.S.C. § 1983[1] asserting facial challenges to the constitutionality of two Ordinances enacted by

the City of Bradford, Pennsylvania.  Presently pending before the Court are the parties' cross-

motions for summary judgment.  For the reasons set forth below, we will enter summary

judgment in favor of the Defendant and against the Plaintiffs.

### I.  BACKGROUND

      At issue in this case are two Ordinances which collectively establish a permitting system

regulating the placement of signs on private and public properties within the City of Bradford.

---

[1]  Section 1983 provides a cause of action for "any person who has been deprived of
rights secured by the Constitution or laws of the United States by a person acting under color of
law." <u>Curley v. Klem</u>, 298 F.3d 271, 277 (3d Cir. 2002).

A.

The first ordinance, Chapter 178 of the City of Bradford Code ("BC"), regulates the placement of exterior signs City-wide.  As a general matter, Chapter 178 requires that any person wishing to erect a  non-exempt sign first obtain a permit, pay a modest fee ($20 for temporary signs and, for permanent signs, the greater of $20 or 2% of cost),[2] and provide proof of insurance or a bond.  (BC §§ 178-3, 178-4, 178-16.)   Permit applications must be submitted to the City Building Inspector and must include, among other things, information concerning the intended location and positioning of the sign in relation to other surrounding buildings or structures, plans and specifications for the sign, information as to dead load and wind load, the name of the person or firm that will be erecting the sign, written consent from the owner of the building or property to which or upon which the sign will be affixed, and any other information that the Building Inspector may require in order for the applicant to demonstrate full compliance with Chapter 178 and other municipal law.  (BC § 178-4).

The Code contains special restrictions to ensure, e.g., that electrical signs comply with the City's electrical code (id. at § 178-5), that signs are not constructed so as to obstruct doors, windows or fire escapes (§ 178-17), and that signs pose no hazards to traffic (§ 178-18).  In addition, specific restrictions govern the physical aspects of construction, location, and erection relative to ground signs (§ 178-23), wall signs (§ 178-24), roof signs (§ 178-25), projecting signs

---

[2] The Code's provision pertaining to imposition of an annual fee (see BC § 178-7) has since been amended out of the ordinance and has no force or effect.  Due to a printing error, the provision still appears in the official codification of Chapter 178, but this error is in the process of being redressed.  Accordingly, to the extent Plaintiffs' First Amendment challenge is premised on the annual fee provision, we consider the issue moot.

(§ 178-26), temporary signs (§ 178-27), marquees (§ 178-28), awnings and canopies (§ 178-29), and street clocks (§ 178-30).

If an individual erects a sign that is deemed unsafe or otherwise in violation of Chapter 178, the Building Inspector must give written notice of the deficiency and give the permittee 10 days in which to remedy the deficiency. (BC § 178-10.) If the permittee fails to do so, the Building Inspector may remove the sign or make any alternations necessary to achieve compliance. (Id.) If the sign presents an immediate peril to other persons or property, the Building Inspector may summarily remove it without notice. (Id.)

Once an application is made for a permit, the Building Inspector is required to take action within thirty days. The Building Inspector is required to issue a permit "if it shall appear that the proposed structure is in compliance with all the requirements of this chapter and all other laws and ordinances of the City of Bradford." (BC at § 178-6.) Persons aggrieved by the denial of a permit can appeal to the Court of Common Pleas in accordance with the provisions of the Local Agency Law. (Id.)

Chapter 178's regulations apply only to exterior signs and therefore impose no restrictions on the placement of interior door or window signs. Moreover, several categories of signs are exempt from the regulations of Chapter 178,[3] including temporary signs no larger than 12 square

---

[3] The list of exempted categories includes, in its entirety:

A.    Temporary signs not exceeding twelve (12) square feet, provided each such sign is removed within sixty (60) days of its erection.

B.    Identification signs not exceeding three (3) square feet denoting only the name and profession of an owner or occupant.

C.    Signs painted on the exterior surface of a building or structure; provided,

feet (if removed within 60 days of erection) and noncommercial signs no larger than 12 square

feet which are placed by an owner or occupant upon his own private property.  (BC § 178-15.)

B.

The second ordinance, Section 125(E) of Chapter 125 of the Code, regulates exterior

signs within the City's designated historic district.  The City originally adopted Chapter 125

verbatim from a Model Ordinance prepared by the Pennsylvania Historical and Museum

Commission and utilized by numerous other municipalities across the Commonwealth.[4]  Since its

---

however, that if said signs have raised borders, letters, characters, decorations or
lighting appliances, they shall be subject to the provisions of § 178-24 [pertaining
to wall signs] and all applicable provisions of this chapter.

D.      Bulletin boards not exceeding eight (8) square feet in area advertising or
        informing of a service, business, occupation or profession carried on, in or about
        the property upon which such bulletin board is displayed.

E.      Signs cut into any masonry surface or when constructed of bronze or other
        incombustible materials denoting the name or other identifying information
        concerning a building or its date of construction.

F.      Traffic or other municipal signs, legal notices, railroad crossing signs, danger and
        such emergency or nonadvertising signs as may be approved by the City Council.

G.      Noncommercial signs not exceeding twelve (12) square feet in area placed upon
        private property by the owner or occupant of the property.

(BC § 178-15).

[4] Defendant represents that:

[i]n order to secure National Register status for the Historical District and the
benefits attendant to that status, the City of Bradford was required to follow an
expensive and relatively complex process prescribed by the U.S. Department of
the Interior and the Pennsylvania Historical and Museum Commission.  This
process included the requirements that the City adopt the Model Ordinance that
became Chapter 125 and that the City retain a professional historic architecture
firm to inventory and catalog virtually every building within the Historic District.

4

enactment, Chapter 125 has been amended in part to address certain of the Plaintiffs' concerns about its constitutionality.

Generally speaking, Chapter 125 governs the maintenance of the Historic District by and through the City's Board of Historical Architectural Review ("HARB"), a nine-member body appointed by Bradford's City Counsel. By regulation, the HARB includes a registered architect, a licensed real estate broker, the Building Inspector, and six other individuals "with knowledge of and interest in the preservation of the Historic District." (BC § 125-5.) Broadly speaking, Chapter 125 addresses the selection, functions and responsibilities of the HARB.

In relevant part, Chapter 125, § 125-8 requires that the City of Bradford governing body issue a "certificate of appropriateness" (CA) before the Building Inspector can issue a building permit for the erection, alteration, reconstruction, or demolition of all or part of any building within the historic district. Certain applications for building permits or CA's – including "[a]ny application for a sign or sign structure"– require HARB review. (BC § 125-9(B)(1) and (2).) No separate fee is assessed under Chapter 125 for a permit application. (BC § 125-9(D).) In addition, Section 125-15(E) (in its present amended form) provides the following regulations specifically governing the placement of signs within the Historical District:

E. Signs and awnings.

(1)     No commercial sign or permanent external advertising display of any kind shall be erected, altered or used in the historic district except for advertising informing the public of a service, business, occupation or profession carried on, in or about the property on which such sign or permanent external advertising is displayed.

(2)     Except as provided in subsections (3) and (4) of this Ordinance, no sign or display of any kind or for any purpose shall be erected or altered, notwithstanding zoning sign approval, until an application for permit to make such erection or alteration has been reviewed by

---

(Def.'s Br. in Opp. to Pl.s' Mot. for Summ. Judg. and in Supp. of Cross-Mot. for Summ. Judg. [Doc. No. 16] at p. 8.)

HARB for conformity in exterior material composition, exterior structural design, external appearance and size of similar advertising or information media used in the architectural period of the district in accordance with the Resource Inventory of building architectural styles of the Bradford Historic District (which is available in the Office of the City Clerk), and a permit granted thereon.

(3)     Noncommercial signs not exceeding twelve (12) square feet in area placed upon private property by the owner or occupant of said property are exempt from the permitting requirement of this ordinance.

(4)     Temporary signs not exceeding twelve (12) square feet are exempt from the permitting requirement of this ordinance, provided that each such sign is removed within sixty (60) days of its erection.

(5)     The letters of all signs and displays, regardless of content, displaying an area four (4) square feet or larger shall be in uniform type-set style of print or professionally printed.

(6)     The face of a sign or other display shall not consist of unpainted or unfinished wood or wood products. All signs and other displays constructed of materials other than solid wood must be painted or displayed on material of a uniform color, except where the sign includes a border. The border of any sign or other display shall be of a uniform width and color.

(7)     All signs or other displays must be painted in colors chosen from the Historic Color Chart. The Historic Color Chart is available in the City Clerk's Office.

(8)     To the extent that there exists any conflict between the City of Bradford Zoning Code (Chapter 220), and either this chapter or Chapter 178, the provisions of this chapter and Chapter 178 shall control.

(BC § 125(E).)

The HARB meets on a monthly basis and is required by § 125-10(D) to render a decision and recommendation as to any pending application for a building or sign permit, within 30 days after its meeting. (BC § 125-10(D).) Within this same time period, the HARB must submit written recommendations to the City Council concerning the issuance of a CA. If an application is not ruled upon by the HARB within this 30-day period, the application is deemed to be approved. (Id.) City Council is then required to act upon the HARB's recommendation at the next council meeting. If the Council fails to act within the designated time period, the HARB's recommendation is deemed to be approved. (Id.) Aggrieved applicants may petition the City Council for reconsideration and obtain a hearing on the petition. If the applicant is unsuccessful,

he or she may obtain judicial review of the Council's final order in the Court of Common Pleas in accordance with the provisions of the Local Agency Law.  (BC § 125-12(K).)

## II.  DISCUSSION[5]

In analyzing whether a particular governmental restriction upon speech is permissible, the first inquiry usually is to determine whether the restriction is content-based or content-neutral. See Rappa v. New Castle County, 18 F.3d 1043, 1053 (3d Cir. 1994); Curry v. Prince George's County, Md., 33 F. Supp. 2d 447, 452 (D. Md. 1999).  Where the regulation is content-based, the government must demonstrate that the regulation "'is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'"  Rappa, 18 F.3d at 1053 (quoting Boos v. Barry, 485 U.S. 312, 321 (1988)).  Indeed, "[w]ith rare exceptions," regulations which discriminate based upon the content of speech of private citizens – whether on private property or in a traditional public forum –  are "presumptively impermissible, and this presumption is a very strong one."  Curry, supra, at 452 (quoting City of Ladue v. Gilleo, 512 U.S. 43, 59 (1994) (O'Connor, J. concurring)).

Less exacting scrutiny applies, however, when the regulation at issue is content-neutral. Curry, supra, at 452.  Generally, content-neutral restrictions on speech are permissible if they are

---

[5] The parties agree that there is no genuine issue of material fact and that entry of a summary judgment is an appropriate mechanism by which to resolve their dispute.  We therefore apply the well-established standard of review to motions brought under Fed. R. Civ. P. 56, to wit: summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  See Anderson v. Liberty Lobby, 477 U.S. 242 (1986); Celotex Corp. v. Cattrett, 477 U.S. 317 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).

narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the desired speech. See Burson v. Freeman, 504 U.S. 191, 197 (1992); Arlington County Republican Committee v. Arlington County, Va., 983 F.2d 587, 593 (4th Cir. 1993); Curry, *supra*, at 452.

Here, Plaintiffs assert a four-pronged facial challenge to the permitting requirements of Chapters 178 and 125.  First, Plaintiffs attack the permitting system as an unconstitutional prior restraint on speech protected by the First Amendment.  Alternatively, they contend that Bradford's two ordinances fall short of the well-established First Amendment standards for lawful permit systems because they:  (a) are impermissibly content based, (b) lack clear and objective standards to guide decision-makers, and (c) allow the City too much time to act on a permit request.  We address these arguments in turn.

(i)

Plaintiffs first argue that the First Amendment prohibits the City from utilizing a licensing or permitting system to regulate signs on private property where the underlying governmental objective is aesthetics.  As Plaintiffs acknowledge, permitting systems have been upheld in certain contexts, most commonly to regulate competing uses of public forums such as streets and parks by establishing restrictions on the time, place and manner in which speech can occur. See, e.g., Thomas v. Chicago Park District, 534 U.S. 316 (2002) (upholding municipal park ordinance requiring individuals to obtain permit before conducting large scale events); FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990) (licensing system regulating the location of adult entertainment venues); City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750 (1988) (regulation governing news racks placed on public property).  In such cases, permitting

8

requirements are permissible, provided that: (i) the permitting scheme does not delegate overly broad licensing discretion to a government official, (ii) any limitations on the time, place and manner of speech are not based on the content of the message, (iii) such limitations are narrowly tailored to serve a significant governmental interest, and (iv) the regulation leaves open ample alternatives for communication of the speech. <u>Forsyth County, Ga. v. Nationalist Movement</u>, 505 U.S. 123, 130 (1992).

Plaintiffs candidly acknowledge that the Supreme Court has not squarely addressed the constitutionality of permitting systems designed to regulate signage on private property. Nevertheless, they assert that the Supreme Court's decisions in <u>Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton</u>, 536 U.S. 150 (2002), and <u>City of Ladue v. Gilleo</u>, 512 U.S. 43, 58 (1994), and the district court's decision in <u>Curry v. Prince George's County, Md.</u>, *supra*, support their assertion that the Bradford permitting system amounts to an unconstitutional prior restraint on protected speech. We are not persuaded that these cases compel us to strike down the Bradford ordinances.

<u>Watchtower Bible</u> involved a municipal ordinance that required persons to register their names with the mayor and obtain a permit before they could engage in door-to-door advocacy. The Supreme Court upheld the plaintiffs' facial challenge to the ordinance, finding it unconstitutionally over-broad as applied to religious proselytizing, anonymous political speech, and the distribution of handbills. Guiding the Court's decision were several themes culled from its prior jurisprudence, *to wit:* the value of the speech involved (hand distribution of religious material), the "historical importance of door-to-door canvassing and pamphleteering as vehicles

for the dissemination of ideas," and the importance of door-to-door distribution of circulars "'to the poorly financed causes of little people.'" See 536 U.S. at 161-63.

Although the municipality had argued that three interests – the prevention of fraud, the prevention of crime, and the protection of residents' privacy – were served by the ordinance, the Court held that these governmental goals were not sufficient to justify the broad restrictions which the ordinance imposed on virtually all "for cause" speech. The Court found it "offensive – not only to the values protected by the First Amendment, but to the very notion of a free society – that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so." 536 U.S. at 165-66. Such a system, the Court found, had the "pernicious" effects of: (a) compromising the canvasser's anonymity, (b) imposing an objective burden on citizens, some of whom would choose to remain silent rather than submit to the government regulation, and (c) effectively banning a significant amount of spontaneous speech. Id. at 166-67. As to the latter point, the Court noted that, e.g., persons who decided during a holiday or weekend to partake in a political campaign by passing out handbills – or individuals who spontaneously decided to urge a neighbor to vote against the mayor – would be prohibited from engaging in the desired speech until they had first obtained a permit.

Nevertheless, the "breadth and unprecedented nature of this regulation" was not the ordinance's only fatal flaw because the Court also found that the regulation was not logically tailored to serve the Village's proffered interests. Insofar as the ordinance restricted non-commercial activity such as religious proselytizing, political campaigning, and/or advocacy of unpopular causes, the Court found no relation to the Village's stated interest of preventing fraud.

10

To the extent the Village sought to protect the privacy of its residents, the Court found that this goal could be adequately served simply by residents posting "no solicitation" signs and exercising their "unquestioned right to refuse to engage in conversation with unwelcome visitors." 536 U.S. at 168.  With respect to the goal of preventing crime, the Court considered it "unlikely that the absence of a permit would preclude criminals from knocking on doors and engaging in conversations not covered by the ordinance." Id. at 169.  As the Court noted, potential criminals could still engage residents by simply asking for directions, seeking permission to use the telephone, posing as surveyers or census takers or simply registering under a false name.

Plaintiffs argue that the Court's analysis in Watchtower Bible is significant for our purposes in this respect:  "when the municipality's public-safety interests were balanced against the 'interests and the effects of the regulations on First amendment rights,' the ordinance was [found to be] unconstitutional." (Pl.'s Br. at 10.)  According to Plaintiffs, Bradford's ordinances similarly fail constitutional analysis because, Plaintiffs submit, the City's interest in maintaining aesthetics is not as important as the interests at stake in Watchtower Bible and because the ordinances at issue do not logically promote aesthetics.

We are not persuaded by this analysis.  First the nature of the speech at issue in Watchtower Bible (door-to-door canvassing) differs from the type of speech involved here.  "It is generally understood, for First Amendment purposes, that each method of expression is 'a law unto itself and that law must reflect the differing natures, values, abuses and dangers of each method.'" Rappa.,18 F.3d at 1054 n. 16 (quoting Metromedia, Inc. v. San Diego, 453 U.S. 490, 501 (1981) (plurality opinion)).  Thus, it is not at all clear to this Court that the First Amendment

11

analysis pertaining to door-to-door proselytizing has relevance in the context of this case. Significantly, the Watchtower Bible Court's decision was guided largely by the "historical importance of door-to-door canvassing and pamphleteering as vehicles for the dissemination of ideas" and the importance of door-to-door distribution of circulars "'to the poorly financed causes of little people.'" 536 U.S. at 161-63.

Second, the extent of the government regulation involved in the Watchtower Bible decision is substantially distinguishable from that involved here. The primary defect with the Watchtower Bible ordinance was the sheer amount of speech subject to government restriction. In fact, because of its broad wording, the Watchtower ordinance would have required prior government permitting not only for religious canvassers like the Jehovah's Witnesses, but also for groups such as "Camp Fire Girls," "Children's Sports Organizations," "Christmas Carolers," "Parcel Delivery," "Little League," "Trick or Treaters during Halloween Season," "Political Candidates," and "Campaigners" (among other groups), unless expressly exempted by the target home-owner. 536 U.S. at 157 n. 6. The regulation affected even casual communication between neighbors as to a political or social issue. In essence, the permitting system in Watchtower entirely foreclosed the medium of door-to-door canvassing as a means of advocating political or religious causes absent the acquisition of a prior government permit.

By contrast, the Bradford permitting system is far less sweeping and can be bypassed altogether in many circumstances. Insofar as the Bradford permitting scheme affects private property, the cumulative effect is as follows: offsite commercial signage is generally banned altogether within the Historical District but presumably is allowed, subject to Chapter 178's permitting and fee requirements, outside of the Historical District; on-site commercial signage is

subject to HARB review within the Historical District; under Chapter 178, on-site signage is generally subject to the permitting and fee requirements only if its exceeds certain size restrictions; noncommercial signs placed on private property by the owner or occupant are exempt from Chapter 178's permitting and fee requirements and/or HARB review *provided* they do not exceed a specific size limitation. As the foregoing demonstrates, Bradford's signage restrictions apply chiefly to off-site commercial signs and the permitting system includes substantial exemptions both for on-site commercial signs and for noncommercial signs erected by the owner or occupant of private property. A residential homeowner, for example, can place any "for cause" sign on his or her property, provided it does not exceed 12 square feet. Consequently, the "pernicious effects" of the <u>Watchtower Bible</u> permitting system – i.e., the loss of speaker anonymity associated with the application process, the "burden" of undergoing the application process, and the potential suppression of spontaneous speech – may all be avoided under the Bradford scheme if residents simply limit the size of their signs to no more than 12 square feet.

Plaintiffs seek to draw similarities between this case and <u>Watchtower Bible</u> by arguing that the Bradford ordinances (like the ordinance in <u>Watchtower</u>) do not logically advance the government's stated interest. For example, Plaintiffs protest that Chapter 178's fee and bond requirements and the requirement that permit applicants submit personal identifying information, drawings and specification plans are all completely unrelated to aesthetics. The central problem with Plaintiffs' analysis is that it assumes that promoting aesthetics is the only governmental

interest underlying the Bradford permitting scheme, but that is not the case.[6]  As we discuss in more detail below, certain of the requirements tied to the permit application process are designed to serve the City's interest in promoting safety, promoting historical preservation, and even promoting cost-effectiveness for both sign owners and government officials.  In sum, we are not persuaded that Watchtower Bible's analysis compels a nullification of the Bradford ordinances.

Plaintiffs also cite City of Ladue, *supra,* for the proposition that the Supreme Court has "suggested in dicta that a licensing system to regulate signs on private property could not be justified."  (Pl.'s Br. at 13.)  We do not read City of Ladue quite so broadly.

Unlike our case, City of Ladue did not involve a permitting system, but rather an ordinance prohibiting homeowners outright from displaying any signs on their property except for "residence identification" signs, "for sale" signs, and signs warning of safety hazards.  Under the ordinance, commercial establishments, churches, and nonprofit organizations could erect certain signs not allowed to be displayed at private residences.  The plaintiff was a private citizen

---

[6] In a footnote in their brief, Plaintiffs state that "[a] licensing system for signs on private property might be allowable to advance public safety.  Since Bradford has admitted that the permitting system is intended solely to advance aesthetics, see testimony at April 23, 2004 preliminary injunction hearing; admission of Bradford attorney Richard Lanzillo at June 4, 2004, settlement conference, plaintiffs do not address this possibility."  (Pl.s' Br. at p. 8, n. 27.)  This Court does not consider itself so constrained in considering the governmental interests behind Bradford's permitting scheme.  First, Plaintiffs provide no specific record support for the City's supposed "admissions," citing only in general fashion to certain procedural events which have occurred during the course of this litigation.  Admissions supposedly made by Mr. Lanzillo in the course of settlement proceedings in this case might be inadmissible under Fed.R.Evid. 408 in any event.  Moreover, it is evident from the Defendant's briefs that the City **is** asserting an interest in public safety and, to the extent it can be differentiated from aesthetics generally, historical preservation as well.  Indeed, it is self evident from certain provisions of the ordinances that they are directed at concerns not strictly limited to aesthetics.  Our analysis proceeds accordingly.

who, because of the ordinance, could not lawfully place a sign in her yard protesting the Gulf War.

Assuming *arguendo* that the regulation was content and viewpoint neutral in terms of its enumerated exemptions, the Court nevertheless found that the ordinance's near-total prohibition of residential signs was constitutionally infirm because it "ha[d] almost completely foreclosed a venerable means of communication that is both unique and important." 512 U.S. at 54. The Court noted that the display of a residential sign "often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means." Id. at 56.[7] Yet the City's near-total ban on residential signs had essentially precluded residents from displaying any political, religious or personal messages on their property. As the Court observed, "[a] special respect for individual liberty in the home has long been part of our culture and our law," and "that principle has special resonance when the government seeks to constrain a person's ability to *speak* there." Id. at 58 (citations omitted) (emphasis in the original). Accordingly, the Court found the ordinance overly broad as it failed to leave open ample alternative channels for communication.

In contrast to the Ladue ordinance, the permit requirements which Bradford imposes on its private residents may be bypassed altogether, as we have previously discussed, provided that a property owner's (noncommercial) sign does not exceed 12 square feet in area. Simply stated,

---

[7] Because of their location, residential signs provide information about the identity of the "speaker," which, as the Court noted, can be an important component of persuasion. 512 U.S. at 56. In addition, residential signs are an unusually cheap and convenient form of communication and, "[e]specially for persons of modest means or limited mobility," may have "no practical substitute." Id. at 57. Moreover, "a person who puts up a sign at her residence often intends to reach *neighbors*, an audience that could not be reached nearly as well by other means." Id.

the "overbreadth" problems which plagued the City of Ladue's ordinance are not implicated here. Thus, we do not agree with Plaintiff's assertion that the City of Ladue opinion suggests a licensing system to regulate signs on private property can never be justified.  True, the Court noted in City of Ladue that the government's "need to regulate temperate speech from the home is surely much less pressing" than its need to "mediate among various competing uses ... for public streets and facilities." 512 U.S. at 57.  But the Court was also careful to note that it was not ruling on the constitutionality of "mere regulations" on private property signage short of a ban, see 512 U.S. at 59 n. 17, and the Court considered it "common ground" that governments may regulate the physical characteristics of signs.  Id. at 48.

Plaintiffs also refer us to Curry v. Prince George's County, Maryland, *supra*, as "the case that comes closest to holding that permit schemes are never justified in the private-property context." (Pl.'s Br. at 15.)  In Curry, the district court struck down an ordinance which imposed durational limits on the posting of campaign signs on private property and further imposed fee and permitting requirements as prerequisites to the posting of such signs.  In evaluating the ordinance, the district court quoted at length from City of Ladue and noted the Ladue Court's emphasis on the "special nature of 'cause' speech emanating from private residential property." 33 F. Supp. 2d at 454.  "When political campaign signs are posted on private residences," the court wrote, "they merit the same special solicitude and protection established for cause signs in City of Ladue."  Id.  Accordingly, the court found that the ordinance's "extended" durational ban which prohibited political signs for all but 45 days before and 10 days after a political election was "inconsistent with the 'venerable' status that the Supreme Court has accorded to individual speech emanating from an individual's private residence."  Id. at 455.  The court then went on to

16

strike down the permit and fee requirements, indicating "there is no justification for imposing such requirements in the case of campaign signs posted upon a private residence." Id. Specifically, the court observed that there "are no expenses to defray of the sort attributable to parades and processions ... and '[p]olitical signs neither interfere with use of the streets nor create a risk of disorder.'" Id. (quoting Baldwin v. Redwood City, 540 F.2d 1360, 1372 n. 32 (9th Cir. 1976)). Quoting the foregoing language, Plaintiffs interpret Curry as suggesting that "even a content-neutral permit and fee scheme could not be upheld in the context of residential signs." (Pl.s' Br. at 15.)

We do not interpret the Curry court's ruling as broadly as Plaintiffs do. Strictly speaking, that decision addressed the constitutionality of specific durational limits and permitting requirements in the limited context of campaign signs posted on private property. The permitting and fee requirements which concerned the Curry court would be a non-issue under the Bradford scheme, provided that campaign signs are limited to no more than 12 square feet in area and are removed within 60 days after their erection. Moreover, no durational, permitting, or fee requirements would be imposed on private residents to the extent they post campaign signs upon their own property and adhere to the 12 square foot size limitation.[8] In sum, the ordinance at issue in Curry, like those at issue in Watchtower Bible and City of Ladue, imposed burdens on speech that were substantially broader than those involved under the Bradford permitting system. Furthermore, the Curry court was careful to note that it was not ruling on the validity of regulations restricting the size, shape, location "or other permissible restrictions" on campaign

---

[8] The Bradford ordinances do not limit the number of signs that private residents may place on their property.

signs. <u>See</u> 33 F. Supp. 2d at 455 ("This is not to say that campaign signs, to the extent that they might be found to be out of compliance with reasonable size, shape, location or other permissible restrictions, are necessarily immune from appropriate sanctions."). In fact, the <u>Curry</u> court acknowledged that "[c]ourts have ... routinely upheld regulation of signs by size and shape." <u>Id</u>. at 452 (citing <u>Outdoor Sys., Inc. v. City of Mesa</u>, 997 F.2d 604, 615 (9th Cir. 1993). Accordingly, the court's legal analysis in <u>Curry</u> is not dispositive of the challenges raised by Plaintiffs in this case.

Plaintiffs' first argument is essentially a facial challenge to the Bradford ordinances on the grounds that they – like the ordinances struck down in <u>Watchtower Bible</u>, <u>City of Ladue</u>, and <u>Curry</u>, *supra* – are unconstitutionally overbroad. When a facial challenge is lodged on such grounds, the Court's "first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." <u>Gibson v. Mayor and Council of City of Wilmington</u>, 355 F.3d 215, 226 (3d Cir. 2004) (quoting <u>Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489, 494 (1982)). Among the factors for consideration are "the number of valid applications, the historic or likely frequency of conceivably impermissible applications, the nature of the activity or conduct sought to be regulated, and the nature of the state interest underlying the regulation." <u>Id</u>. (quoting <u>Aiello v. City of Wilmington, Del.</u>, 623 F.2d 845, 852 (3d Cir. 1980)). Here, Plaintiffs have proffered nothing by way of demonstrating the historic or likely frequency of impermissible applications of the Bradford ordinances. They have cited no law compelling us to reach the conclusion that the First Amendment imposes a *per se* bar on permitting systems which regulate signage on private property in the interests of promoting aesthetics. Accordingly, we reject Plaintiffs' first line of argument.

18

(ii)

Plaintiffs next argue that, even if Bradford's permitting scheme is not unconstitutional *per se* as an unjustified prior restraint on speech, it is invalid because it violates certain constitutional prerequisites for time, place and manner regulations.  Preliminarily, Plaintiffs insist that the permitting system contains content-based exceptions and is therefore presumptively unconstitutional.  With respect to Chapter 178, e.g., Plaintiffs argue that § 178-15 imposes different size and temporal burdens on signs depending on their content.  Plaintiffs also complain that § 125-15 is content-based because, e.g., § 125-15.E.(1) bans permanent commercial signs within the Historic District unless they consist of "advertising informing the public of a service, business, occupation or profession" occurring onsite.  (BC § 125-15.E(1).)  Both ordinances exempt from the permitting system non-commercial signs placed upon private property by the owner/occupant if the signs do not exceed 12 square feet.  Plaintiffs contend that these provisions are content-based because one must look to the content of the sign in order to determine whether the permitting restrictions apply.

In Rappa v. New Castle County, *supra,* the Third Circuit Court of Appeals refined the test for determining whether seemingly content-based exemptions from a signage ordinance violate First Amendment principals.  In that case, the court addressed the validity of a Delaware statute that generally banned signs placed along or near the right-of-way of public highways yet provided various categorical exemptions.  While acknowledging the Supreme Court's decision in Metromedia, Inc. v. San Diego, 453 U.S. 490 (1981), wherein the Court struck down a similar regulatory scheme, the Third Circuit found that the badly splintered Metromedia decision failed

to provide any "common denominator" which controlled the outcome of the First Amendment

claims in Rappa's case.  See 18 F.3d at 1060-61.

Based on Justice Brennan's concurring opinion in Metromedia, the Third Circuit

fashioned a new standard for determining whether content-based exceptions to a general sign

prohibition are constitutionally sound, *to wit*:

> ...statutes aimed at a legitimate end unrelated to the suppression of speech but
> which nonetheless restrict speech in a certain locality may constitutionally contain
> content-based exceptions as long as the content exempted from restriction is
> significantly related to the particular area in which the sign is viewed--for
> example, a sign identifying the property on which it sits as a restaurant, or a sign
> alongside a highway which tells drivers how to reach a nearby city.  Such
> exceptions must also be substantially related to advancing an important state
> interest that is at least as important as the overall goal advanced by the underlying
> regulation, be no broader than necessary to advance the special interest, and be
> narrowly drawn so as to impinge as little as possible on the overall goal.

18 F.3d at 1047.  The court found that certain content-based exceptions under the Delaware

regulatory scheme would likely survive this test; however, an exception for signs advertising

local industries, meetings, buildings, historical markers and attractions would not.

In their motion for summary judgment, Plaintiffs do not address Rappa at any great

length.  Instead, they posit that Rappa pertains only to regulations restricting signage on public

property and therefore is not controlling in this case.

We disagree.  Nowhere in Rappa did the Third Circuit expressly limit its holding to

ordinances governing only signage on public property.  On the contrary, the Rappa court was

deciding the constitutionality of a statute which regulated the posting of signs "both along the

rights of way of the majority of roads in Delaware and on private property."  Id., 18 F.3d at 1070.

In fact, the defendants in Rappa had tried to argue that the state statute was a valid regulation

under principles applicable to non-public fora, i.e., "fora that have neither traditionally been

available for public expression, nor been designated by the State as open for expressive activity."

Id. In such cases, the government may engage in content discrimination provided that the

regulations are reasonable and do not discriminate by viewpoint. See id. (citing United States v.

Kokinda, 497 U.S. 720, 726 (1990)). The Rappa court noted that, *"because the statutes regulate*

*a private party's speech on his or her own property*, they are subject to the highest level of

scrutiny," i.e., "that applied to the regulation of a public forum" under normal time, place, and

manner analysis. Id. at 1071 (emphasis added) (citing Arlington County Republican Comm. v.

Arlington County, Va., 983 F.2d 587 (4th Cir. 1993)).

    In any event, the distinction between regulating the use of public versus private property

was not central to the Rappa court's analysis. The core challenge for the Rappa court was

developing a rational means by which to assess the constitutionality of "statutes aimed at a

legitimate end unrelated to the suppression of speech but which nonetheless restrict speech in a

certain locality" through exemptions seemingly based on the content of speech. See 18 F.3d at

1047. The Rappa court agreed with the Metromedia concurrence that "when government has a

significant interest in limiting speech that is unrelated to the content of that speech, government

should not be left with a choice of enacting a regulation banning all signs in a particular

geographic area or none." 18 F.3d at 1064. The test developed by the Rappa court was designed

to "provide a concrete criterion by which legislatures and courts could evaluate particular

exceptions" while "allow[ing] government some flexibility to limit speech when it has a

significant interest in doing so without eliminating all speech." Id. at 1065. Even if Rappa were

not controlling authority in the case at bar, its analysis is certainly persuasive and has relevance

in a broader context beyond the limited facts of that case.  Accordingly, we see no reason *not* to apply its reasoning here.[9]

Having concluded then that <u>Rappa</u>'s analysis has relevance in this case, we next conclude that this analysis disposes of Plaintiffs' argument that the Bradford ordinances are constitutionally infirm content-based regulations.  Preliminarily, we view the Bradford permitting scheme, like the one involved in <u>Rappa</u>, as one aimed at legitimate ends unrelated to the suppression of speech even though it does have the effect of restricting certain speech in particular localities.  <u>See</u> 18 F.3d at 1047.  The City has proffered the advancement of public safety,[10] the promotion of aesthetics, and the preservation of its Historical District as justifications for the substantive restrictions set forth in Chapters 178 and 125.  It cites efficiency concerns as the impetus behind the permitting process.[11]  We do not view the permitting

_____

[9] We recognize that <u>Rappa</u> dealt with exemptions from a general ban on signage, whereas this case involves exemptions from Bradford's permitting system.  However, we do not find this factual distinction to be material to our analysis.

[10] As the City explains:

> Chapter 178 includes design and safety standards that protect against the dangers presented by inadequately mounted signs that hang or extend above doors, walks and other areas where patrons, visitors and passersby are likely to frequent.  Chapter 178 includes design criteria to ensure that signs, including large signs and canopies, can withstand the formidable wind and snow loads that are part of the climate of Bradford, Pennsylvania. Chapter 178 includes standards to prevent the risks of fire, electric shock and electrocution that are inherent in lighted signs.

(Def.'s Br. in Opp. to Pl.s' Mot. for Summ. Judg. and in Support of Cross-Mot. for Summ. Judg. [Doc. 16] at 14-15.)

[11] The City notes that:

> [w]ithout the permitting system, each ordinance would be ineffective to serve the governmental interests at issue.  With respect to Chapter 178, public safety is served far better by a permitting system that allows for prior review of compliance with design and safety standards than the hit-or-miss, post hoc system proposed by plaintiffs.  Under plaintiffs' vision of First Amendment jurisprudence, a municipality such as

restrictions in Chapters 178 and 125 as an attempt by government to "censor certain viewpoints or to control what issues are appropriate for discussion." <u>Rappa</u>, 18 F.3d at 1065.

We also find that none of the challenged exemptions are unconstitutional content-based regulations. As we discuss in more detail below, some exemptions are not content-based at all, while others satisfy <u>Rappa</u>'s test for permissible content-based regulations. We consider the challenged provisions individually, though not necessarily in the same order in which they appear in the Ordinances.

§ 178-15(A) and (C)

We can easily dispose of any claims relative to §178-15(A) and (C), which respectively exempt from the permitting scheme "temporary signs not exceeding twelve square feet, provided they are removed within sixty days of erection" and "signs painted on the exterior surface of a

---

Bradford should not have the ability to examine the location, plans and specifications for any sign prior to its erection. Instead, plaintiffs would have the City attempt to identify non-compliant, unsafe signs, by means of inspections after they are erected. With all due respect to plaintiffs, their proposed system is a prescription for ineffective regulation and poor government. If adopted, it would entrust public safety to the hope that the City's limited enforcement personnel would inspect and identify a dangerous sign before it injures or kills someone.

***

Similar considerations apply to the permitting system under § 125-15. The nine members of the HARB Board cannot be expected to wander the streets of the Historic District to identify and evaluate signs for compliance with the ordinance. Once a sign is erected, the ability of the City to vet it for compliance is very limited and impractical.

***

Plaintiffs' approach also makes no economic sense for the public and promotes poor relations between government and the public. The City's permitting process allows persons and businesses to know whether a proposed sign complies with design standards *before* a person or business invests sums that often total thousands and sometimes tens of thousands of dollars to erect the sign. Plaintiffs' system is much more likely to engender strife between government and citizens than a system such as the Bradford system, which provides notice of defiiencies *before* construction costs are incurred and potentially wasted.

(Def.'s Br. in Opp. to Pl.s' Mot. for Summ. Judg. and in Support of Cross-Mot. for Summ. Judg. [Doc. 16] at 14-16.)

building."[12]  (BC § 178-15 (A) and (C).)  Plaintiffs do not appear to seriously challenge these

provisions and, in our view, they are not even arguably content-based restrictions.  Accordingly,

they are not presumptively unconstitutional, nor are they subject to Rappa's analysis.

### § 178-15(F)

Subsection 178-15(F) of the City Code exempts "[t]raffic or other municipal signs, legal

notices, railroad crossing signs, danger and such emergency or nonadvertising signs as may be

approved by the City Council."  (BC § 178-15(F).)  Rappa involved a similar exemption from the

Delaware sign ban relative to "[d]irectional or warning signs and official signs or notices, ...

danger and precautionary signs that relate to the premises, ... and signs or notices of a railroad,

other transportation, or communication company that are necessary for the direction, information

or safety of the public."  18 F.3d at 1066 (internal and end citations omitted).  The Rappa court

viewed this grouping as falling under the general rubric of "regulatory signs directly related to the

functioning of the roads and property on which they are located."  Id.[13]  The court found that this

exception satisfied its requirement that there be a "significant relationship between the content of

particular speech and a specific location."  18 F.3d at 1066.  The court went on to note that most

---

[12] The latter category of exempted signs are subject to additional restrictions relative to "wall signs" if the sign has raised borders, letters, characters, decorations or lighting appliances.

[13] The Rappa court noted that, in order to be found constitutional, the exception for "official signs or notices" must be interpreted as limited to signs relating to the property on which they stand.  Thus, the court noted "[a]n official sign that said 'Thomas Carper – Congressman' probably would not be related to the property on which it stood unless it was standing at Carper's district office."  18 F.3d at 1066 n. 41.  To the extent subsection (F)'s exemption for "legal notices" or "nonadvertising signs as may be approved by the City Council" is ambiguous, we similarly interpret the language as limiting the exemption to signs relating to the property on which they stand, such as "no trespassing" signs, "DUI enforcement zone" signs, or the like.

of the regulatory signs at issue were important enough that they would likely survive even a compelling state interest test. Accordingly, the court reasoned, "these exceptions certainly survive the intermediate scrutiny component of the test we have adopted – the state's interest in these signs is greater than the state's aesthetic and safety interests in banning these signs, and the exemption is narrowly tailored to serve the state interest." 18 F.3d at 1066.

We similarly conclude that the exemption set forth in subsection 178-15(F) satisfies the Rappa court's test for permissible content-based exceptions. Traffic and municipal signs, railroad crossing signs, emergency signs, and the like have an obvious and significant relationship to the localities they regulate. Further, it is self evident that these regulatory signs substantially advance public safety concerns that are at least as important as the concerns underlying Bradford's permitting system. Finally, the exemption (as we have interpreted it) is no broader than necessary to advance its special purpose and is narrowly drawn so as to impinge as little as possible on the City's broad goals of minimizing the presence of unsafe and unattractive signs.

### § 178-15(E)

Subsection 178-15(E) exempts from the permitting system "[s]igns cut into any masonry surface or when constructed of bronze or other incombustible materials *denoting the name or other identifying information concerning a building or its date of construction*." (BC § 178-15(E) (emphasis supplied).) The only seemingly content-based aspect of this exception is that the signage must identify the building on which it sits and/or its date of construction. In our view, this exemption is acceptable under Rappa. The speech covered by § 178-15(E) has a significant relationship to the location of its intended use. See Rappa, 18 F.3d at 1065 (noting

that "an address sign performs its function better when it is actually on the property with that address than if it is anywhere else").  Signs that identify particular buildings in this fashion serve an obvious purpose of promoting order among members of the public and providing information of historical significance – ends which are quite legitimate and just as important as the City's underlying concerns about minimizing unsafe and unattractive signage.  The exception is narrowly tailored and does not impinge in any significant manner on the City's safety and aesthetics goals.  Accordingly, it is not an impermissible content-based regulation under Rappa.

### § 178-15(B)

In a similar vein, we find that § 178-15(B) is permissible.  That provision exempts signs that identify the name and profession of a building owner or occupant, provided that the sign does not exceed 3 square feet.  Like § 178-15(E), this exemption serves important civic interests in promoting order and apprising the public as to where particular professional services may be obtained.  Such information is best conveyed on the property where the services are rendered.  Moreover, because the exemption extends only to signs not exceeding 3 square feet, it is narrowly tailored so as to serve its function without unduly impinging on the City's safety and aesthetics concerns.

### § 178-15(D)

Section 178-15 (D) exempts "[b]ulletin boards not exceeding eight (8) square feet in area advertising or informing of a service, business, occupation or profession carried on, in or about the property on which such bulletin board is displayed."  (BC §178-15(D).)  Plaintiffs object that this provision impermissibly discriminates between various types of commercial speech.  Under Plaintiffs' interpretation, for example, signs advertising products and events do not fall within the

26

exemption because they do not technically inform of "a service, business, occupation or profession carried on, in or about the property..."

We find Plaintiffs' interpretation unduly narrow. It seems more accurate to instead interpret these provisions as creating a distinction not between differing subject matter of speech (e.g., advertising of "products" versus "services"), but between different venues of speech – i.e., on-site advertising versus off-site advertising. This construction is both reasonable and consistent with the City's proffered interpretation. (See Def.'s Br. [Doc. 16] at 21 ("Each of the exemptions listed in subsections (b)-(f) of § 178-15 distinguishes between "on-site" and "off-site" activities. Each requires a limited examination of the sign to ascertain whether it has a significant relationship to the activities or character of the building or location where it is to be situated.").) Under this interpretation, events occurring (or scheduled to occur) at a particular site and products manufactured, distributed or sold at a particular site could be considered part of the "service, business [or] occupation ...carried on, in or about the property," and therefore bulletin boards advertising products and/or events in this manner would be covered by the exemption.

The next question is whether the exemption, so construed, passes constitutional muster under Rappa. The Third Circuit in Rappa considered an exemption from the Delaware ban that applied to signs "advertising activities conducted on the real property" upon which they are located. See 18 F.3d at 1051, 1053. The court found that the exemption was not a content-based provision and was constitutional: "Although evaluating whether a sign is an onsite sign does require the state to analyze the content of the sign, the onsite exception does not preclude any particular message from being voiced in any place; it merely establishes the appropriate relationship between the location and the use of an outdoor sign to convey a particular message."

18 F.3d at 1067.  Thus, the court concluded, the "exception for onsite signs .... is not even subject to the test we have proposed."  Id.  In undertaking this analysis, the Rappa court specifically interpreted the exemption for "on-site advertising" as applicable to both commercial and non-commercial speech and thereby materially distinguished the Delaware exemption from the one struck down in Metromedia, which had impermissibly discriminated in favor of on-site commercial signage and against on-site noncommercial signage.  See 18 F.3d at 1051 n.10, 1054-55, 1056.

In this case, we conclude that Chapter 178's exemption for on-site advertising can and should similarly be construed so as to extend to both commercial and noncommercial speech.  Here, the City of Bradford has professed its intent to generally limit the permitting requirements to commercial signs of a permanent nature and to regulate only those noncommercial signs which exceed certain size limitations.  Thus, the City construes the Ordinances as treating noncommercial speech no less favorably than commercial speech.  By implication, then, § 178-15(D)'s exemption from the permitting requirements relative to onsite advertising should be construed as extending to both noncommercial and commercial speech.[14]  We think the

---

[14] We find that this construction is not only reasonable, but also most consistent with the City's proffered intent not to disadvantage noncommercial speech.  By interpreting § 178-15(D) to reach both commercial and noncommercial speech, we – like the Rappa court – can avoid any potential constitutional problems of the sort raised in Metromedia.  See Rappa, 18 F.3d at 1051 n. 10 and id. at 154-55, 1056.  One might argue that it is unnecessary to specifically construe § 178-15(D) as extending to non-commercial speech because § 178-15(G) essentially accomplishes the same thing.  Subsection (G), which we discuss in more detail below, exempts noncommercial signs not exceeding 12 square feet when placed on private property by the owner or occupant.  (See BC § 178-15(G).)  However, because subsection (G) expressly pertains only to noncommercial signs posted on private property, there is potential dissymmetry between subsections (G) and (D):  to wit, signs advertising onsite activity of a commercial nature might be permissible on public property under subsection (D) while those advertising onsite activity of a noncommercial nature theoretically might not be permissible on public property.  In order to

regulation is reasonably susceptible of such a construction:  § 178-15(D)'s exemption covers

"bulletin boards" informing of an on-site "service" or "occupation," which can reasonably be

interpreted to  include noncommercial endeavors.  When interpreted in this fashion, § 178-15(D)

is a content-neutral provision that does not even require <u>Rappa</u> analysis.  <u>See</u> 18 F.3d at 1067.[15]

§ 125-15(E)(1)

We next consider § 125-15(E)(1), which generally bans off-site commercial signage

within the Historic District.  According to the regulation:

> [n]o commercial sign or permanent external advertising display of any
> kind shall be erected, altered or used in the historic district except for
> advertising informing the public of a service, business, occupation or
> profession carried on, in or about the property on which such sign or
> permanent external advertising is displayed.

---

avoid any constitutional defect that might arise from such a construction, we interpret
§ 178-15(D) as reaching on-site advertising of both a commercial and noncommercial nature.
<u>See</u>, <u>e.g.</u>, <u>Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council</u>, 485
U.S. 568, 575-76 (1988) ("[W]here an otherwise acceptable construction of a statute would raise
serious constitutional problems, the Court will construe the statute to avoid such problems unless
such construction is plainly contrary to the intent of Congress.); <u>Frisby v. Schultz</u>, 487 U.S. 474,
483 (1988)("To the extent they endorsed a broad reading of the ordinance, the lower courts ran
afoul of the well-established principle that statutes will be interpreted to avoid constitutional
difficulties."), *cited in* <u>Rappa</u>*, supra*, at 1051 n. 10.

[15] The <u>Rappa</u> court went on to note that, "[b]ecause the onsite exception is not content-
based, however, does not make it irrelevant to time, place and manner analysis more generally.
To the contrary, it may be highly relevant to evaluating the fit between the regulation and the
government's asserted interest."  18 F.3d at 1067 n. 42.  Because Plaintiffs have not attempted to
challenge these provisions other than on the ground that they are impermissible content-based
restrictions, we need not conduct this analysis.

29

(BC § 125-15(E)(1).)[16]  As they do with § 178-15(D), Plaintiffs criticize this provision for

allegedly discriminating between different types of commercial speech – *to wit*, Plaintiffs

contend that events or products are not covered by the regulation.  For the reasons previously

discussed in relation to our analysis of § 178-15(D), we find Plaintiffs' construction of the

regulation unduly narrow.  We conclude that the provision is reasonably susceptible of being

interpreted to cover commercial advertising of events and/or products, so long as the advertising

pertains to on-site activity.

    In sum, the distinction created by § 125-15(E)(1) is between onsite and offsite

commercial advertising:  i.e., offsite commercial advertising is banned within the Historic

District while onsite commercial advertising is permitted, subject to other limitations.  Such a

distinction passes muster under <u>Rappa</u>.  Allowing an exception from the ban for onsite

commercial advertising satisfies the requirement that there be a "significant relationship"

between the content of exempted signage and the particular area where the sign is to be viewed.

<u>See</u> 18 F.3d at 1047.  The exception serves an obvious and important governmental interest in

allowing commercial enterprises to identify themselves and allowing members of the public to be

informed as to the location of commercial establishments.  That interest is strongest when a

business seeks to advertise on its own premises.  <u>See</u> <u>Metromedia, Inc. v. San Diego</u>, 453 U.S. at

---

[16] The language of this provision tracks that of § 178-15(D) insofar as it addresses signs "informing ...of a service, business, occupation or profession carried on, in or about the property."  We need not necessarily interpret the provision as applying equally to both commercial and noncommercial speech, however, because – unlike § 178-15(D) – § 125-15(E)(1)'s ban specifically targets "*commercial* sign[s] or permanent external advertising display[s]."  The City apparently interprets the term "commercial" as modifying both "signs" and "permanent external advertising displays" such that, under § 125-15(E)(1), only offsite *commercial* signage is banned within the Historic District.  Our analysis proceeds accordingly.

512 ("As we see it, the city could reasonably conclude that a commercial enterprise--as well as

the interested public--has a stronger interest in identifying its place of business and advertising

the products or services available there than it has in using or leasing its available space for the

purpose of advertising commercial enterprises located elsewhere.").  In addition, we note that the

exemption for onsite commercial advertising is neither unduly broad nor likely to significantly

impinge on the City's interests in aesthetics, historical preservation, or safety because onsite

commercial signage, though exempt from the ban, is still subject to restrictions within the

Historical District.[17]  See also City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 425

n.20 (1993) (noting that seven Justices in the Metromedia case agreed that San Diego could

completely ban offsite commercial billboards for reasons unrelated to the content of those

billboards); Rappa, 18 F.3d at 1055 (noting that the Metromedia concurrence indicated that

content-based distinctions within the category of commercial speech were permissible).

---

[17] It appears from the language of § 125-15(E) that onsite commercial signage within the Historic District is still subject to HARB review.  What is not entirely clear to the Court is whether such signage is also categorically subject to Chapter 178's permitting requirements or whether, within the confines of the Historic District, such signage benefits from the limited exemptions set forth in § 178-15(B) and (D).  Resolution of this issue is not crucial for present purposes, however, because we conclude that, in any event, the exemption for onsite commercial signage under § 125-15(E)(1) is narrowly drawn so as to impinge as little as possible on the City's goals of advancing aesthetics, historical preservation, and safety.  Under even the most liberal interpretation, it would appear that onsite commercial signs within the Historical District are categorically subject to HARB review and also subject to Chapter 178's permitting requirement if they exceed 8 square feet.  Under this interpretation, the exemption is not broader than necessary to advance the City's interest in identifying commercial establishments, and it does not substantially impinge on the underlying goals of promoting safety, aesthetics, and historical preservation.

In sum, we conclude that all of the foregoing provisions satisfy First Amendment principles under <u>Rappa</u> and none are invalid as impermissible content-based regulations.  In the words of the <u>Rappa</u> court:

> [the exemptions] do not raise many of the concerns that mandate limiting government's ability to discriminate based on content. The exceptions are quite small; they are not for particular subjects likely to generate much debate and so are not likely to focus debate on that subject matter at the expense of other subject matter; and they do not discriminate by viewpoint.  Thus, they do not appear to be motivated by a desire to suppress certain speech, and they do not eliminate certain issues from discussion in a way that makes it likely that government is aiming to shape the public agenda or is in fact significantly affecting the shape of that agenda.

18 F.3d at 1063.

### §§ 178-15(G) and 125-15(E)(3)

The exceptions under §§ 178-15(G) and 125-15(E)(3) merit more discussion.  These provisions exempt from the permitting scheme and HARB review "noncommercial signs" not exceeding 12 square feet in area which are "placed upon private property by the owner or occupant."  (<u>See</u> BC §§ 178-15(G) and 125-15(E)(3).)  The effect of these provisions is to favor non-commercial speech over commercial speech inasmuch as *any* non-commercial sign (whether or not it relates to on-site activities) can be displayed on private property by the property owner or occupant, as long as the sign does not exceed 12 square feet.  There is no similar exemption for commercial signs.

To the extent the exception allows for noncommercial signage beyond that which advertises activities conducted on premises, it would at first blush seem to fail <u>Rappa</u>'s requirement that a significant relationship exist between the content of exempted speech and the

32

specific location of its intended use.  See 18 F.3d at 1065.  However, upon closer examination,

we find this is not necessarily the case.  As the Supreme Court has noted, a message

communicated through a sign frequently has greater significance when posted on the speaker's

own property or residence than it may have when posted elsewhere:

> [d]isplaying a sign from one's own residence often carries a message quite
> distinct from placing the same sign someplace else, or conveying the same
> text or picture by other means. Precisely because of their location, such
> signs provide information about the identity of the "speaker." As an early
> and eminent student of rhetoric observed, the identity of the speaker is an
> important component of many attempts to persuade. ... A sign advocating
> "Peace in the Gulf" in the front lawn of a retired general or decorated war
> veteran may provoke a different reaction than the same sign in a
> 10-year-old child's bedroom window or the same message on a bumper
> sticker of a passing automobile.  An espousal of socialism may carry
> different implications when displayed on the grounds of a stately mansion
> than when pasted on a factory wall or an ambulatory sandwich board. ...
>
> Residential signs are an unusually cheap and convenient form of communication.
> Especially for persons of modest means or limited mobility, a yard or window
> sign may have no practical substitute. .... Even for the affluent, the added costs in
> money or time of taking out a newspaper advertisement, handing out leaflets on
> the street, or standing in front of one's house with a handheld sign may make the
> difference between participating and not participating in some public debate. ...
> Furthermore, a person who puts up a sign at her residence often intends to reach
> *neighbors*, an audience that could not be reached nearly as well by other means.
> ...
>                                        ***
> A special respect for individual liberty in the home has long been part of our
> culture and our law, ...; that principle has special resonance when the government
> seeks to constrain a person's ability to speak there.

City of Ladue v. Gilleo, 512 U.S. at 56-58 (emphasis in original) (internal footnotes and citations

omitted).  Thus, there is a significant relationship between the content of speech exempted by

§§ 178-15(G) and 125-15(E)(3) (i.e., noncommercial speech) and the location of its intended

viewing (i.e., the speaker's own property or residence) because noncommercial residential signs

33

arguably convey their information better at that location than they could anywhere else.  See Rappa, 18 F.3d at 1065.

The exemption is therefore permissible so long as the City does not make the distinction in an attempt to censor certain viewpoints or to control what issues are appropriate for public debate and so long as the exemption also survives the test proposed by the Metromedia concurrence.  See Rappa, 18 F.3d at 1065.  Here, the exemption for "noncommercial" signage is general enough that it neither suggests nor permits any attempt by the City to censor particular viewpoints or limit specific topics for debate.

In fact, the exemption on its face bespeaks an attempt by the City not to censor speech, but to protect and advance the right of private citizens to regulate the use of property which they own or reside upon.  To that end, the exemption satisfies the requirements laid out by the Metromedia concurrence and adopted by the Third Circuit in Rappa.  Subsections 178-15(G) and 125-15(E)(3) substantially advance the City's interest in promoting the right of private citizens to engage in protected First Amendment speech at their own homes and upon their property.  This is an interest which, if not compelling, is certainly as important as the City's underlying goals of minimizing unsafe and unattractive signs and promoting the historic character of Bradford. Because the exemption extends only to signs not exceeding 12 square feet, it is not broader than necessary to achieve its purpose and does not substantially impinge on the City's safety and aesthetics-related goals .[18]  In fact, the very nature of the exemption ensures that the City's

_____

[18] We note that Plaintiffs criticize the Ordinances partly on the basis that the exemptions allow for different size limitations:  e.g., § 178-15(D) exempts signs up to 8 square feet, while subsection (B) limits exempted signs to 3 square feet and subsection (G) exempts signs up to 12 square feet.  According to Plaintiffs, these size differentials are presumptively unconstitutional because they differ depending upon the content of the sign.  We are not persuaded that these size

broader goals will not be unduly infringed upon, since private residents have an inherent interest in minimizing safety hazards and eyesores upon their own property.  See City of Ladue, *supra*, at 58 ("It bears mentioning that individual residents themselves have strong incentives to keep their own property values up and to prevent "visual clutter" in their own yards and neighborhoods--incentives markedly different from those of persons who erect signs on others' land, in others' neighborhoods, or on public property. Residents' self-interest diminishes the danger of the "unlimited" proliferation of residential signs that concerns the City of Ladue.").

Plaintiffs nevertheless criticize §§ 178-15(G) and 125-15(E)(3) as running afoul of the Supreme Court's ruling in City of Cincinnati v. Discovery Network, Inc., *supra.*  In Discovery Network, the Supreme Court struck down a Cincinnati ordinance that banned (from public property) newsracks dispensing commercial papers but allowed newsracks dispensing noncommercial publications.  The City's stated interest in passing the regulation was to promote safety and the attractive appearance of its streets and sidewalks, yet its sole justification for discriminating against commercial papers was the asserted "low value" of commercial speech relative to noncommercial speech.  The Court found that the ordinance was unconstitutional under the analysis applied to commercial speech regulations in Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557 (1980), and Board of Trustees of State University of New York v. Fox, 492 U.S. 469 (1989), in that there was no reasonable fit between

---

discrepancies partake of impermissible content-based regulation.  Although we agree that the size limitations are relevant to our constitutional analysis, their relevance, in our view, runs to the issue of whether the exemption is sufficiently tailored in accordance with Rappa – that is, whether the exemptions are broad enough, but no broader than necessary, to advance their special governmental interests without unduly impinging on the City's underlying goals of advancing safety, aesthetics, and historical preservation.

the ban on commercial news racks (which comprised only a small percentage of the total number of newsracks within the City) and the stated interests in safety and aesthetics. See 507 U.S. at 428 ("In the absence of some basis for distinguishing between 'newspapers' and 'commercial handbills' that is relevant to an interest asserted by the city, we are unwilling to recognize Cincinnati's bare assertion that the 'low value' of commercial speech is a sufficient justification for its selective and categorical ban on newsracks dispensing 'commercial handbills.'"). The Court went on to hold that the ordinance could not pass muster as a content-neutral time, place and manner regulation because the ordinance was content-based. See id. at 429 ("[T]he very basis for the regulation is the difference in content between ordinary newspapers and commercial speech."). The Court noted that there was no neutral justification for the City's selective ban on commercial newsracks – indeed, the only justification was the City's "naked assertion" that commercial speech has "low value." Id. at 429-30.

Plaintiffs contend that, under Discovery Network, Bradford's interest in aesthetics is insufficient to justify §§ 178-15(G) and 125-15(E)(3)'s effect of burdening commercial speech more than noncommercial speech. We are not convinced that Discovery Network compels us to strike down those provisions. Unlike that case, wherein the City of Cincinnati could not articulate any content-neutral reason justifying its more favorable treatment of noncommercial speech, the City of Bradford in this case has proffered a facially legitimate and logical rationale:

> Each ordinance regulates primarily commercial signs because, subject to a specified size limitation, noncommercial signs are exempt from the permit requirements. This dichotomy makes perfect sense because the vast majority of signs within the City and the Historic District are commercial signs, which tend to be erected for longer periods of time and tend to be larger and more elaborate in design. Accordingly, the permitting systems effectively advance the City's interests in safety, aesthetics and historic

36

> preservation because these systems apply to the majority of signs and, in
> particular, to those signs that are most likely to implicate issues of safety,
> aesthetics and historic preservation. ...

(Def's Br. [Doc. No. 16] at pp. 13-14.)  Moreover, the Court in <u>Discovery Network</u> was careful

to limit its holding to the facts before it:

> [W]e do not reach the question whether, given certain facts and under
> certain circumstances, a community might be able to justify differential
> treatment of commercial and noncommercial newsracks.  We simply hold
> that on this record Cincinnati has failed to make such a showing.  Because
> the distinction Cincinnati has drawn has absolutely no bearing on the
> interests it has asserted, we have no difficulty concluding ... that the city
> has not established the "fit" between its goals and its chosen means that is
> required by our opinion in *Fox*.

507 U.S. at 428.  In sum, we do not read <u>Discovery Network</u> as requiring this Court to strike

down §§ 178-15(G) and 125-15(E)(3) simply because they favor noncommercial speech over

commercial speech.

To the extent those provisions constitute an implicit restriction on commercial speech, we

further find that they pass muster under the test annunciated in <u>Central Hudson</u> and <u>Fox</u>.  Under

this test, courts must first determine whether the speech at issue is entitled to First Amendment

protection, i.e., it "at least must concern lawful activity and not be misleading."  <u>Central Hudson</u>,

447 U.S. at 566.  Assuming the speech at issue is protected under the First Amendment, a

restriction on that speech will nevertheless be valid if:  (a) the asserted governmental interest is

substantial, (b) the regulation directly advances the asserted governmental interest, and (c) it is

not more extensive than is necessary to serve that interest.  <u>Id</u>.

37

There is no assertion here that the commercial speech restricted by the ordinances is unprotected speech. Nor can it be seriously disputed but that the City's proffered interests in advancing public safety, aesthetics, and historical preservation are substantial interests. See, e.g., Lavey v. City of Two Rivers, 171 F.3d 1110, 1114 (7th Cir. 1999) ("After the Supreme Court's decision in [Metromedia], we do not think that it can be said that the City's interests in traffic and aesthetics are not substantial municipal goals."). Accordingly, the first two inquiries under Central Hudson are somewhat perfunctory.

As to the third prong, we conclude that Bradford has succeeded in demonstrating that its permitting system, insofar as it burdens commercial signage more than noncommercial signage, directly advances its asserted interests in safety, aesthetics and historical preservation because commercial signs are more likely – both because of their character and their prevalence within the City – to impact public safety, aesthetics, and historic preservation.

The last inquiry requires us to determine whether the regulation of commercial speech is not more extensive than necessary to serve the City's interests. Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 556 (2001) (citation omitted). "[T]he least restrictive means" is not the standard; rather it is sufficient if there is a reasonable "'fit between the legislature's ends and the means chosen to accomplish those ends, ... a means narrowly tailored to achieve the desired objective.'" Id. (citation omitted). We find that this prong is satisfied in the case at bar. Permanent commercial signage, although the primary focus of Bradford's permitting scheme, is not burdened more extensively than necessary in order for the City to achieve its goals. Such signs are banned only within the Historic District and only to the extent they advertise off-site activities. In other respects, they are allowed, subject to the permitting process, and, as we have

seen, there are substantial exemptions from the permitting process for on-site commercial signs that do not exceed specified size limitations.

In sum, we reject Plaintiffs' argument that the Bradford ordinances constitute impermissible content-based regulations. We find that the challenged exemptions contained in Chapters 178 and 125 satisfy the requirements of <u>Rappa</u> and, to the extent it is relevant, <u>Central Hudson</u>. Plaintiffs' second line of argument fails to persuade this Court that the Ordinances are unconstitutional.

(iii)

Plaintiffs next argue that the Bradford ordinances are unconstitutional because they do not contain precise and objective standards to guide decisionmakers. The Supreme Court has recognized that "[a] government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" <u>Forsyth County, Ga. v. Nationalist Movement</u>, 505 U.S. at 130-31 (quoting <u>Heffron v. International Society for Krishna Consciousness, Inc.</u>, 452 U.S. 640, 649 (1981)). "To curtail that risk, 'a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must contain 'narrow, objective, and definite standards to guide the licensing authority.'" <u>Id</u>. at 131 (citations omitted). Otherwise, "[i]f the permit scheme 'involves appraisal of facts, the exercise of judgment, and the formation of an opinion' ... by the licensing authority, 'the danger of censorship and of abridgment of our precious First Amendment freedoms is too great' to be permitted." <u>Id</u>. (citations omitted).

Plaintiffs attack both Chapter 178 and Chapter 125 on the ground that they accord the permitting authorities too much discretion. As to Chapter 178, Plaintiffs complain that it contains no standards to guide the Building Inspector's decision to approve a permit. We disagree. Subsection 178-6 states that the Building Inspector

> shall examine such plans and specifications and other data and the premises upon which it is proposed to erect the sign or other advertising structure, and if it shall appear that the proposed structure is in compliance with all the requirements of this chapter and all other laws and ordinances of the City of Bradford, he shall then issue the erection permit.

(B.C. § 178-6.) We think that, contrary to Plaintiffs' assertion, § 178-6 gives the Building Inspector virtually *no* discretion to decide whether an erection permit should be issued; provided that an applicant's plans and specifications comply with local laws, all of which are codified and available to the public, § 178-6 mandates that the permit "shall" be issued. Should the Building Inspector breach his obligations under § 178-6, the Bradford Code affords the applicant judicial recourse in accordance with local agency laws.

Plaintiffs next object that, if the approval process is merely a ministerial function, then there is no justification for the permitting system because content-neutral time, place and manner regulations can achieve the City's interests in advancing public safety and aesthetics. However, the permitting system itself is designed to achieve its own goal of promoting efficiency and cost-effectiveness for both City officials and prospective sign owners, and this goal would be directly undermined if the permitting system was abolished. As the City notes:

> Plaintiffs' proposed system for sign regulation is .... impractical. Once a sign is erected, it typically can be inspected for compliance with most safety standards only if it is removed or disassembled. Compliance officers cannot see through walls, supports and brackets, for example, to ascertain whether the design of a sign complies with support, mounting and electrical standards. The most

40

practical and meaningful opportunity to evaluate whether a design complies with code requirements is before the sign is erected.

(Def.'s Br. in Opp. to Pl.s' Mot. for Summ. Judg. and in Support of Cross-Mot. for Summ. Judg. [Doc. 16] at 15.)

Plaintiffs further contend that there are no standards to govern the revocation of a permit under § 178-9, which describes permits as "mere licenses revocable at any time by the Building Officer." (BC § 178-9.) This provision might be problematic were it not for § 178-33, which specifically addresses revocation of permits. Section 178-33 states that "[t]he Building Inspector is hereby authorized and empowered to revoke any permit issued by him upon failure of the holder thereof to comply with any provision of this chapter." Thus, when § 178-9 is read in conjunction with the more specific and limiting language of § 178-33, it becomes apparent that the Building Inspector does not possess unbridled discretion in determining when or why a permit should be revoked. Rather, the statute reasonably limits the Building Inspector's discretion to situations where the permit holder is noncompliant with a provision of Chapter 178. When construed in such a fashion, § 178-9 is not unconstitutional.

Plaintiffs also attack Chapter 125-15 as unconstitutionally vague. According to Plaintiffs, § 125-15(E)(1) gives the HARB complete discretion to approve and disapprove any sign on a completely subjective basis and without any recourse available to the unsuccessful applicant. Here again, we disagree.

In its present form,[19] § 125-15(E)(1) states:

_____

[19] Section 125-15(E)(2) was amended effective July 13, 2004 in connection with these proceedings in an attempt to resolve Plaintiffs' concerns about the alleged vagueness of the statute.

41

> Except as provided in subsections (3) and (4) of this Ordinance [applying, respectively, to noncommercial signs not exceeding 12 square feet placed on private property and temporary signs not exceeding 12 square feet], no sign or display of any kind or for any purpose shall be erected or altered, notwithstanding zoning sign approval, until an application for permit to make such erection or alteration has been reviewed by HARB for conformity in exterior material composition, exterior structural design, external appearance and size of similar advertising or information media used in the architectural period of the district in accordance with the Resource Inventory of building architectural styles of the Bradford Historic District (which is available in the Office of the City Clerk), and a permit granted thereon.

(B.C. § 125-15(E)(2).)  Thus, the HARB's discretion under this section is limited to reviewing

proposed signs for consistency with exterior material composition, exterior structural design and

external appearance of the architectural period.  As the provision suggests, the HARB's decision-

making process is informed by reference to the City's Resource Inventory – a detailed inventory

of each building in the Historic District which sets forth the building's identity, location,

architectural style, use and relevant history.  Additional guidance is provided by §§ 125-15(E)(5)-

(7),[20] which incorporate the use of a "Historic Color Chart" and which establish objective

material, border and print standards to further inform the decision-making process.  As the City

observes, the fact that nine individuals comprise the HARB –  including by law at least one real

estate broker, one architect, the City Inspector, and other individuals knowledgeable about

preservation of the Historic District – further ensures that applicants will not be subjected to the

---

[20] Subsection (E)(7) requires that "[a]ll signs or other displays ... be painted in colors chosen from the Historic Color Chart" available in the City Clerk's Office.  (BC § 125-15(E)(7).) Subsection (E)(5) requires that, for any sign displaying an area of four square feet or more, the letters be in "uniform type-set style of print or professionally printed."  (Id. § 125-15(E)(5).) Subsection (E)(6) requires uniformity in the background color of sign displays and prohibits sign displays on unfinished or unpainted wood surfaces.  (Id. at § 125-15(E)(6).)

arbitrary whimsy of a single official.  Finally, unsuccessful applicants have recourse through the

judicial review process as an added means of protection against arbitrary governmental action.

It is undeniable that the process by which HARB members decide whether to issue a

certificate of appropriateness partakes of some subjective judgment.  However, this is of

necessity and, given that advancement of aesthetics and historical preservation are legitimate

governmental goals, it is difficult to imagine a scenario whereby a government official's

decision-making in this regard would not partake of some element of subjectivity.  See Maher v.

City of New Orleans, 516 F.2d 1051, 1062 (5th Cir. 1975) ("To satisfy due process, guidelines to

aid a commission charged with implementing a public zoning purpose need not be so rigidly

drawn as to prejudge the outcome in each case, precluding reasonable administrative

discretion.").  In fact, Defendant cites cases where standards no more precise than those set forth

in Chapters 178 and 125 have been upheld.  See, e.g., Mayes v. City of Dallas, 747 F.2d 323, 325

(5th Cir. 1984) (ordinance provided "adequate legislative direction" where it required e.g., that

building color "harmonize with the structure's facade as well as complement the overall

character of the District," that "building facade material ... be architecturally and historically

appropriate," and that "finish texture " of walkways "be compatible with ... walkways of

surrounding structures"); Burke v. City of Charleston, 893 F. Supp. 589, 611-12 (D.S.C. 1995)

(ordinance was valid where it required architectural review board to maintain files, drawings, and

other documents to serve as general guides in decision-making and where it established process

of informal application review whereby preliminary assessment of compliance and suggestions

for modification could be made), vacated on jurisdictional grounds, 139 F.3d 401 (4th Cir. 1998);

Park Home v. City of Williamsport, 680 A.2d 835 (Pa. 1996) (statute was not unconstitutionally

vague where it provided that "[a]ny governing body in determining whether or not to certify to the appropriateness of the ... demolition or razing of a building ... shall consider the effect which the proposed change will have upon the general historic and architectural nature of the district" and "shall consider the general design, arrangement, texture, material and color of the building or structure and the relation of such factors to similar features of buildings and structures in the district."). Cf. Lamar Advertising Co. v. City of Douglasville, Georgia, 254 F. Supp. 2d 1321, 1330 (N.D. Ga. 2003) (ordinance lacked sufficient criteria to guide commission's decisions whether to approve signs posted within the city's historic district; although the ordinance required the establishment of guidelines for color, size and design standards, no such guidelines had been established by the commission, and its decision-making would be guided only by considerations such as the proposed sign's "effect on the aesthetic, historic, or architectural significance and the value of the historic property," as well as "any design review guidelines which may be developed by the commission.").

We find that the standards set forth in Chapters 178 and 125-15 provide sufficient criteria to ensure against unbridled discretion on the part of government decision-makers. Accordingly, neither Chapter is unconstitutional under a vagueness theory.

(iv)

Finally, Plaintiffs object that the Bradford ordinances fail to require a sufficiently prompt decision on applications. As Plaintiffs correctly observe, permitting schemes must contain reasonable time limits on decision-making; otherwise, there is a risk that permissible speech may be indefinitely suppressed. See FW/PBS, Inc., 493 U.S. at 227 ("Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the

44

provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech.").

Here, we have little difficulty concluding that Bradford's two ordinances pass constitutional muster in this regard. Under § 178-6, the Building Inspector must take action within 30 days upon receipt of an application. The City asserts, and we agree, that this period is reasonable considering the number of safety and aesthetic criteria the Building Inspector must review in order to ascertain compliance. Similarly, the HARB, which meets on a monthly basis, must render a written decision and recommendation on any pending application within 30 days after its meeting; otherwise, an application is automatically deemed to be approved. Once the HARB's recommendation is rendered, City Council is required to act upon the recommendation at its next meeting.; otherwise the application is automatically considered approved by Council. Such a time frame is reasonable under the circumstances and does not offend First Amendment principles.

### III. CONCLUSION

In sum, for the reasons set forth above, we conclude that Plaintiffs' facial attacks on the Bradford Ordinances are unavailing and the challenged provisions do not violate the First Amendment. Accordingly, we will grant the City's motion for summary judgment and deny the Plaintiffs' motion for summary judgment. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

THOMAS RIEL, DIANE THOMPSON    )
and FRED PYSHER,    )
    )    Civil Action No. 04-90 Erie
                    Plaintiffs,    )
    )
    v.    )
    )
CITY OF BRADFORD,    )
    )
                    Defendant.    )

**ORDER OF JUDGMENT**

AND NOW, this 31st day of August, 2005, for the reasons set forth in the accompanying

Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiffs' motion [Doc. No. 13] for summary judgment

is DENIED and the Defendant's cross-motion [Doc. No. 15] for summary judgment is

GRANTED.

JUDGMENT is hereby entered in favor of the DEFENDANT, the City of Bradford, and

against the Plaintiffs.


                                        s/  Sean J. McLaughlin
                                        United States District Judge


cm:    All counsel of record.

46