IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


THOMAS RIEL, et al.,            )
      Plaintiffs      )
              )
   v.            )  CIVIL ACTION NO. 04-90 ERIE
              )
CITY OF BRADFORD,            )
     Defendant        )


HEARING ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Friday, April 23, 2004.


APPEARANCES:
    PHILIP B. FRIEDMAN, Esquire, appearing on behalf
    of the Plaintiffs.

    WITOLD J. WALCZAK, Esquire, appearing on behalf
    of the Plaintiffs.

RICHARD A. LANZILLO, Esquire, appearing on behalf of the Defendant.

TRACEY D. JONES, Esquire, appearing on behalf of the Defendant.


Ronald J. Bench, RMR - Official Court Reporter


2


1            I N D E X

2

3    WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS

4

5  FOR THE DEFENSE:

6  John Peterson          24    90    125     131

7  Merle Silvis          136   143    --      --

8

9

10

11  FOR THE PLAINTIFFS:

12  Frederick Pysher       147   156    --      --

13  Thomas Riel           162   173    --      --

14

15

16

17

18

19            - - -

20

21

22

23

24

25

                                3

1            P R O C E E D I N G S

2

3            (Whereupon, the proceedings began at 10:00 a.m., on

4    Friday, April 23, 2004, in Courtroom C.)

5

6            THE COURT:  This is the time we've set for hearing

7    on the plaintiffs' motion for a preliminary injunction relative

8    to Chapter 178 and Chapter 125 of the Bradford Ordinance

9   dealing with signage in various particulars.  First of all, I

10  received a reply brief filed by the plaintiffs, that I got in

11  my hands this morning, I've had an opportunity to read it.

12  Have the defendants received it as well?

13       MR. LANZILLO:  We received it, it came by fax five

14  minutes before we left for the courthouse, so I have not yet

15  had an opportunity to read it.

16       THE COURT:  All right.  It's not that long, you'll

17  have an opportunity during a break to look at it, we'll be

18  talking about it later on.  I thought the way that we would

19  proceed this morning and I take it probably into the afternoon,

20  given the number of potential witnesses that I perceive might

21  be called, is this.  I'd like to hear a brief opening statement

22  from the plaintiffs.  And then I'll hear a brief opening

23  statement from the defendants.  I have read all the papers, I

24  have read what I consider to be the relevant cases.  I have

25  many questions for both sides, which I'll just take up as it

4

1   becomes appropriate during the course of the hearing.

2        After the opening statements, then it seems to me

3    the most intelligent way to proceed, Mr. Lanzillo, is for the

4    City to put on evidence concerning the background and purpose

5    of these statutes.  The reason or reasons for the various

6    exemptions or exceptions that are at issue at least in part

7    here.

8            And then at the conclusion of your evidence, the

9    plaintiffs will have an opportunity to put on any witness or

10   witnesses, presumably one or more of the plaintiffs, I gather.

11   And I will say, particularly insofar as it relates to 178 or

12   Chapter 178, I am most interested in your theory of standing

13   relative to that ordinance.  All right, are we ready to go,

14   okay, sir.

15           MR. WALCZAK:  Thank you, your Honor.  I don't want

16   to take a lot of time, I think we've laid out our arguments in

17   the application for preliminary injunction.  In a nutshell,

18   there are two ordinances that are being challenged here.

19   Chapter 178 and Section 125.15 --

20           THE COURT:  Could I impose upon you, could I ask you

21   to come up to the podium there.  This is not a real good

22   courtroom for acoustics unless you're at a mike.  All right,

23   Mr. Walczak.

24           MR. WALCZAK:  Thank you, your Honor.  Should I start

25  over?

5

1        THE COURT:  I've heard the first part, go ahead.

2        MR. WALCZAK:  In a nutshell, plaintiffs' argument

3  comes down to the following.  The City of Bradford has two

4  ordinances that treat signs differently based upon the message

5  in the sign, based upon the content.  They also have instituted

6  a permitting system with some exemptions.  Again, the

7  exemptions are based on content.  And both the content-based

8  distinctions, the licensing system, and the fact that they are

9  regulating expression on private property, any one of those

10  three would trigger strict scrutiny.  Three of them together,

11  clearly strict scrutiny applies here.  The City of Bradford

12  would need to show that they have a compelling interest that is

13  narrowly tailored to advance whatever its interests are.

14  Presumably, the interests here are aesthetics.

15        THE COURT:  And/or safety.

16        MR. WALCZAK:  The safety is, again, and the problem

17  with content-based distinctions is that they undermine either

18  the aesthetic or the safety justification.  Because why is

19  Joe's Pizza any more aesthetically pleasing or less dangerous

20  than Vote For Joe, to the extent you're making those kinds of

21  distinctions.  But I'm sure we'll can get into all the details.

22  I don't know if your Honor has questions at this point?

23      THE COURT:  I just have one quick question as we get

24  out of the blocks here.  With respect to 178, which exempts

25  largely -- well, by way of example, real estate signs on a


6


1  property which is being sold, professional nameplates,

2  occupational signs where there's construction work going on,

3  indicating who's doing it, (A) through (H) are largely either

4  commercial or legal traffic signs, that type of thing.  (I)

5  which apparently was an amendment to the previous statute,

6  includes noncommercial signs not exceeding 12-feet square

7  placed upon private property by the owner or occupant of said

8  property.  My question as to each of the three plaintiffs here

9  today, how have, and how do you anticipate the evidence that we

10  take will show, how have any of them been harmed by the

11  application of 178?

12      MR. WALCZAK:  Your Honor, as we understand the

13    regulatory scheme, 125 applies just in Bradford's Historic

14    District.

15         THE COURT:  That was my next question, what is the

16    scope of its application?

17         MR. WALCZAK:  As we understand the process, to get

18    approval in the Historic District, first you have to go through

19    HARB and the 125 process.  If you are approved there, then you

20    are subject to 178.

21         THE COURT:  So 178, your understanding is, that the

22    scope of 178's reach does not stop at the historic borders of

23    Bradford.  So people living within the Historic District, then,

24    you think the evidence will show, are subject to two chapters,

25    whereas, people living outside the Historic District are

7

1    subject to one, is that right?

2         MR. WALCZAK:  That is our understanding.  In

3    response to one of the questions your Honor indicated you'd be

4    asking is what is our standing?

5         THE COURT:  Yes.

6         MR. WALCZAK:  I would point to, I don't know if it's

file:///A|/RIELINJ.TXT

7   cited in our papers, the most recent Third Circuit case I'm

8   aware of is Peachlum_v._City_of_York, 2003 case.  That, again,
    _____ __ ____ __ ____

9   involved a challenge to a sign ordinance.  There, primarily,

10  the defendants had raised ripeness and exhaustion arguments.

11  But there is a long discussion about the importance and the

12  ability of plaintiffs to be able to bring facial challenges to

13  laws that infringe on free expression.  And it very clearly

14  says that even if the law has not been applied to people, but

15  could be applied to people, that they have standing to

16  challenge that.  And then Peachlum follows the City_of_Lakewood
    _____        ____ __ _____

17  and the Cincinnati_v._Discovery case.  There's a long line of
    _____ __ _____

18  Supreme Court cases to support that.

19         THE COURT:  All right, thank you, Mr. Walczak.

20         MR. WALCZAK:  Thank you.

21         THE COURT:  Mr. Lanzillo.

22         MR. LANZILLO:  Thank you, your Honor.  Your Honor,

23  if you would permit me, I would like to speak for a few

24  minutes, I believe that my comments will actually expedite our

25  case.  I don't anticipate calling more than one or two

1   witnesses on behalf of the City of Bradford.  My ability to do

2   that is in part tied to laying out where we'd like to go with

3   our proof.

4       THE COURT:  All right.

5       MR. LANZILLO:  Your Honor, let me begin with what I

6   refer to as the general sign ordinance, Chapter 178.  And let

7   me start first with the permit requirement under that

8   ordinance.  And this is the ordinance of general application

9   throughout the City of Bradford.  When we present evidence to

10  show the governmental interests and public interests that that

11  ordinance is designed to further, it's helpful to see the types

12  of signs that we're regulating and why we're doing so.

13      To that end, we'll be offering a few photographs

14  into evidence, including what will be marked as Defendant's

15  Exhibit R.  Your Honor, this is a photograph of an

16  establishment, a carwash in the City of Bradford, and it

17  depicts one of a number of examples of signs that are subject

18  to regulation under Section 178.  This happens to be what's

19  defined as a wall sign within the ordinance.  And under the

20  ordinance, as your Honor I'm sure already is aware, there are a

21  multitude of safety-related regulations concerning the

22  stability of mountings, the materials used, incombustibility of

23  materials, the height of placement.  The texture of the surface

24  to insure that nails aren't protruding and the like.  Here you

25  have an example of why it might be a good idea to regulate this

9

1  sign.  I just happened to notice that here we have a sign

2  that's erected immediately above the door on a commercial

3  establishment open to the public.  The scenario you imagine,

4  after a few hundred or thousand bangs of the door, if not

5  properly designed, the sign comes down and strikes a patron on

6  the head, by way of example.

7       Another sign that is regulated under 178, your

8  Honor, again just randomly selected in the City, would be this

9  mounted sign, street level sign.  Here regulations would govern

10  the strength of these mountings, which I am indicating at the

11  moment, how they are mounted into the walkway, the wind load

12  that this sign must sustain in order to be stable.  You'll

13  note, of course, that this is adjacent to a public walkway.

14  The reasons for those types of requirements I think are

15  self-evident.

16         Another example, your Honor, here, this is a Country

17  Fair that's just over the line of the Historic District.  Here

18  we have another standing sign.  Regulations, again, would

19  govern the stability of this structure.  Would insure that the

20  electrical wiring for this electrical illuminated sign is

21  properly done, so that people aren't shocked or electrocuted,

22  so you don't have a fire hazard.  It would insure that these

23  panels are mounted properly so they can't blow out against the

24  wind and strike a pedestrian.  There are regulations within

25  this ordinance which regulate the placement of this sign

10

1  relative to visibility of traffic, so it doesn't become an

2  obstruction to cars and others lawfully using the highway.

3  That's Defendant's Exhibit T.

4         And Defendant's Exhibit U, which we'll admit, I want

5  to illustrate the scope of this ordinance.  This canopy is

6  defined as a sign within the ordinance.  It must meet

7  requirements for snow loads, wind loads, construction of the

8  supports and so on.

9          We have a number of other photographs, your Honor,

10   but that illustrates my point and takes me to the reason why

11   you want to have a permitting system in this situation.  The

12   only way to this regulatory structure works, your Honor, and

13   the evidence will show, is if you have a permitting structure.

14   It can't protect the public without it.  The City must have

15   notice that the sign is proposed to go up before it goes up, so

16   it can review the plans, the specifications and insure that

17   what is being erected meets safety requirements.  Meets the

18   specific criteria set forth in the ordinance.  A

19   post-construction inspection doesn't work.  Inspectors do not

20   have X-ray vision.  Also, it's mere happenstance if they happen

21   to see a sign that's gone up and recognize it as a new sign.

22   That's why we have a requirement that before you put up a

23   non-exempt sign, you go through the permitting process.

24          And further, your Honor, this permitting system is

25   only fair to the applicants.  As you can see from the various


11


1   signs we've illustrated through photographs, signs can range in

2   cost from minimal cost to hundreds of dollars, thousands of

3  dollars, even tens of thousands of dollars.  A permitting

4  requirement gives notice to the applicant before they make that

5  investment as to whether their sign is compliant.  Otherwise,

6  without the permitting requirement, you have a situation where

7  the sign goes up, the inspector says, sorry, you don't comply

8  with the safety requirements, tear it down.  That makes sense,

9  of course, for no one.  The permit system insures compliance

10  before the sign is erected, when it really matters, your Honor.

11       Now, that brings me to the plaintiffs' argument, and

12  this was raised during a telephone conference, I've heard it a

13  couple times, I believe it was alluded to here today.  It's the

14  proposition that a municipality simply cannot have the

15  permitting system regulating signs on private property.  To the

16  extent that is in fact the plaintiffs' position, that's just

17  wrong.  The case law is clear and, your Honor, we're prepared

18  to supplement our papers on this.  But just to name a few cases

19  that jump out at us where you have comparable permitting

20  systems governing signs on private property, I would reference

21  the court to Lombardo_v._Warner, 353 F.3d, 774, that's a 9th
   _____ __ _____

22  Circuit 2003 case.  Long_Island_Board_of_Realtors_v. Massapipwa
   ____ _____ _____ __ _____ __ _____

23    , a 2nd Circuit 2002 case, 277 F.3d 622.  Marathon Outdoor_v._
                      _____ _____ __

24    Esconti, 107 F.Supp.2d, 355, that's Southern District of New
      _____

25    York.


                                  12


1              THE COURT:  365?

2              MR. LANZILLO:  I'm sorry, 355, your Honor.

3              THE COURT:  All right.

4              MR. LANZILLO:  And let me just throw out, I have

5    more, but just way of example, 11th Circuit, Messer_v._City_of
                          _____ __ ____ __

6    Douglasville, 975 F.2d 1505 (11th Cir. 1992).  Your Honor, and
     _____

7    even reading the cases, you see repeated references in passing

8    to these types of permitting structures.  What the plaintiffs

9    are advocating is a rule of law which, if adopted, would

10    invalidate sign regulation across the country.  I'm sure the

11    court is well aware of regulations, for example, governing

12    billboards across the country.  Those aren't limited to

13    billboards on public property.  A permitting system for

14    billboards on public property, obviously, they have to serve

15   their purposes also to apply to private property.  The case law

16   illustrates that.

17          The cases simply don't make the critical

18   distinction, public versus private.  The test is, your Honor,

19   does the public official have unbridled discretion in issuing

20   the permit.  And is there an opportunity for reasonable review

21   of the official's decision, that's the test.  And we pass it

22   with respect to each of these ordinances.  Chapter 178 has

23   detailed technical requirements, there is no discretion here --

24          THE COURT:  Is there aesthetic component to 178?

25          MR. LANZILLO:  There is, your Honor, although, I


13


1   will say the safety component substantially prevails over

2   others.  Safety is a very strong aspect of this.  As we go

3   through parts of the ordinance, I think that will be obvious.

4   But aesthetics is also part of the equation.  We have those

5   detailed requirements, your Honor.  We have judicial review

6   guaranteed under the local agency law.

7          We will show through the evidence a history, an

8   unbroken history of prompt, fair and timely decisions.  And no

9   claim of censorship under this ordinance.  Your Honor, we'll

10  also show that recently City Council commenced the process to

11  amend this part of the ordinance.  This requires a second

12  reading, there was preliminary approval this week --

13          THE COURT:  Amended in what respect?

14          MR. LANZILLO:  Your Honor, various sections were

15  amended to further buttress this ordinance, which we believe is

16  entirely valid as drafted.  But this is an important ordinance

17  to them.  And they want to make it as strong as possible and be

18  as fair to the public as possible.  To those ends, they have

19  reduced the time limits for decision-makers, as far as how long

20  it takes to grant a permit.  And expressly provided that if a

21  permit isn't granted within the prescribed timeframes, the

22  application is deemed approved.  They've granted further rights

23  and avenues of review.  And, although, these appellate rights

24  have always been there, City Council has passed preliminarily

25  an amendment which sets out in very detailed fashion how to


14


1   appeal, where to appeal and the timeframes pursuant to which

2   the deciding bodies must act.

3          THE COURT:  But in point of fact, if I understand

4    what you're saying, that proposed amended ordinance is not yet

5    the law of Bradford, is that right?

6          MR. LANZILLO:  That is correct, your Honor.  As a

7    matter of --

8          THE COURT:  Because if it was, then what would we be

9    doing here, at least in part, would be mooted by that, is that

10   right?

11          MR. LANZILLO:  That's correct, your Honor.

12   Although, it does go to the harm that's allegedly threatened in

13   this case.  The only reason those, I cannot represent those

14   ordinances to be in effect is because they require further

15   notice and a second reading.  Those are the ordinances that

16   will be applied to these plaintiffs and others.  However, and

17   because of that, because we're only looking at a short period

18   of time, I think that is relevant to the case.

19          Your Honor, let me talk a little bit about the

20   Historic District ordinance, if I may.  The Historic District

21   in Bradford is only about 5 to 10 percent of the City.  Now,

22   the plaintiffs in their submissions stated that the Historic

23   District exists by local designation only.  That is absolutely

24   incorrect.  Your Honor, the district has been certified on the

25   National Register of Historic Places by the U.S. Department of

15

1   the Interior.  By the National Parks Service.  It's been

2   certified by the Pennsylvania Historical and Museum Commission.

3           In fact, it couldn't exist without these

4   authorizations because there's a statute, the Pennsylvania

5   Historic District Act, which requires it.  That Act has been

6   invoked by 71 municipalities across Pennsylvania to create 93

7   Historic Districts.  And that Act require that they have an

8   ordinance like the one at issue here.  In fact, the ordinance

9   you will be scrutinizing, your Honor, is from a model

10   ordinance.  The words chosen by the City of Bradford are

11   verbatim to what comes out of the model ordinance.  And from

12   Bedford to West Homestead, this ordinance exists in

13   municipalities across the Commonwealth.

14           THE COURT:  Verbatim?

15           MR. LANZILLO:  Verbatim or virtually verbatim.  Let

16   me put it to you this way, your Honor -- the ordinances are the

17   same in every material respect.  A word may change here or

18   there, but you'll see that the operative language that you'll

19  be scrutinizing is the same.

20          THE COURT:  So your point being the decision on the

21  constitutional validity or invalidity of 125 has far broader

22  implications than just the City of Bradford?

23          MR. LANZILLO:  Your Honor, in part, our point is to

24  dispel any implication that there was discriminatory or

25  censorship motivation here based on the creation of this

16

1  ordinance, but in point of fact what you've just stated is

2  absolutely correct.  If this ordinance, this section is invalid

3  here, it is presumably invalid in municipalities across the

4  Commonwealth.

5          Your Honor, the HARB board, which we heard so much

6  about, the Historical Architectural Review Board, that exists

7  by virtue of the state law Historic District Act, that's

8  required to exist in such municipality and under the model

9  ordinance.  Under that ordinance, our ordinance and state law,

10  this board must have nine members, including a registered

11  architect, a licensed real estate broker, the City Building

12  Inspector and six other individuals knowledgeable concerning

13  historic preservation.  In Bradford, for example, the City

14  historian is on the board.  A woman who has actually written a

15  book about the Historic District.

16          Now, the standards for the HARB are set out in a

17  multitude of locations, your Honor.  Of course, the HARB

18  reviews, whether it's a sign or modification to a facade or a

19  demolition, they review for conformity to the historic context

20  of a building and the area, according to the period of history

21  from which the building is derived.  The guidelines are set

22  forth in the ordinance itself.  There are general principles,

23  there's specific design guidelines throughout the ordinance.

24  There is also a HARB manual that's provided to the applicant at

25  the time of application, including a checklist of requirements.


17


1  And one piece of evidence and guide for HARB review, which is

2  really fascinating, your Honor, is the inventory of every

3  property in the Historic District.  Creating this Historic

4  District and putting this regulatory structure in place was not

5  some fly by night operation, it requires thousands of hours and

6  tens of thousands of dollars.  And that investment is to assist

7  the board insuring it has suitable guidelines to follow,

8  generated an inventory, which we'll mark as Defendant's Exhibit

9  Z -- this will be hard to see because it's a spreadsheet, your

10  Honor, but this is -- I haven't counted the pages, I'm

11  estimating 20 or more pages of a spreadsheet detailing every

12  property in the Historic District.  Providing the name of the

13  building, the function of the building -- historically

14  constituted a current function.  The architectural style, from

15  neoclassical revival, to colonial revival, vernacular, art

16  deco, Italiante, all the way through.  So as to provide a guide

17  to HARB, the applicant has to have what styles are appropriate

18  for this building.  There's additional information regarding

19  the roof, the height, and then a narrative that talks about

20  significant attributes to structures and the characters of the

21  building.

22          There is also, your Honor, a historic paint color

23  guide which must be followed and that is available to everyone.

24  In addition to that, there are the files of other permit

25  applications that were granted to guide the HARB board and

18

1    applicants.  And what you end up with, your Honor, and in part

2    what's being sought through this ordinance are signs and

3    facades, general appearance.

4         Like some of these, Exhibit OO, Defendant's Exhibit

5    OO, which is an example of a sign that has gone through the

6    HARB process to conform to the surrounding style and structure.

7    Exhibit PP, another example.  Exhibit QQ, in this case I

8    believe it's a gift shop at a movie store.  Here we have

9    pictures of a couple of other signs, both of which were subject

10   to regulation.  This one is suspended from the wall.  And, of

11   course, the front facade sign, just to show you a few examples

12   for the time being, your Honor.

13        The guidelines are sufficiently definite.  There is

14   no unbridled discretion here.  And, moreover, your Honor, HARB

15   is subject to very specific requirements and guidelines for

16   decision-making.  Under the current version of the ordinance,

17   they must decide within 45 days of the application.  You will

18   see, your Honor, through the evidence that the HARB almost

19   invariably decides within a couple of days after the

20   application.  The HARB has been a very useful tool for

21   residents for guidance and suggestions concerning these types

22  of developments.  They've always been timely.  But to make it

23  even better, the amendments that are pending will shorten the

24  time for decision to 30 days, as a deadline and absolute

25  drop-dead date and upon the elapse of that deadline, the


19


1  application will be deemed approved.

2          THE COURT:  Let me interrupt you.  Let me ask you a

3  question about 178.  I'm talking about the present ordinance,

4  I'm not talking about this ordinance that they're working on.

5          MR. LANZILLO:  Yes, your Honor.

6          THE COURT:  Under the present ordinance under 178

7  there is no timeframe, is there, within which a decision must

8  be made on a permit?

9          MR. LANZILLO:  Your Honor, I do not believe that

10  ordinance prescribes a specific timeframe.  I do believe

11  reading the case law, though, that that is not dispositive.

12  And particularly in a case like this where we would show

13  through the evidence that every decision on every application

14  has not only been timely, but expeditious, within days in most

15  cases.  We'll be able to demonstrate that through the

16  plaintiffs.

17          THE COURT:  Let me finally interrupt you one more

18  time and ask you this.  This is with respect to 125.

19          MR. LANZILLO:  Yes, your Honor.

20          THE COURT:  Do you have the text of that in front of

21  you?

22          MR. LANZILLO:  Yes, your Honor.

23          THE COURT:  And I'm speaking now about the

24  plaintiffs' facial challenge to 125, not as applied.  The

25  plaintiff says that a fair reading of the face of 125 exempts


                                20


1  from the regulation various types of commercial signage, but

2  does not provide the same exemption to noncommercial signage.

3  What is the City's response to that?

4          MR. LANZILLO:  Your Honor, our response is that

5  Section 125-15(E)(1), which is the operative subsection, treats

6  commercial and noncommercial speech exactly the same under the

7  current ordinance.  Those signs, first of all, we're not

8  talking about a ban, we're talking about the permitting

9  requirements, and in that particular case I believe the

10  plaintiffs incorrectly came to that conclusion based upon the

11  first sentence, which is the word for word from the model

12  ordinance.  It states "no sign or permanent external

13  advertising display of any kind shall be erected, altered,

14  etc., in the Historic District except for advertising,

15  informing the public of a service, business, occupation or

16  profession carried on, in or about the property on which such

17  sign or permanent external advertising is displayed."  The

18  operative part of that sentence, the point of that sentence,

19  your Honor, is the on-site versus off-site distinction, which,

20  as the court well knows, is entirely permissible under Rappa

_____

21  and the controlling Supreme Court case law.  The potential

22  problem with that sentence, the potential for a confusion

23  arises, obviously, from the words service, business,

24  occupation, or profession carried on, in or about the property.

25          THE COURT:  They all suggest a commercial activity,

21

1  don't they?

2          MR. LANZILLO:  Your Honor, if you take the literal

3  definition of the term service, they don't.  In fact, I have it

4    here, the Oxford English language dictionary specifies service

5    as including the espousing of a position as being a public

6    service.  I can tell you this, your Honor.  That was never the

7    intent of that sentence and it has never been the application

8    of that sentence.  And, in fact, when you look at the

9    plaintiffs' citations, you will see they were cited solely for

10   failing to go through the HARB review process, the citations

11   had nothing whatsoever to do with the commercial or

12   noncommercial nature of the signs.  If, in fact, we were

13   interpreting the sentence the way the plaintiffs' fear, the

14   citations would have been for failing to go through HARB -- it

15   wouldn't be for failure to go through HARB, because HARB

16   wouldn't apply at all, it would be posting a noncommercial

17   sign.

18         Your Honor, just as an aside, I understand that

19   we're here on the extent ordinance, but I want you to know that

20   City Council wants their to be no ambiguity or confession, so

21   they have amended this section of the ordinance, specified the

22   word no commercial sign and, in fact, instituted a general

23   exemption for noncommercial signage similar to under Section

24   178, as an aside, your Honor.

25          THE COURT:  When are these new ordinances, when do

22

1   they legally become effective and supersede the ordinances that

2   we are here on today on the injunction hearing?

3          MR. LANZILLO:  Your Honor, Mark Hollenbeck is the

4   solicitor for the City of Bradford, may I consult with him to

5   make sure my answer is accurate?

6          THE COURT:  All right.

7          (Discussion held off the record.)

8          MR. LANZILLO:  With advertising requirements, these

9   will be before Council on Tuesday, May 11th, for final

10   approval.

11          THE COURT:  And are you saying, assuming, if final

12   approval is given on the 11th, as of the 11th they become the

13   new ordinance?

14          MR. HOLLENBECK:  May I speak directly, your Honor?

15          THE COURT:  Sure.

16          MR. HOLLENBECK:  Yes, the Third Class City Code says

17   that they're valid within 10 days of the passage unless

18   otherwise provided.  As drafted, it reads they'll be valid upon

19  passage, which will be May 11th.

20      THE COURT:  All right.  Let's wrap it up then, Mr.

21  Lanzillo, then we'll start to take some testimony.

22      MR. LANZILLO:  Yes, your Honor.  Finally, a brief

23  word the exemptions under 178.  Your Honor, these are

24  exemptions tied directly to the purpose of the property.  There

25  are substantial and even compelling reasons for each.  They are


                              23


1  treated as content-neutral under Rappa.  The Supreme Court's
                              _____

2  decision in Lorilard_Tobacco, Taxpayers_For_Vincent, there is
             _____ _____  _____ ___ _____

3  no problem with those exemptions under Section 178.

4      And, finally, your Honor, there simply will be no

5  evidence in this proceeding of any content-based attempt to

6  regulate speech or any attempt at censorship.  What the

7  plaintiffs are proposing is a regulatory structure, which will

8  put the public at risk.  If these, particularly under 178, this

9  permitting structure is struck down, as illustrated by the

10  photographs we have here, we will have a situation that

11  promotes danger to the public.  Also, to strike down Chapter

12  125 would be a frustration of the efforts of cities across the

13  Commonwealth and I think actually across the country, to try to

14  save and revitalize their cities, to stem the decay that

15  infected many, that's decay that Bradford has had a great deal

16  of success in turning around.  We hope the court will take into

17  consideration the public interest.

18          THE COURT:  All right, call your first witness.

19          MR. LANZILLO:  John Peterson.

20          THE COURT:  Mr. Peterson, would you be so kind as to

21  step up here in front of my clerk and she'll swear you in.

22          THE WITNESS:  Sure

23          THE CLERK:  Please state your name for the record,

24  sir?

25          THE WITNESS:  John Peterson.


                                24


1          JOHN PETERSON, DEFENSE WITNESS, SWORN

2                  DIRECT EXAMINATION

3  BY MR. LANZILLO:

4  Q.    Mr. Peterson, would you state your name and address for

5  the record?

6   A.   John William Peterson.

7   Q.   How are you employed?

8   A.   I'm employed as the City Clerk and administrative

9   assistant to City Council for the City of Bradford.  I also

10  serve as the City's Zoning Officer and Health Officer for the

11  City of Bradford.

12  Q.   How long have you been employed by the City of Bradford?

13  A.   Thirty-two years.

14  Q.   Could you briefly describe for the court your employment

15  history with the City?

16  A.   I began with the Bradford Fire Department in 1972.

17  Worked my way up through the ranks through the department to

18  the rank of Chief, which I obtained in 1995.

19       THE COURT:  Mr. Peterson, pull in just a little bit

20  and speak into the microphone.

21       THE WITNESS:  In 1995 I was appointed Chief of the

22  department.  Assumed the duties of Building Inspector as well

23  at that point.  I was appointed Zoning Officer, acting Zoning

24  Officer for the City upon an illness of the Zoning Officer at

25  the time.  Upon his passing, I was named Zoning Officer for the

25

1   City of Bradford in 1996.  In 2000 I was appointed as City

2   Clerk and administrative assistant to City Council, which is

3   the position I currently hold.

4   BY MR. LANZILLO:

5   Q.    Now, with respect to the positions that you held with the

6   City, have you had responsibility concerning the implementation

7   or enforcement of the two sign ordinances at issue in this

8   case?

9   A.    Yes, I have.

10  Q.    And that would include responsibilities as a member of

11  the HARB board itself?

12  A.    Yes, I also served, in the duties as Building Inspector

13  from 1995 through 2000, I also was a member of the HARB board,

14  and attended meetings and reviewed applications under the HARB

15  process.

16  Q.    And, of course, as Building Inspector or as Zoning

17  Officer, you would have had responsibility with respect to

18  these ordinances?

19  A.    To the ordinances, also to the review of the applications

20  that came in for signage.

21  Q.    I'd like to begin by discussing Chapter 178 with you,

22    would it be fair to describe that as the general sign ordinance

23    in the City of Bradford?

24    A.    That's correct.

25    Q.    And a question I believe the court raised during the

26

1    opening statements here is whether this would apply throughout

2    the City, including the Historic District?

3    A.    Yes, it would.

4    Q.    Very good.  Now, I understand that under Section 178-3,

5    which discusses permitting requirements -- your Honor, may I

6    present the witness with a copy of the exhibit?

7        THE COURT:  Yes.

8        MR. LANZILLO:  For the record, your Honor, this will

9    be Exhibit Q, Defendant's Exhibit Q.

10   BY MR. LANZILLO:

11   Q.    And, Mr. Peterson, you should feel free to refer to any

12   part of the ordinance that you need to.  Now, as I understand,

13   under Section 178-3, which talks about permitting requirements,

14   this applies to, in the words of the ordinance, any sign that's

15   out of doors?

16  A.    That's correct.

17  Q.    All right.  Are signs which are displayed through a

18  window or through a door from the interior of a structure

19  covered by this ordinance?

20  A.    The City takes no jurisdiction over signs in the interior

21  of buildings.

22  Q.    Now, I believe I'm correct that under Section 178-2,

23  there are various types of signs defined therein?

24  A.    Yes, there is.

25  Q.    Could you briefly outline to the court the main


27


1  categories of signs that are regulated under this ordinance?

2  A.    The ordinance regulates every sign, billboard, ground

3  sign, wall sign, roof sign, illuminated sign, projecting sign,

4  temporary signs, marquees, awnings, canopies and street clocks.

5  Q.    Those are all defined terms within the ordinance?

6  A.    Yes, they are.

7  Q.    Now, am I correct that there are nine exemptions under

8  the ordinance under 178-15?  Your Honor, would you like a copy

9  of the ordinance?

file:///A|/RIELINJ.TXT

10          THE COURT:  I have it in front of me, thank you.

11          THE WITNESS:  Yes, there are.

12  BY MR. LANZILLO:

13  Q.    We've already talked about the fact that the window and

14  door signs are not covered, why is that?

15  A.    Why is --

16  Q.    Why are the window and door signs not covered?

17  A.    Signs within the interior of a building?

18  Q.    Yes.

19  A.    There's not the danger to the general public on signs of

20  that type.  To pedestrians, to motorists, that occur with

21  exterior signs.

22  Q.    We'll talk about the exemption under 178-15 in a moment,

23  but flip now to Section 178-4, which refers to the application

24  for a permit.  What I'd like you to do, Mr. Peterson, is walk

25  through the various items of information required under that

28

1  section and tell us why each piece of information is requested?

2          THE COURT:  Mr. Lanzillo, let me make a suggestion.

3  Why don't you put, as you're going through these various

4    sections, why don't you put them on the overhead.

5         MR. LANZILLO:  Yes, your Honor.

6  BY MR. LANZILLO:

7  Q.    Can you read that okay, Mr. Peterson, on the screen?

8  A.    Yes, I can.

9  Q.    Do you see here under 178-4, first item of information,

10  name, address and telephone number of the applicant; why is

11  that required?

12  A.    It's required so the City can document where the sign is

13  located.  The person making the application for the sign, a

14  telephone number is helpful if there's a question concerning

15  the application permit.

16  Q.    Obviously, if they had to communicate with the applicant?

17  A.    Correct.

18  Q.    Location of the building, structure or lot to which or

19  upon which the sign is going to be located or erected, right?

20  A.    Again, that's to determine where this is, our records are

21  computerized so this data is entered into the computer system

22  so the signs can now be tracked.  It also tells us what zoning

23  district in the City that the sign is located in.  And in the

24  case of the Historic District, obviously, it would tell us if

25  this sign or proposed sign would be located within the Historic

29

1  District.

2  Q.    Subsection (C), "the position of the sign or other

3  advertising structure in relation to nearby buildings or

4  structures;" why do you need to know that?

5  A.    There are requirements for signs not to be placed in the

6  public right-of-way.  This is important, there is a site plan

7  furnished usually with the sign application showing exactly

8  where the sign is located.  In the event, say, of roof signs,

9  there are setback requirements for a roof sign, in case it does

10  fail in a severe windstorm or something, the roof sign won't

11  fall off the top of the roof and endanger the public below it.

12  So there's some setback requirements.  So this information is

13  important, positioning of the sign is important and

14  determination, also.

15  Q.    Things like obstructing the public right-of-way?

16  A.    Correct.

17  Q.    Among others.  Now, the next requirement is "the

18  application be accompanied by two blueprints or ink drawings of

19   the plans and specifications and method of construction and

20   attachment to the building or in the ground;" why is that

21   required?

22   A.    This is to insure that the sign will withstand all --

23   that the sign is designed according to standards that are set

24   by sign industries.  Also, that the anchoring of the sign into

25   the ground, to the building, to the rooftop, whatever, is

30

1   adequately sufficient.  So it, again, danger to the public, the

2   general safety are the riding forces in this.  Also, with large

3   signs which take into effect a canopy, very critical factors,

4   including wind load and snow load and stress factors on that,

5   and we review those for certification, stamp drawings from an

6   engineer in cases of these larger signs.

7   Q.    Those specific requirements that you're describing, that

8   you reviewed for compliance, those are set forth in other parts

9   of the ordinance?

10   A.    Yes, they are.

11   Q.    The next subsection requires "submission of copies of

12   stress sheets and calculations showing that the structure is

13  designed for dead load and wind load pressure in any direction

14  in the amount required by this chapter and all other laws and

15  ordinances of the City;" why is that required?

16  A.   Again, due to the wind loads and snow loads, and the

17  stress placed upon these signs, that's of critical importance.

18  As with Erie or the City of Bradford, there are designated wind

19  loads, snow loads for municipalities throughout the

20  Commonwealth, throughout the country, set by national agencies

21  and recognized by makers of signs in the sign industry.  And

22  very often that's the first process -- a sign installer will

23  call the City of Bradford for the snow load and wind load.

24  Q.   The next requirement "is the name of the person, firm,

25  corporation or association erecting the structure;" why do you


31


1  want to know that?

2  A.   Again, this is for contact purposes.  Oftentimes the sign

3  installer will be the person acting to secure the permit.  We

4  get calls from Cicogna here in Erie, people in Ashtabula, Ohio.

5  Some of your larger sign installers that work on bigger

6  projects.  Again, that's critical for us to make contact if

7   there's a question.  Also, any company doing business within

8   the City of Bradford is required to have a copy of their

9   liability insurance policy on record with the City.  And, of

10  course, if that has lapsed or whatever, we need to be able to

11  contact these people.

12  Q.    Subsection (G), "written consent of the owner of the

13  building;" why is that required?

14  A.    That's to prevent somebody from putting a sign up on a

15  building that they don't own.  If they have the ownership, we

16  ask that it be in writing from the owner of the building

17  stating they have no objection to their placing the sign on the

18  property.

19  Q.    So there is a consent requirement to avoid a trespass on

20  the property?

21  A.    Correct.

22  Q.    Electrical permit, if any, for the sign?

23  A.    Illuminated signs pose their own dangers, they are

24  required to be installed in full compliance with the

25  International Electric Code.  The signs themselves have to have

32

1   Underwriter's Laboratory approval for internal wiring to the

2   sign and the work of any illuminated sign, the ultimate hookup

3   of that sign has to be approved.

4   Q.    And is the concern there to avoid electrical shock and

5   fire hazard?

6   A.    Yes, it is.

7   Q.    The next item, is insurance policy or bond required by

8   Section 178-16, let's defer on that until we get to that

9   section and talk about it in detail.  And, finally, obviously,

10  there are other ordinances in the City of Bradford which may

11  regulate these structures, is that correct?

12  A.    Yes, there are.

13  Q.    And the final section of the required items for the

14  application require such other information as the Building

15  Inspector shall require to show full compliance with this

16  chapter and all other laws and ordinances of the City; why is

17  that required?

18  A.    We require, in the instance of signage that would be

19  installed within the HARB district, obviously, the Building

20  Inspector needs to be aware of applications in process or has

21  been approved by HARB.  Any other general information that

22  might be required for the inspector to make a decision

23   concerning a sign.

24   Q.    For example, if it is unclear whether the sign will be

25   structurally sound, the inspector could request additional

33

1   engineering information or structural information?

2   A.    Exactly.  If the original data submitted with the

3   application was non-sufficient, could ask for additional

4   information.

5   Q.    Section 178-5 talks about illuminated signs and approval

6   of the Electrical Inspector.  Actually, you touched upon this

7   earlier, could you tell the court why this section of the Code

8   exists?

9   A.    Electric poses the second biggest danger with a sign,

10   probably only superseded by proper anchorage and installation

11   itself.  But the inherent dangers of electricity are well-known

12   and this insures that the sign is installed to the most recent

13   Code enacted by the International Codes Council.

14   Q.    Under Section 178-6 it provides the instruction that if

15   it shall appear that the proposed structure is in compliance

16   with all the requirements of this chapter and all other laws

17   and ordinances of the City of Bradford, the Building Inspector,

18   shall then issue the erection permit.  Does the Building

19   Inspector have any discretion to deny the permit where these

20   requirements are satisfied?

21   A.   No, he would not.

22   Q.   I don't recall seeing an expressed deadline for the

23   timeframe for the Building Inspector to issue the permit.

24   First of all, is that correct, I didn't see that in this

25   ordinance, I believe it's in the HARB?


34


1   A.   No, there's not one in this ordinance.

2   Q.   Let me ask you as a matter of practice, how long does it

3   typically take the Building Inspector to decide an application

4   after submission of the required materials?

5   A.   I would say normal practice, there would be a turnaround

6   within three to five days.  Unless it's a very complicated

7   situation and you may be asking for additional information.

8   Q.   Have you ever received a complaint that it's taking an

9   undue amount of time for the Building Inspector to review and

10   issue a decision on a sign permit?

11  A.   No, I have not.

12  Q.   Section 178-7 discusses permit fees.  Before I get into

13  the substance of that, let's cover a little background as to

14  how these codifications work.  I take it that an ordinance is

15  passed by City Council and then sent to a printer for

16  codification?

17  A.   That is correct.

18  Q.   Are things sometimes lost in translation?

19  A.   Yes, they are.

20  Q.   Is the codification we're looking at consistent with the

21  actual ordinance or law of the City of Bradford?

22  A.   No, it is not.

23  Q.   Could you tell the court what's wrong with the printed

24  material?

25  A.   I can't remember the exact year, I believe it was 1998,

35

1  the City amended this ordinance to take out the language for

2  annual permitting of signs.  That was done by Council, the

3  ordinance passed on the second and final reading, sent to the

4  codifiers for inclusion into our code book.  The word annual in

5   178-7(A), the word annual permit fee --

6   Q.   Mr. Peterson, I'm being unfair to you, I'm making you

7   recall what is set forth in writing.  Let me show you what

8   we've marked as Defendant's Exhibit V, as in Victor, and tell

9   me if this is a copy of the ordinance changing the fee

10   structure to which you're referring?

11   A.   Could I see the bottom with the signatures on it, please.

12   Yes, that would be the City Clerk at the time this ordinance

13   was passed and the Mayor at the time this ordinance was adopted

14   by the City.

15   Q.   Picking up with what you were just telling the court,

16   then, as I understand it, the amended ordinance which is the

17   law of the City of Bradford, there is no annual fee, there is

18   no annual renewal requirement?

19   A.   That is correct.

20   Q.   And that would leave only a one time fee which is

21   typically in the amount of $20?

22   A.   That's correct.

23   Q.   In some instances it's $20 or two percent of cost?

24   A.   Correct.

25   Q.   And the reason why the codification is not consistent

file:///A|/RIELINJ.TXT

36

1   with the actual ordinance is the printer made a mistake?

2   A.   That's correct.  And when I reviewed this ordinance, the

3   general publishers, who is are codifier, was notified and this

4   will be corrected.

5         THE COURT:  Mr. Lanzillo, let me interrupt you, if I

6   could.  Mr. Peterson, if you recall, why was the requirement of

7   an annual fee deleted?

8         THE WITNESS:  Your Honor, I believe at that time,

9   I wasn't involved with Council as I now am, that was during my

10  time as Fire Chief, but I believe one of the discussions

11  involved around the fact that the City was not collecting an

12  annual fee anyway.  The City was not collecting an annual fee

13  anyway on signs and, therefore, that could be deleted.

14  BY MR. LANZILLO:

15  Q.   In fact, Mr. Peterson, the City has not been collecting

16  an annual fee since 1998 and apparently before that?

17  A.   Definitely not since '98, and to the best of my knowledge

18  they were not collecting it before.

19  Q.   With respect to the fee structure that is in place, could

20   you explain to the court its purpose?

21   A.   The fee structure partially defrays the cost of

22   examination, the review process for the signage.  Helps defray

23   those costs.  There's also on-site inspections performed by a

24   Code Enforcement official, who also would serve as Building

25   Inspector.  Depending on the size of the sign, the type of sign


37


1   it may be, this may require two or three visits to the site by

2   the Code Inspector.  So, obviously, the $20 amount will not

3   take in the whole cost of the permitting process for the City,

4   but it does defray a portion of the costs.

5   Q.   When you talk about Code Enforcement officers and their

6   responsibilities, what are we looking at as far as, it may vary

7   from person to person, but as an average cost to maintain that

8   employee?

9   A.   I'd say with salary and benefits, in excess of $20 per

10   hour.

11        MR. LANZILLO:  Your Honor, I'd move the admission of

12   Defendant's Exhibit V.

13        MR. FRIEDMAN:  No objection.

14          THE COURT:  It's admitted.

15   BY MR. LANZILLO:

16   Q.    Section 178-10 addresses the subject of unsafe and

17   unlawful signs.  I'll put that on the screen.  Could you tell

18   the court the purpose of that section?

19   A.    This section reads that "if the Building Inspector shall

20   find that any sign or other advertising structure regulated

21   herein as unsafe or insecure or is a menace to the public or

22   has been constructed or erected or is being maintained in

23   violation of the provisions of this chapter, he will give

24   written notice to the permittee thereof.  If the permittee

25   fails to remove or alter the structure so as to comply with the

38

1   standards set forth within 10 days after such notice, such sign

2   or other advertising structure may be removed or altered to

3   comply by the Building Inspector at the expense of the

4   permittee or owner of the property upon which it is located.

5   The Building Inspector shall refuse to issue a permit to any

6   permittee or owner or refuses to pay costs so assessed.  The

7   Building Inspector may cause any sign or other advertising

8  structure which is an immediate peril to persons or property to

9  be removed summarily and without notice." The safety of the

10  public is the driving force behind this regulation. Every sign

11  located within the City of Bradford has the potential to be a

12  safety concern for someone. A customer entering a store front,

13  motorists passing by a ground sign. Someone getting gasoline

14  as a convenience store, underneath that canopy all deserve and

15  expect the right that's not going to fall on them causing

16  injury or death. The very last sentence gives the Building

17  Inspector the right -- say a sign was damaged in a motor

18  vehicle accident, and one of the support structures holding

19  that support, if it maybe had two supporting structures, was

20  damaged, severed, whatever, and the sign was just hanging

21  there. Which, obviously, is an immediate danger. That gives

22  the Building Inspector the right, if there is an immediate

23  peril, to have that sign removed without notice. Short of

24  that, the Building Inspector has a process where he goes to the

25  permittee and asks them to bring the sign into compliance

39

1  within 10 days.

2  Q.   And that involves notice and an opportunity to correct

3  the problem?

4  A.   Yes, it does.

5  Q.   Section 178-11 refers to notation of permit number, date

6  and voltage with respect to signs within the ordinance.  Could

7  you explain to the court the purpose of that particular

8  provision and how it's applied within the City of Bradford?

9  A.   This ordinance is an ordinance that is approaching

10  30-years-old.  In the early days it was critical for an

11  inspector to know the date that the sign was erected.  And,

12  obviously, to go through without that information being printed

13  on the sign, to go through years and years of sign permits,

14  building permits that have been issued by the City of Bradford,

15  that could become very time consuming.  So that was a quick

16  reference during that period of time.  We have --

17  Q.   I don't mean to interrupt you, but I take it at the time

18  this ordinance was adopted, for most of its life, you were

19  working with a paper based system record keeping?

20  A.   That's correct.

21  Q.   I'm sorry, please continue.

22  A.   In the early '90s, mid '90s we computerized our systems.

23  Now by the information contained we can access the data on the

24  sign through the property owner, through the address, physical

25  street number, whatever, and have that information available to

40

1  the Building Inspector immediately.  There's less need for this

2  requirement today, to be quite honest, I'm not sure that all

3  signs today carry this notation of when it was, if it's painted

4  on that, when it was erected, and it's not as critical today as

5  it was in the past.  Because we do have that data available

6  immediately to an inspector.  The electrical requirements are

7  still there.  Any sign that is illuminated carries a UL label

8  permanently attached to that sign and that would state the

9  voltage.

10  Q.   Section 178-12 refers to painting certain portions or

11  components of the signs every two years.  Do you see that --

12  that refers to painting at least once every two years all parts

13  and supports of said sign unless the same are galvanized or

14  otherwise treated to prevent rust.  Could you tell the court

15  the purpose of that requirement?

16  A.   On the face of this section it would appear that there's

17  some aesthetic content to this.  When you read into it, where

18  it states that the parts and supports of the sign are required

19  to be painted.  We're talking about the metal parts and

20  components of the sign.  The pieces that anchor the sign into

21  the ground, onto a wall or whatever, that these be painted and

22  properly rust proofed to prevent corrosion, deterioration of

23  those critical elements, particularly given the nature of our

24  seasons.

25  Q.  Section 178-13 has specific requirements for wind


41


1  pressure and dead load requirements, let me put those on the

2  screen.  Refers to signs being designed and constructed to

3  withstand a wind pressure of not less than 40 pounds per square

4  foot of area.  And be constructed to receive dead loads as

5  required in the Building Code or other ordinances of the City

6  of Bradford.  I think you explained this earlier, would you

7  just touch upon the safety purpose there?

8  A.  Any sign must be able to withstand what has been

9  designated by National Code Council as the wind requirements

10  and the snow load for the City of Bradford.  If not, structural

11  failure could occur.

12  Q.   Let me refer you to Section 178-16, which discusses the

13  bond or insurance requirements.

14        THE COURT:  We're going to take a short break, Mr.

15  Lanzillo.

16        MR. LANZILLO:  Yes, your Honor.

17        (Recess from 11:10 a.m.; until 11:20 a.m.)

18        THE COURT:  All right, Mr. Lanzillo.

19        MR. LANZILLO:  Thank you, your Honor.

20  BY MR. LANZILLO:

21  Q.   Mr. Peterson, before the break we were about to take a

22  look at the requirement for a bond in the ordinance, which is

23  under 178-16.  This provides "every applicant for a permit

24  referred to herein shall, before the permit is granted, file

25  with the Building Inspector a continuing bond in the penal sum


42


1  of $10,000 executed by the applicant and a surety company to be

2  approved by the City Solicitor."  It goes on to provide that "a

3  liability insurance policy issued by an insurance company

4  authorized to do business in the Commonwealth of Pennsylvania

5  conforming to this section may be permitted in lieu of a bond."

6  First of all, could you tell the court what the purpose of this

7  provision is?

8  A.   This is liability protection for both the public as well

9  as for the City of Bradford.

10  Q.   Now, there's discussion here about a bond for an

11  insurance policy, could you tell the court the typical or

12  common practice of late with respect to this requirement?

13  A.   Once again, I think this shows the age of this ordinance.

14  Bonds were common, I believe probably in the early stages of

15  time back in the '70s, when this ordinance was enacted.  Today

16  I have no bonds on record for a sign.  We only have liability

17  insurance policies issued by their insurers.  And this is

18  nothing more than an insurance rider specifying that they have

19  insurance on their sign on their property, as well as the

20  structure itself.

21  Q.   What is your understanding concerning the difficulty of

22  obtaining an insurance rider of $10,000 in coverage?

23  A.   Very often when an insurance company is notified by their

24  policyholder, we receive a faxed copy of the insurance binder

25  the same day.

1  Q.    Has anyone complained about that requirement?

2  A.    No, they have not.

3  Q.    In the interest of time, I'd like to go through a number

4  of what are -- I don't believe anyone would object to the

5  characterization as clearly safety-related requirements under a

6  series of sections here.  Section 178-17 through Section

7  178-30.

8         MR. FRIEDMAN:  Your Honor, we have not challenged

9  any of these safety-related criteria.

10        MR. LANZILLO:  Well, they challenged the local

11  permitting scheme.  This is fundamental and material to why we

12  have the permitting scheme.

13        THE COURT:  What were you referencing, 178 through

14  what?

15        MR. LANZILLO:  178-17 through 178-30.

16        THE COURT:  Let me just look at them.

17        MR. LANZILLO:  Let me, if I may, your Honor -- while

18  your Honor appears to be reading them.

19        THE COURT:  Go ahead, I'm listening to you.

20        MR. LANZILLO:  I just picked out a couple of

21  examples here, your Honor, and once the document is in

22  evidence, I suppose we can debate whether the rest of these

23  have a safety or aesthetic related purpose.  I would like to

24  point out a couple less obvious ones.  Your Honor, I would add

25  to that, that this goes directly to the criteria that is


                                44


1  applied in deciding whether to issue a permit.  This is what

2  guides the decision-making process.  If you check off these

3  requirements and you satisfy them, the Building Inspector must

4  grant the permit.

5        THE COURT:  Well, first of all, from an evidentiary

6  standpoint, get it on the record one way or the other, you can

7  argue your implications and plaintiffs can argue theirs.

8  BY MR. LANZILLO:

9  Q.   Mr. Peterson, let's go through these in a fairly summary

10  fashion.  Section 178-17 deals with obstructions to doors,

11  windows or fire escapes.  The section prescribes those types of

12  obstructions, briefly why?

13  A.   So means of egress or ingress into a building is not

14  obstructed or blocked in the event of fire, other catastrophe

15  that may occur.  Obviously, you attach it to a stand pipe,

16  which is a component used by the fire department in fighting

17  fires in the building that would not want to be hampered by a

18  sign.  Someone may place it on it -- nor would the functioning

19  working mechanisms of a fire escape want to be hampered by a

20  sign that may be placed upon it.

21  Q.    Section 178-18 talks about not putting up signs in a

22  manner as to obstruct free and clear vision or at any location

23  where, by reason of the position, shape or color, it may

24  interfere with, obstruct the view of or be confused with any

25  authorized traffic sign, signal or device or shall make use of


45


1  the words stop, look, drive-in, danger or other similar phrase.

2  Why is that prescription included in the ordinance?

3  A.    This basically is for protection of the motoring public,

4  as well as pedestrians that may be in areas where they would

5  have danger from a motorist not being able to see them due to a

6  sign that would block the vision of the motorist.  And this is

7  actually the only section where there are specific words that

8  are not allowed within this ordinance.

9    Q.    Why don't you want a sign in a certain location with the

10   words stop or other directive language, such as that referred

11   to in the ordinance?

12   A.    Obviously, if it's not where there's a stop sign and

13   somebody sees a sign that says stop, it may cause confusion,

14   they may decide to stop right there and it could be a potential

15   for an incident to occur.

16   Q.    Section 178-19 talks about sign face texture, what's the

17   purpose of that provision?

18   A.    That's for protection of the public safety issues again,

19   that there's no nails, tacks or wire that could cause a problem

20   with anyone.

21   Q.    Section 178-21, by way of example, talks about spotlights

22   and floodlights being prohibited, why?

23   A.    This section actually does not have spotlights and/or

24   floodlights on public property.  Again, that could be for the

25   protection from hazards to pedestrians, safety concerns, could


46


1    cause visibility issues.  That's why the use of loose neck

2    reflector type lights are allowed in another section.

3   Q.    Section 178-22 includes a prohibition of obscene matter

4   as that term is interpreted from time to time under either the

5   federal case law or the case law of this Commonwealth.  Let me

6   ask you first, has that provision been amended in recent years?

7   A.    That was amended in 2002.

8   Q.    At whose request?

9   A.    The ACLU.

10  Q.    And what was added, do you know?

11  A.    Excuse me.

12  Q.    Do you know what part of that was amended, what words

13  were added?

14  A.    I believe the language under the federal case law and the

15  case law of this Commonwealth was what was amended.

16  Q.    Does it make it clear that obscene was to be interpreted

17  in light of that case law?

18  A.    I don't believe that language is in the former ordinance.

19  Q.    Section 178-23 talks about ground signs and has a series

20  of specific safety requirements for those types of signs?

21  A.    Yes, it does.

22  Q.    Including requirements relating to bracing, anchorage and

23  supports, correct?

24  A.    Yes.  It covers the construction, sign construction, the

25  sign location, the actual erection methods for the sign.  The

47

1  supports.  Again, the sign must meet requirements and it

2  actually addresses the site of the sign once the sign's

3  installed.

4  Q.   Now, I'm not going to go through each one of these, in

5  summary form there is a section dealing with wall signs,

6  Section 178-24?

7  A.   Yes.

8  Q.   Am I correct that what this ordinance attempts to do is

9  address the particular safety concerns that arise from

10  different styles of signs categorically?

11  A.   Yes, it does.

12  Q.   So we have wall signs -- roof signs, projecting signs,

13  correct?

14  A.   That's correct.

15  Q.   Under Section 178-26, what is a projecting sign?

16  A.   A sign that projects outward from the face of a building,

17  as opposed to a wall sign that's attached flat to a building,

18  the projecting sign projects out.  Oftentimes over a public

19  right-of-way, sidewalk, street, whatever.  So it has its unique

20  set of characteristics for the installation of that type of

21  sign.  And, obviously, there's more of a danger to pedestrians

22  and to the general public from a projecting sign probably than

23  any other sign.

24  Q.    The section dealing with temporary signs is Section

25  178-27, correct?


48


1  A.    Yes.

2  Q.    Again, the structure of these requirements typically

3  focus on three elements it appears, construction, location and

4  erection?

5  A.    That's correct.

6  Q.    Am I correct Section 178-28 addresses the construction,

7  location and erection concerns relative to the safety of

8  marquees?

9  A.    Yes, it does.

10  Q.    Section 178-29 addresses those same concerns regarding

11  awnings and canopies?

12  A.    Yes, it does.

13  Q.    Finally, Section 178-30 addresses those considerations

14  regarding street clocks, correct?

15  A.    Yes, all of them.

16        MR. LANZILLO:  Your Honor, as a matter of

17  housekeeping, if I may digress and offer something to the

18  court.  During our opening remarks you had asked me about the

19  lack of specified time limit for a decision under Chapter 178.

20  I would like to offer to the court a couple of citations.

21  There are others, but these were handy.  In these two cases the

22  court found that lack of a time limit did not invalidate the

23  ordinance.  That's Lombardo_v._Warner, which I mentioned

24  earlier, 353 F.3d 774 (9th Cir. 2003).  Also, Outdoor_Systems

25  v._Mesa, 997 F.2d 604 (9th Cir. 1993).  And, your Honor, also

49

1  just to add some additional authority with respect to another

2  question you raised regarding the possibility of interpreting

3  the first sentence of the historic ordinance as precluding

4  noncommercial speech.  The case holding that on-site signs

5  include noncommercial speech because noncommercial speech is

6  situated wherever the speaker places it.  The citation for that

7  is On-site_Advertising_v._Seattle, and this is in the Federal
   _____ _____ __ _____

8  Appendix, 36 F.A. 332 (9th Cir. 2002).  And I believe it cites

9  other cases.  Thank you, your Honor.

10  BY MR. LANZILLO:

11  Q.    Mr. Peterson, let's talk about the exemptions of the

12  ordinance.  This is Section 178-15.  Let's just briefly review

13  them.  "Real estate signs not exceeding eight square feet in

14  area which advertise the sale, rental or lease of the premises

15  upon which said signs are located only."  Why is that exempt --

16  by the way, let me step back.  These signs are exempt from what

17  under the ordinance, under this section?

18  A.    They're exempt from every part of this ordinance except

19  for 178-10.  Which is the safety section of the sign ordinance.

20  Q.    So these signs would not be subject to permitting?

21  A.    Correct.

22  Q.    These signs would not be subject to the bond or insurance

23  requirement?

24  A.    Correct.

25  Q.    Or the fee requirement?

50

1  A.   Correct.

2  Q.   Am I also correct that this ordinance doesn't ban

3  anything, it simply creates a permitting structure?

4  A.   That would be correct.

5  Q.   These exemptions are really exemptions to the permitting,

6  correct?

7  A.   Yes.

8  Q.   All right.  Why does that first exemption with respect to

9  real estate signs exist?

10  A.   These signs are very temporary in nature.  They are

11  traditionally normally placed in the ground.  The size of the

12  sign usually never exceeds eight square feet.  Signs are

13  usually extremely well maintained by the real estate broker

14  handling the sale of the house.  They're well painted, well

15  maintained.  They're not a detraction in any way to the

16  neighborhood.  From a safety issue, the size of a sign being

17  placed into the ground, obviously, is not as great as safety

18  concern as to a different type of sign.

19  Q.   Let me ask you, these real estate signs, are they

20  typically an industry standard in terms of size and

21  construction?

22  A.    I would assume they are.  Almost all of them appear to be

23  approximately the same size, and not writing this ordinance,

24  I'm not sure, but I would assume -- some measurements may have

25  been taken at that time.

51

1  Q.    As far as the existence of any problems in the past with

2  Coldwell Banker or another realtor erecting shoddy or unsightly

3  signs, has that been an issue over the years?

4  A.    No, it has not.

5  Q.    And this is a requirement that or an exemption that

6  applies only to signs dealing with the specific property where

7  a sign is located, is that correct?

8  A.    Yes.

9  Q.    Subsection (B), "professional nameplates not exceeding

10  one square foot in area."  Why are these signs exempt from

11  permitting?

12  A.    This would be an extremely small sign and may be affixed

13  to a wall structure that may house say a dentist, an attorney,

14  along those lines.  And, again, due to the size of the sign and

15  usually they're installed on private property, I would say

16  probably were deemed not to be any type of a safety hazard.

17  Q.   Typically we're talking about a nameplate?

18  A.   Correct.

19  Q.   I believe there's another similar exemption for

20  occupational signs denoting only the name and profession of an

21  occupant in a commercial building, public institutional

22  building or dwelling house and not exceeding two square feet in

23  area?

24  A.   That is correct.

25  Q.   Same rationale?


                                52


1  A.   I would assume that the rationale is the same when they

2  exempted these, this does allow a little bit bigger sign for

3  those, where it is an occupation as well.

4  Q.   There's a practicality aspect here in terms of allowing

5  adequate space to have the basic information?

6  A.   Yes.

7  Q.   Now, there's an exemption for signs painted on the

8  exterior surface of a building.  What's the rationale for

9  exempting that from permitting?

10  A.   Obviously, there's no danger to the public if a sign is

11  painted on a structure.  The only areas where that would come

12  into question would be something painted on the exterior of a

13  building within the HARB district.

14        THE COURT:  In other words, you could have a sign

15  painted on a building outside the HARB district that was

16  aesthetically awful, but it would be beyond the reach of the

17  ordinance, is that right?

18        THE WITNESS:  Correct.

19        THE COURT:  All right.

20  BY MR. LANZILLO:

21  Q.   Let me, if I may, clarify that, though.  When the court

22  refers to beyond the reach of the ordinance, would it be beyond

23  the reach of the entire ordinance; I don't mean to split hairs

24  here too much, but I suppose if you found out that it was

25  painted with some toxic material, these exemptions only apply

53

1  to the permitting requirements, the unsafe sign requirement

2  applies to all signs?

3  A.   Yes.

4        THE COURT:  My question was aesthetics, it wasn't

5  safety.

6        THE WITNESS:  These signs would come under

7  requirements of 178-24, if they did have raised borders,

8  letters, characters, declarations or lighting.

9  BY MR. LANZILLO:

10  Q.   "Signs denoting the architect, engineer or contractor

11  when placed upon work under construction and not exceeding 16

12  square feet in area;" that's exemption (E), that's that about?

13  A.   Those signs are traditionally erected where a

14  construction project is going on.  It may be a home improvement

15  contractor, it may be a federal project that requires that the

16  names of those people be posted on the property.  It obviously

17  can be an advertising aid to the people doing the project,

18  usually they also offer possibly contact people, the name of

19  the project supervisor or engineer, whatever may be named on

20  them, and offers some information to the public, as well as to

21  public officials if a contact needs to be made.

22  Q.   Let me ask you about that last point.  Why would the

23  information concerning the contractor or architect be valuable

24  to a public official during the course of a construction

25  project?


54


1  A.    A police officer may notice vandalism on the site during

2  patrol, you know, something's broken into, fire, any type of

3  situation like that.  Or it gives a quick reference point

4  possibly for somebody involved with enforcement procedures to

5  be able to make contact.

6  Q.    What about dangerous conditions which can arise on a

7  construction site?

8  A.    Exactly, there could be hazardous situations that occur

9  as well.

10  Q.    I skipped over (D), which is "bulletin boards not over

11  eight square feet in area for public, charitable or religious

12  institutions when the same are located on the premises of said

13  institutions."  What's that one about?

14  A.    These traditionally are tax-exempt organizations and

15  entities, they are located within your own property.  And it

16  informs -- they normally are informational in purpose.  Again,

17  eight square feet is a relatively small sign that doesn't often

18  pose the dangers and the possible safety considerations of

19  larger signs.

20  Q.    "Memorial signs or tablets, names of buildings and date

21  of erection when cut into any masonry surface or when

22  constructed of bronze or other incombustible materials."  Is

23  this for cornerstones and sport nameplates, things like that?

24  A.    Yes, it is.

25  Q.    Why is this exempt from permitting, this category?


55


1  A.    It's carved into the structure.  Normally, oftentimes

2  carved into a structure, carved into a piece of granite,

3  marble, whatever.  Again, there's no real safety concern with

4  something that is carved into stone.

5  Q.    "Traffic or other municipal signs, legal notices,

6  railroad crossing signs, danger and such temporary, emergency

7  or nonadvertising signs as may be approved by City Council."

8  That's exemption (H), and the purpose for that?

9  A.    Obviously, the government needs to regulate traffic on

10  its roadways and highways, provide the service of street signs.

11  Those types of issues that must be done to aid everyone.  And

12  those are exempt from the permitting process.  And it does

13  offer some latitude to people who may wish to erect a sign

14  within a public right-of-way.  City Council can be approached

15  to approve such a sign and that has been done in the City of

16  Bradford by various entities, including the University of

17  Pittsburgh at Bradford.  When they came to City Council and

18  requested directional signage to their facility.

19  Q.   Let me ask you this.  As far as the government signs,

20  authorized by the government, are they subject to separate

21  regulations as far as their construction and design and

22  location?

23  A.   Yes, they are.  They must be constructed and erected and

24  maintained to the Pennsylvania Department of Transportation

25  standards.

56

1  Q.   Now, the last exemption is subsection (I), which applies

2  to "noncommercial signs not exceeding 12 square feet in area

3  placed upon private property by the owner or occupant of said

4  property."  And it's noted this was added December 10, 2002, by

5  Ordinance No. 2986.3.  The first question is at whose request

6  was that exemption added?

7  A.   The ACLU.

8  Q.   And am I correct that this exempts noncommercial signs

9  from all the permitting, bonding fee requirements under Chapter

10  178 and, essentially, leaves them regulated only to the extent

11  they could be classified as an unsafe sign?

12  A.   That's correct.

13  Q.   Mr. Peterson, I'd like to show you some photographs and

14  have you identify them.

15        THE COURT:  Before you do that, Mr. Lanzillo.  Mr.

16  Peterson, if you remember, how was it that the dimension of 12

17  feet was settled upon?

18        THE WITNESS:  My understanding is that was an

19  agreement reached between our City Solicitor and the ACLU,

20  as to the appropriateness of the size.  That allowed a

21  commercial message to be given and didn't constitute a sign

22  that would necessarily create safety concerns.

23        THE COURT:  Do you mean a noncommercial message?

24        THE WITNESS:  Yes, sir.

25        THE COURT:  All right, go ahead.

1  BY MR. LANZILLO:

2  Q.    Mr. Peterson, this is Defendant's Exhibit R, photograph

3  of Moonan's Touchless Carwash in the City of Bradford?

4  A.    Correct.

5  Q.    The sign that's above the entranceway there of the door,

6  is that regulated under the ordinance?

7  A.    Yes, it is.

8  Q.    The ordinance at this point I'm talking about Section

9  178?

10  A.    Yes.

11  Q.    And what category of sign would that fall within?

12  A.    Wall sign.

13  Q.    And could you explain the requirements of the permitting

14  structure of the ordinance, how it would apply to that sign and

15  whatever safety concerns may exist with respect to a sign like

16  that?

17  A.    The anchorage method of the sign to the building.  The

18  overall size of the sign.

19  Q.    Combustibility?

20  A.    Combustibility of the sign, height requirement for the

21  sign.

22  Q.    Now, with respect to anchorage of a sign, as I said

23  earlier in my opening statement, would I be correct that having

24  a properly mounted anchorage sign over a door, would be a

25  concern of yours in the City?


58


1  A.    Yes, it would.

2  Q.    And this is indeed located within the City?

3  A.    Yes, it is.

4         MR. LANZILLO:  I move for the admission of

5  Defendant's Exhibit R.

6         MR. FRIEDMAN:  No objection.

7         THE COURT:  It's admitted.

8  BY MR. LANZILLO:

9  Q.    This is Defendant's Exhibit S, it's a photograph of V & S

10  Medical Associates signage.  What kind of sign is this under

11  the ordinance?

12  A.    This would be a ground sign.

13  Q.    And this is located within the City of Bradford?

14  A.    Yes, it is.

15  Q.    And what safety and construction design concerns would

16  you have with respect to this type of a sign?

17  A.    This sign would first be reviewed for proper setback

18  requirements from a public right-of-way.  This is along,

19  adjacent to a state highway.  So, obviously, the sign would

20  have to be constructed off the right-of-way.  It also would

21  concern the anchorage method, what portion of the sign

22  physically is installed underground, the method of how it's

23  installed underground to insure stability.  Also, the sign does

24  not exceed maximum height requirements for signs.  And that all

25  signage is attached appropriately to the support structures so

59

1  that there is no danger of that falling down.  There also would

2  be wind load requirements associated with a sign of this type.

3  Snow load on this type of a sign would not be critical.

4  Q.    And what safety concerns arise out of those requirements,

5  especially when you have a sign like this located next to an

6  establishment and a sidewalk?

7  A.    There's the potential for sign failure that could injure

8  either pedestrians, customers visiting this facility or the

9    motoring public.

10         MR. LANZILLO:  Your Honor, I would move for the

11   admission of Defendant's Exhibit S.

12         THE COURT:  It's admitted.  Mr. Lanzillo, we're

13   going to take our luncheon recess.  Let's be back here -- how

14   much more do you have to go on direct?

15         MR. LANZILLO:  I'm estimating an hour, your Honor,

16   maybe a little less.

17         THE COURT:  And this is your only witness?

18         MR. LANZILLO:  I think I can cover everything -- I

19   do have one of the enforcement officers with knowledge

20   concerning the particular citations, but so, too, does Mr.

21   Peterson, I will try to get it done with him to move this

22   matter along.

23         THE COURT:  Mr. Walczak, maybe I asked you, if I

24   did, I forgot, are you going to be putting on each of your

25   plaintiffs, or Mr. Friedman?


                              60


1          MR. FRIEDMAN:  Really possibly one, possibly two,

2    the second one would be much more limited.

3        THE COURT:  Well, we'll see how far we go, but it's

4   problematic as to whether we're going to finish this thing up

5   this afternoon perhaps.  Let's do the best we can, all right.

6        (Luncheon recess from 11:58 a.m.; until 1:05 p.m.)

7        THE COURT:  All right, Mr. Lanzillo.

8   BY MR. LANZILLO:

9   Q.   Mr. Peterson, when we left off before the break, I was

10   reviewing with some photographs with you, I have just a couple

11   more I want to show you at this point.  This is Defendant's

12   Exhibit T, which shows a number of things.  But included in

13   Exhibit T is this big Country Fair sign, what type of sign is

14   that?

15   A.   That's a ground sign.

16   Q.   And what are the regulatory concerns with respect to that

17   sign?

18   A.   Again, proper anchoring into the ground.  Proper

19   anchorage of the signs attached to the upright structures of

20   the sign.  Wind load requirements.  Snow load on that type of a

21   sign is not a critical issue, but wind load is.  Also, there

22   are requirements for visibility at intersections, a sign can't

23   be too low so it would block the visibility of that

24   intersection.

25  Q.    That's pretty close to a corner?


61


1  A.    Yes, it is, it's at an intersection.

2  Q.    Is that an illuminated sign?

3  A.    Yes, it is, there's also illumination requirements that

4  you have to adhere to for that sign.

5  Q.    And electric?

6  A.    Yes, electric as well.

7          MR. LANZILLO:  Your Honor, I move for the admission

8  of Exhibit T.

9          THE COURT:  It's admitted.

10  BY MR. LANZILLO:

11  Q.    Exhibit U is another picture of the very same Country

12  Fair station, the structure that is implicated here in the

13  center, what is that?

14  A.    A canopy.

15  Q.    Is that subject to Chapter 178?

16  A.    Yes, it is.

17  Q.    What are the regulatory and safety concerns with respect

18  to that structure?

19  A.    Proper supporting of the overhead structure.  The makeup

20  of the interior of the structure.  What you see is a decorative

21  cornish on the structure, but there's actually integral steel

22  components within that and that those are designed for proper

23  stress.  Also, for the snow load of the City of Bradford.  It

24  would meet the wind load requirements.  And with this type of

25  structure, there is also requirements in place to address

62

1  adequate drainage because this has the ability to acquire water

2  sitting on top of itself.  There's also drainage of this type

3  of structure that has to be addressed.

4        MR. LANZILLO:  I would move for the admission of

5  Exhibit U.

6        THE COURT:  It's admitted.

7  BY MR. LANZILLO:

8  Q.    Mr. Peterson, Bradford obviously has in place a

9  permitting system that requires the obtaining of a permit

10  before the erection of a sign unless it's an exempt sign.

11  Could you explain to the court why this type of a permitting

12  system requiring permit approval exists?

13    A.    It allows a proper review of the structure of a sign, the

14    method of anchorage, the underground footings and supports for

15    the sign that may be required and necessary.  And also that it

16    complies with various setback requirements from right-of-ways,

17    etc.  And actually that prevents unnecessary cost and burdens

18    to the party desiring to install the sign.  If there is a

19    problem, that's caught early on in the permitting process and

20    can be corrected.

21    Q.    Would you be able to protect the public, consistent with

22    the objectives of the ordinance, if there wasn't this prior

23    approval process, but rather a simply an inspection after the

24    fact?

25    A.    It would make the process much more difficult and,


63


1    obviously, the opportunity would arise that you may not know

2    that a sign has been erected in that area and if the sign was

3    not erected properly, it could be a safety problem.

4    Q.    And you mentioned fairness to the applicant or giving

5    them the opportunity to cure any problems.  If you discover a

6    problem after the fact, if you didn't have this preconstruction

7   review and you found that anchorage on a substantial sign such

8   as the Country Fair sign was not adequate, would that person be

9   required to tear down and rebuild that sign?

10   A.   Yes, they would.  Or to make the sign compliant with the

11   regulation of the ordinance.

12   Q.   Let me just ask you about practicality, also.  As

13   compared to reviewing plans and specifications, wind loads,

14   snow loads and the like prepared by professionals, is it

15   effective to simply examine the sign after the fact to assess

16   its safety and stability?

17   A.   It would be extremely difficult.  If there was not some

18   type of a process that required this information to be

19   submitted previously, the building inspectors would not have

20   this information available to check the sign itself.

21   Q.   Has any permit ever been denied, to your knowledge, based

22   on the content of the sign?

23   A.   No.

24   Q.   Let me talk to you a few minutes about the Historic

25   District ordinance.  This is Section 125-15(E).  I'm correct,

64

1   am I not, that that is actually part of the larger ordinance

2   governing the Historic District?

3   A.   Yes, it is.

4       MR. LANZILLO:  Your Honor, for the record, I know

5   you have this in the materials, but to insure that a complete

6   copy is made a part of the record, I'd like to offer as

7   Defendant's Exhibit Q a copy of the entire Chapter 178.

8       THE COURT:  It's admitted.

9   BY MR. LANZILLO:

10  Q.   Mr. Peterson, approximately how much of the City of

11  Bradford is encompassed within the Historic District?

12  A.   Relatively, 5 to 10 percent, it's a very small section of

13  the overall size of the City.

14  Q.   Let me show you what we've marked as Defendant's Exhibit

15  W, can you identify what we've marked as Exhibit W?

16  A.   This is the map of the current Historic District in the

17  City of Bradford.

18      MR. LANZILLO:  I would move for the admission of

19  Defendant's Exhibit W.

20      THE COURT:  It's admitted.

21  BY MR. LANZILLO:

22  Q.    Is the Historic District in the City of Bradford

23  recognized by the National Register of Historic Places?

24  A.    Yes, it is.

25  Q.    Let me show you what's been marked as Defendant's Exhibit


65


1  X, is this a copy of the certificate recognizing or

2  acknowledging the listing of the Bradford Historic District on

3  the National Register of Historic Places?

4  A.    Yes, it is.

5  Q.    The second page of Exhibit X is a letter from the

6  Pennsylvania Historical Museum Commission directed to you; is

7  this a letter acknowledging or congratulating the City on its

8  acceptance into that program?

9  A.    Yes, it is.  This letter states that we were, our

10  Historic District, was placed in the National Register of

11  Historic Places on August 31st of 2000.

12  Q.    And was that designation a matter of some celebration

13  within the City?

14  A.    Yes, it opened the City to a wide variety of programs

15  available, accompanying the certification.  Main Street manager

16  programs, facade improvement programs and grants.  A tax

17  incentive program for property owners.  That was welcome by the

18  City of Bradford.

19  Q.    The third and fourth pages of Exhibit X are actually from

20  the Bradford Era, am I correct, the designation was front page

21  news in the Bradford Era?

22  A.    Yes, it was.

23        MR. LANZILLO:  Move the admission of Defendant's

24  Exhibit X.

25        THE COURT:  It's admitted.


66


1  BY MR. LANZILLO:

2  Q.    I want to talk to you a little bit about the process and

3  requirements for designation on the National Register.  Am I

4  correct that the City had to submit a very extensive

5  application and registration form for that program?

6  A.    Yes.

7  Q.    This is Exhibit Y, which is a fairly thick document.  I'm

8  displaying the first page, can you tell me is this a copy of

9  the registration form application?

10  A.  Yes, it is.

11        MR. LANZILLO:  I move for the admission of

12  Defendant's Exhibit Y?

13        THE COURT:  It's admitted.

14  BY MR. LANZILLO:

15  Q.    This document contains extensive information concerning

16  the Historic District, the buildings, construction periods,

17  architecture and the like.  How was this information compiled?

18  A.    We hired an expert in this area of historic preservation

19  and historic documentation, David Taylor of Taylor and

20  Associates, out of Brookville, Pennsylvania, to do the actual

21  application process for the City.  That included the writing of

22  the application, the inventory of the historic buildings, and

23  all the narratives necessary to accompany this for

24  consideration.

25  Q.    You mentioned the inventory of historic buildings -- I


                                67


1  referred to that earlier in these proceedings, I'll do this in

2  segments.  This is Defendant's Exhibit Z, what is included in

3  the inventory of historic buildings?

4   A.   This document catalogs over 160 buildings that are

5   located within our Historic District.  Giving them the address,

6   the different materials, the historic function, what it was

7   originally used for.  The current function, architectural style

8   or influence.  The primary construction, material used in the

9   building.  Roof type.  Height.  Approximate dates of

10  construction.  Whether or not it's a contributing or

11  non-contributing building to the Historic District.  And then a

12  narrative of the buildings and the architectural features.

13  Q.   Is this document available to and used by the HARB board

14  in evaluating improvements in signs for consistency with the

15  surrounding buildings?

16  A.   Yes, it is.

17       MR. LANZILLO:  I would move for the admission of

18  Defendant's Exhibit Z.

19       THE COURT:  It's admitted.

20  BY MR. LANZILLO:

21  Q.   Is the Historic District of Bradford also recognized by

22  the Pennsylvania Historical Museum Commission?

23  A.   Yes, it is.

24  Q.   Am I correct that there's actually a Historic District

25  enacted by the Pennsylvania legislature?

68

1  A.  Yes.

2       MR. LANZILLO:  For convenience I've marked as

3  Defendant's Exhibit AA, a copy of the Historic District Act

4  that's codified at 53 PS 8001, et seq., which is probably

5  unnecessary, but I'd move for its admission.

6       THE COURT:  It's admitted.

7  BY MR. LANZILLO:

8  Q.  I'm just going to draw your attention, Mr. Peterson, to

9  one provision of this Act under Section 4(c), there's a

10  requirement that any person applying for a building permit with

11  any Historic District shall be given notice of a meeting of the

12  Board of Historical Architectural Review, which is to council

13  of the governing body, and a meeting of the governing body,

14  which is to consider the granting of a certificate of the

15  appropriateness for the said permit and may appear before the

16  said meeting to explain his reasons therefore, in the event of

17  a failure to recommend to the board and in the event of its

18  disapproval, the governing body shall also indicate what

19  changes in this plan and specifications would meet its

20  conditions for protecting the distinctive historical character

21  of the Historic District.  Mr. Peterson, my question is do you

22  understand the City of Bradford and the HARB board would be

23  subject to this regulation?

24  A.   Yes, they are.

25  Q.   Now, there were other requirements, were there not, as

69

1  part of the certification process necessary to become a

2  Historic District?

3  A.   Yes, there are.

4  Q.   I will show you a document I've marked as Defendant's

5  Exhibit BB, again, this is an oversized document, so I will

6  show you part of it.  The first page of the document appears to

7  be a cover letter to a Diane Galt of the City of Bradford, from

8  a Janice Stramara.  It's followed then by a resolution of the

9  City of Bradford giving permission for the execution of an

10  agreement between the Pennsylvania Historical Commission -- I'm

11  sorry, the Pennsylvania Historical Museum Commission and the

12  City of Bradford to become a certified local government.  And

13  then a copy of the agreement, certification agreement follows.

14    Could you explain to the court what this agreement relates to,

15    what this is all about?

16    A.    The certified local government provisions require a

17    municipality applying for certified local government to take a

18    necessary number of steps to do this.  Requires the creation of

19    a Historic District ordinance, the creation of a HARB board.

20    It covers the training that the HARB board members are required

21    to obtain, and to keep current with.  And in doing so, it

22    allows the City government to avail themselves of a raft of

23    programs that are involved in this, including the Main Street

24    program, the facade improvement programs, which are grants and

25    tax incentive programs to property owners within the Historic


70


1    District that do repairs and improvements to their buildings.

2    Q.    So under the Historic District Act of Pennsylvania in

3    this agreement, the City was required to form a HARB board to

4    constitute the HARB board, by providing a certain number of

5    members and provide training to those HARB members?

6    A.    Yes.

7    Q.    Do you recall the required composition of the HARB board?

8  A.    The HARB board is a nine member panel, consisting of a

9  licensed architect, a licensed real estate broker, the Building

10  Inspector for the City of Bradford.  And the remaining members

11  are to be persons with a general interest and knowledge of,

12  genuine interest in the historic aspects as they relate to our

13  Historic District.  We added our City Historian to ours as well

14  to guide the board in a number of areas.

15  Q.    She's one of the six members?

16  A.    Yes.

17  Q.    In addition to the registered architect, licensed real

18  estate broker and the Building Inspector?

19  A.    Yes.

20  Q.    What is her name?

21  A.    Sally Costic.

22        THE COURT:  What does a City historian do?

23        THE WITNESS:  She actually documents the history of

24  the city and the history, her personal goal is the structures

25  and buildings within the City of Bradford, she's actually

71

1  published several books relating to, picture books, that are on

2  the early history of the City of Bradford.

3        THE COURT:  Go ahead.

4  BY MR. LANZILLO:

5  Q.    Are HARB members required to have initial and ongoing

6  training?

7  A.    Yes, they are.

8  Q.  Is that a minimum of eight hours annually?

9  A.  I believe that's correct.

10  Q.   Now, you also mentioned that under the Act, the

11  Pennsylvania law, that authorizes the creation of Historic

12  Districts.  Under the agreement the City was required to have a

13  Historic District ordinance, that of course is Chapter 125.  My

14  question to you is where did the City get that ordinance and

15  what did it pattern its ordinance after?

16  A.   The City of Bradford's ordinance is patterned after a

17  model ordinance prepared by the Pennsylvania Historic Museum

18  Commission.

19        MR. LANZILLO:  I would move for the admission of

20  Defendant's Exhibit BB.

21        THE COURT:  What was it, I'm sorry?

22        MR. LANZILLO:  Exhibit BB, your Honor.

23        THE COURT:  BB, it's admitted.

24  BY MR. LANZILLO:

25  Q.    Mr. Peterson, am I correct that this is a copy of the

72

1  model Historic District ordinance for local governments in

2  Pennsylvania produced by the Pennsylvania Historical Museum

3  Commission, Bureau for Historic Preservation?

4  A.    Yes, it is.

5  Q.    Is this the ordinance upon which Bradford patterned and

6  based its ordinance?

7  A.    This is what the City of Bradford's ordinance was

8  patterned on, yes.

9  Q.    Let me show you what has been designated Exhibit DD, I've

10  marked as Exhibit DD, it appears to be Section 501, and for the

11  record let me read it.

12        THE COURT:  What is this a part of again, Mr.

13  Lanzillo, what was the larger document?

14        MR. LANZILLO:  This is part of the model Historic

15  District ordinance for local governments in Pennsylvania

16  produced by the Pennsylvania Historical Museum Commission.

17   This is the template upon Bradford and many other

18   municipalities that created their ordinances.

19          THE COURT:  All right, go ahead.

20   BY MR. LANZILLO:

21   Q.   Section 501(a) of the model ordinance states "no sign or

22   permanent external advertising display of any kind shall be

23   erected, altered or used in the Historic District except for

24   advertising informing the public," it says or a service -- "of

25   service, business, occupation or profession carried on" this is


73


1   a typo, I apologize, I'm just noting --

2          THE COURT:  But not completely -- there's sics in

3   both of these.

4          MR. LANZILLO:  There's several typographic errors,

5   the court obviously noting the fact instead of saying the word

6   professional, I think it fits the model ordinance as well.

7          THE COURT:  Can you lay that at the feet of your

8   printer?

9          THE WITNESS:  I'm not sure, your Honor, who to lay

10   that one on.

11          THE COURT:  Go ahead.

12          MR. LANZILLO:  Obviously, the Commonwealth and

13  Bradford use the same printer.

14          THE COURT:  It's a finding I don't have to make,

15  though.  Go ahead.

16  BY MR. LANZILLO:

17  Q.    "Carried on, in or about the property on which such sign

18  or permanent external advertising display appears."  In

19  conjunction with this, "no such sign or advertising display of

20  any kind or for any purpose shall be erected or altered,

21  notwithstanding zoning sign approval, until an application for

22  permit to make such erection or alteration has been reviewed by

23  HARB for conformity in exterior material composition, exterior

24  structural design, external appearance and size with similar

25  advertising or information media used in the architectural


74


1  period of the district and a permit granted thereon."  Is this

2  the language from which Section 125-15(1) was derived?

3  A.    Yes, it is.

4          MR. LANZILLO:  Move the admission of Defendant's

5  Exhibit DD.

6          THE COURT:  It's admitted.

7          MR. LANZILLO:  For record purposes, I move the

8  admission of a copy of Chapter 125 of the Historic District

9  ordinance adopted in Bradford as Exhibit CC.

10          THE COURT: It's admitted.

11          MR. LANZILLO:  I'm not sure this is the entire copy.

12          THE COURT:  Is that the whole copy, CC?

13          MR. LANZILLO:  This is the whole ordinance, your

14  Honor.

15          THE COURT:  I'm sorry, which ordinance is it?

16          MR. LANZILLO:  This is Chapter 125.

17          THE COURT:  Chapter 125 ordinance, all right.

18          MR. LANZILLO:  Your Honor, we would probably save

19  time, I don't know whether it's necessary to go through these

20  with the witness, but I pulled just a few examples of

21  ordinances, Historical District ordinances from other locals

22  that adopted identical or substantially identical language

23  utilized by Bradford.

24          THE COURT:  Let's do it this way.  Rather than

25  unnecessarily wasting time, in the interest of time, would the

1  plaintiffs stipulate that elsewhere in the Commonwealth there

2  are ordinances that are identical or at least sufficiently

3  similar to be functionally identical to the Bradford Historic

4  Preservation Ordinance?

5         MR. FRIEDMAN:  With the same typographical errors?

6         THE COURT:  Save the typographical errors?

7         MR. FRIEDMAN:  Judge, in all honesty, I've never

8  seen them, I don't know what relevance there is to them,

9  either.

10        THE COURT:  Neither do I.

11        MR. FRIEDMAN:  If there are, I just have no idea.

12        THE COURT:  Then that means you can't stipulate, go

13  ahead and put your proof on.

14  BY MR. LANZILLO:

15  Q.   Mr. Peterson, at my request did the City obtain some

16  copies of similar ordinances from other locals?

17  A.   Yes, they did.

18  Q.   This was by no means an exhaustive search, this was just

19  a few townships and municipalities across the state?

20  A.   Yes.

21   Q.   Let me show you a copy of the Historic District's

22   ordinance for Bedford, Pennsylvania.  I won't read this in its

23   entirety, but I draw your attention to page 27-89, subparagraph

24   4 dealing with signs.  This is one of the ordinances that was

25   obtained by the City?

76

1   A.   Yes, it is.

2        MR. LANZILLO:  Your Honor, to save time, your Honor

3   can do the comparison of the language and decide for himself

4   whether they are substantially identical.  I would move this

5   into evidence as Defendant's Exhibit EE.

6        THE COURT:  It's admitted.  Just for my benefit,

7   it's admitted -- I'm not saying there's a hundred of these

8   ordinances out there, but hypothetically, if there's a hundred

9   of these ordinances, if they're all the same, could

10   theoretically be perfectly constitutional.  Or a hundred of

11   them could all be constitutionally infirm, so what difference

12   does it make how many of them there are?

13        MR. LANZILLO:  Your Honor, this is again simply --

14        THE COURT:  Facial challenge.

15          MR. LANZILLO:  I'm sorry, your Honor.

16          THE COURT:  Insofar as a facial challenge, if one is

17  bad, they're all bad.  If one is good, they're all good.

18          MR. LANZILLO:  I agree on the facial challenge, your

19  Honor.  This is designed solely to respond to the allegation,

20  that you have to step back and remember that the plaintiffs'

21  position was that our Historic District was by local

22  designation only, essentially, a pretext for getting at the

23  free speech rights of these plaintiffs.  This is simply

24  additional evidence to show that we patterned this after a

25  model ordinance that is widely used to dispel any possible

77

1  implication --

2          THE COURT:  Of bad motive?

3          MR. LANZILLO:  Of pretext.

4          THE COURT:  All right, go ahead.

5  BY MR. LANZILLO:

6  Q.   This ordinance 175 from the Township of Whitemarsh,

7  Pennsylvania, in Montgomery County, dealing with their Historic

8  District.  This is also an ordinance that was obtained by the

9   City at my request?

10  A.   Yes.

11  Q.   And it, too, has a sign ordinance for the Historic

12  District substantially similar or identical to Bradford's?

13  A.   Yes.  They didn't catch the typo, either.

14        MR. LANZILLO:  Move the admission of Exhibit FF.

15        THE COURT:  It's admitted.

16        MR. FRIEDMAN:  We agree to the admission of all of

17  these.  With the exception that we don't think there's any

18  relevance, other than that.

19        THE COURT:  All right, they're all admitted.

20        MR. LANZILLO:  Those would be Exhibits GG, HH, II,

21  and a player to be named later.  And JJ.  Ordinances from

22  various locals across the Commonwealth.

23        MR. LANZILLO:  Thank you, Mr. Friedman.

24  BY MR. LANZILLO:

25  Q.   I want to look at specific sentences of Section


78


1   115-15(E)(1), and ask you about the City's interpretation of

2   that ordinance and how it has been applied.  The first sentence

3   of the regulation states "no sign or permanent external

4   advertising display of any kind shall be erected, altered or

5   used in the Historic District except for advertising, informing

6   the public of a service, business, occupation or professional

7   carried on, in or about the property on which such sign or

8   permanent external advertising is displayed."  Could you tell

9   the court, Mr. Peterson, does that sentence ban noncommercial

10  speech in the Historic District of Bradford?

11  A.    No, it does not.

12  Q.    Has it ever been interpreted as banning noncommercial

13  speech in the Historic District of Bradford?

14  A.    No, it has not.

15  Q.    Has anyone ever been cited for putting up a sign with a

16  noncommercial message in the Historic District?

17  A.    No, they have not.

18  Q.    The reference to the word service, how has the City

19  understood and interpreted that word?

20  A.    Service would be anything related to a message that the

21  owner of that property may wish to put out as public notice.

22  Q.    With respect to the language in that first sentence,

23  referring to the various activities carried on, in or about the

24    property on which such sign or permanent external advertising

25    is displayed, is that an on-site, off-site distinction?

79

1    A.    Yes.

2          MR. LANZILLO:  Your Honor, I'm not going to review

3    them unless the court asks or instructs me to do so.

4          THE COURT:  Review what?

5          MR. LANZILLO:  But I would like to offer into

6    evidence a copy of the pending amendments because I do believe

7    they go to the issue of eminent and irreparable harm, they have

8    some relevance.

9          THE COURT:  All right, I'll take them and decide

10    what relevance they have.

11          MR. LANZILLO:  For the record, these are contained

12    in Defendant's Exhibit P.

13    BY MR. LANZILLO:

14    Q.    Now, the second sentence of Section 125.15(E)(1) states

15    "no display of any kind or for any purpose shall be erected or

16    altered, notwithstanding zoning sign approval until an

17    application for a permit to make such erection or alteration

18  has been reviewed by HARB for its conformity to exterior

19  material composition, exterior structural design, external

20  appearance and size with similar advertising or information

21  media used in the architectural period of the district and a

22  permit granted thereon." My question is, Mr. Peterson, what

23  guidelines are used by HARB in applying this ordinance?

24  A.   There are guidelines contained within the actual HARB

25  ordinance itself, that guides the commission council utilized


80


1  by the public. There are guidelines within the sign ordinance

2  that can be utilized as well. There is an extensive packet of

3  materials that are given to every applicant for HARB -- for

4  work within the Historic District, that has the design

5  guidelines and standards. It has a checklist for them to

6  comply with, and it actually encourages them to have open

7  dialogue back and forth with members of the HARB board prior to

8  the actual HARB hearing. There also is available in my office

9  every application that has been received from HARB, so they can

10  see other types of applications, the pictures and diagrams,

11  whatever might accompany that. Oftentimes there's colored

12  photos for color schemes.  There's also available in my office

13  the historic chart that is used by the City of Bradford HARB

14  board for determining appropriate color combinations and

15  schemes involving both.

16  Q.    You mentioned earlier that the property inventory had

17  been marked as Exhibit Z, is also used as a guide?

18  A.    Yes, it is.  That's also available in my office, as well

19  as through any member of the HARB board.

20  Q.    Just to make sure I have this straight, there is the

21  ordinance itself, the sign portion also of the guidelines that

22  are contained in the rest of the ordinance, the HARB manual and

23  checklist, which I've marked as Defendant's Exhibit LL, which I

24  will display momentarily, the inventory property guide, which

25  is Exhibit Z.  You mentioned the historic paint guide or color


81


1  guide?

2  A.    Yes.

3  Q.    This is a guide that shows approved colors?

4  A.    There actually is a very extensive color chart that the

5  HARB board uses to assist the people coming for them and to

6    pick out appropriate color combinations and color schemes.

7    Q.    Is that available to the public for inspection?

8    A.    Yes, it is.

9    Q.    And you also mentioned, of course, the permit files on

10    record which provide a record showing what others have done

11    consistent with the environs?

12    A.    Yes, there are.

13    Q.    This is a copy of Exhibit LL, which appears to be about

14    23 pages in length.  Which contains the checklist that you

15    mentioned and the application process and the other information

16    that you described as far as guidelines; is this the HARB

17    manual that you had mentioned earlier?

18    A.    This is the HARB application packet.

19        MR. LANZILLO:  Your Honor, I move the admission of

20    Defendant's Exhibit LL.

21        THE COURT:  It's admitted.

22    BY MR. LANZILLO:

23    Q.    I believe I have just a couple more minutes, what I'd

24    like to do is show you some of the photographs for buildings

25    within the HARB.

82

1        THE COURT:  Are these ones that have already been

2   identified?

3        MR. LANZILLO:  They've been identified in my

4   opening, your Honor, they have not been admitted.

5   BY MR. LANZILLO:

6   Q.   Exhibit QQ, this is, Mr. Peterson, the photographs of

7   Movie Magic -- everyone can see the signage.  Was this done

8   pursuant to HARB approval and the permitting process of the

9   ordinance?

10  A.   Yes, it was.

11  Q.   What about the building depicted here, what is this a

12  picture of?

13  A.   This is former Forest Oil Building within our Historic

14  District.  This building also went to the HARB board, through

15  the HARB application process for a new color scheme on the

16  building, and they also took some signage actually to HARB as

17  well.

18  Q.   Exhibit RR.  This is a picture of the Grocery Stretcher,

19  which has a wall sign, and what is this again?

20  A.   Projecting sign.

21  Q.   Projecting sign, excuse me, did those go through the HARB

22  process?

23  A.    Yes, they did.

24  Q.    Exhibit NN.  Exhibit MM is a closer view of the

25  projecting sign for the same, is that correct?


                                83


1  A.    Yes.

2  Q.    Exhibit PP is a photograph, Furniture, Carpet and

3  Mattress Outlet with signage in the storefront, did that go

4  through the HARB process?

5  A.    Yes, it did.

6  Q.    Finally, what looks like -- is that Angelo's Family

7  Restaurant?

8  A.    That's Angel's Family Entertainment Center.  And yes,

9  that particular project also went through the HARB application

10  process.

11  Q.    That's Defendant's Exhibit OO.

12        MR. LANZILLO:  Your Honor, I move the admission of

13  Defendant's Exhibit NN, MM, PP and OO.

14        THE COURT:  What about QQ?

15        MR. LANZILLO:  QQ and RR.

16          THE COURT:  Okay, those are admitted.  Mr. Peterson,

17    let me just ask you a question here.  In this Historic area

18    that we're talking about, it take it, would it be accurate to

19    say that the majority of buildings with structures within that

20    area that are historic within the meaning of the term, whether

21    it's by age or otherwise, but inevitably there would have to be

22    some structures in the Historic area that just by virtue of

23    having popped up earlier would not have otherwise qualified, is

24    that right?

25          THE WITNESS:  Yes, your Honor.  On that inventory

84

1    listing, it actually states whether that building is

2    contributing or noncontributing.  Obviously, new structures

3    have been erected in downtown are listed as noncontributing

4    structures.

5          THE COURT:  If they're noncontributing, I'm not even

6    sure this is necessarily relevant, but just for my background,

7    if they're noncontributing, are they subject to the

8    requirements of the Act?

9          THE WITNESS:  Yes, they are.

10        THE COURT:  Okay.  Which might mean, for instance,

11   that if they wanted to put signage in front of a brand new

12   modern building, the signage in front of the building might

13   have to be checked to see if it's in conformance, not with a

14   brand new building, but with the other signage in the area?

15        THE WITNESS:  That's correct, your Honor.  I would

16   also say that we have had no new buildings constructed on Main

17   Street since we have adopted the new ordinance and became a

18   certified local government.  Any new building construction

19   actually has to -- well, I'll take that back, your Honor.  We

20   did have a very significant building constructed, it's a Tops

21   Supermarket, that went through the HARB process.  And very

22   lengthy and detailed revisions to that building, so it was not

23   a box.  It has decorative cornish, it has even so far as the

24   canopy of their gas station that they erected later, still has

25   the same decorative effect to make it blend into the Historic


85


1   District.  Any building that's been constructed since '99 goes

2   to HARB for conformance of the actual building itself.

3   Buildings over the '40s and '50s, no.  But they would if they

4  wanted to put up a sign.

5        THE COURT:  Go ahead, Mr. Lanzillo.

6  BY MR. LANZILLO:

7  Q.   These are, as I understand, please confirm for me,

8  buildings next door to Mr. Riel's property, the plaintiff Mr.

9  Riel's property at 52 Mechanic Street?

10  A.   That's correct.

11  Q.   This building here in Exhibit SS, is that Just Riding

12  Along?

13  A.   Yes, it is.

14  Q.   Would you tell the court about that business?

15  A.   That's a bicycle shop.  The owner is a young gentleman,

16  who's just starting out in business.  The City actually

17  provided some funding to him to establish his business.  He did

18  go through the HARB process for his color scheme of his

19  building and also for his signage.

20  Q.   Exhibit TT, these are just structures with no signage to

21  the left of 52 Mechanic Street?

22  A.   That's correct.

23        MR. LANZILLO:  I move the admission of Defendant's

24  Exhibits SS and TT.

25    THE COURT:  They're admitted.

86

1  BY MR. LANZILLO:

2  Q.    Are you familiar with the reasons for the citations

3  issued to the plaintiffs in this case?

4  A.    Yes, I am.

5  Q.    Could you tell the court for what the plaintiffs were

6  cited?

7  A.    Failure to obtain HARB approval.

8  Q.    Was any plaintiff ever cited for posting a sign with a

9  noncommercial message?

10  A.    No.

11  Q.    I'm going to show you a couple of final photographs as

12  the last bit of evidence I have for this witness.  This is

13  Exhibit A, Defendant's Exhibit A, do you recognize that sign?

14  A.    Yes, I do.

15  Q.    Where is that located?

16  A.    That is located on Seward Avenue in the City of Bradford.

17  Q.    Who owns the underlying property?

18  A.    Mr. Riel.

19  Q.   And the sign reads "How is the Mayor Like a Hemorrhoid?"

20  A.   Correct.

21  Q.   And I think we can agree that would appear to be a

22  noncommercial message?

23  A.   Yes.

24  Q.   Has Mr. Riel been cited for this sign?

25  A.   No, he has not.


87


1  Q.   I'll actually mark this group of photos collectively as

2  Defendant's Exhibit A, page two of Exhibit A is actually just a

3  larger version of the last sign.  Here's another sign on there,

4  is this also on the Seward property?

5  A.   Yes, it is.

6  Q.   On Mr. Riel's property, this one reads "What is a

7  Political Prostitute?"

8  A.   Correct.

9  Q.   Has he ever been cited for that sign?

10  A.   No.

11  Q.   What about this sign, where is that one located?

12  A.   Same location.

13   Q.   This one reads "Is the City of Bradford Run Like a

14   Brothel?"

15   A.   Correct.

16   Q.   Has Mr. Riel ever been cited for that sign?

17   A.   No.

18   Q.   This next page is another picture of the sign that reads

19   "What is a Political Prostitute?"  Page six of the exhibit asks

20   "How corrupt is City Hall?"  Is this also on the same property

21   owned by Mr. Riel?

22   A.   Yes, it is.

23   Q.   Has he ever been cited for that sign?

24   A.   No.

25   Q.   Just so you don't feel slighted, Mr. Peterson, here's one


                                   88


1   that I think refers to you, it says "Good Luck John Peterson!"

2   Is that on that same property?

3   A.   Yes.

4   Q.   Has he been cited for that sign?

5   A.   No.

6   Q.   Page eight another photograph, I believe you've seen that

7   one, "How Corrupt is City Hall?"  Same property?

8   A.   Yes.

9   Q.   No citation?

10  A.   No.

11  Q.   Here's one, "Is our Mayor Arrogant, Mean or Just Plain

12  Rude?"  Same property?

13  A.   Yes.

14  Q.   Citation?

15  A.   No.

16  Q.   "Has the Mayor Failed Herself," is the sign depicted on

17  page 10 of Exhibit A.  Any citation with this one?

18  A.   No.

19  Q.   Page 11 is just another copy of a sign we've seen before,

20  it's page 12.

21       MR. LANZILLO:  I would move for the admission of

22  Defendant's Exhibit A.

23       THE COURT:  It's admitted.

24  BY MR. LANZILLO:

25  Q.   Those signs are all within the City of Bradford?

89

1  A.  Yes.

2  Q.  They're not within the Historic District, are they?

3  A.  No, they are not.

4  Q.  They would be exempt under 178-15(I)?

5  A.  That section of the general sign ordinance, yes.

6  Q.  Exhibit B are two photographs, still photographs of

7  another property in the City of Bradford; do you recognize the

8  property?

9  A.  It's property located at the intersection of Interstate

10  Parkway and West Washington Street, outside of our Historic

11  District.

12  Q.  This is a busy intersection?

13  A.  Yes, it is, it's one of the busiest traveled roadways in

14  Bradford.

15  Q.  Do you know who posted the sign depicted on the first

16  page of Defendant's Exhibit B?

17  A.  I believe it would be Mr. Riel.

18  Q.  Has there been a citation issued for this sign?

19  A.  No.

20  Q.  Now, this one is really hard to read, the second page of

21  Exhibit B.  Let me begin by asking you is this the same

22  building that we were discussing relative to the first page of

23  Exhibit B?

24  A.   Yes, it is.

25        MR. LANZILLO:  Your Honor, can you make out the

90

1  contents of the sign, looks like "Make City Council a

2  Democratic Forum Again, Vote Riel for" -- is that Mayor?

3  A.   I believe that was the content of the sign, yes.

4  Q.   Do you know whether a citation was ever issued for that

5  sign?

6  A.   No, there was not.

7  Q.   This, too, was exempt under the general ordinance?

8  A.   Yes.

9  Q.   It's outside of the Historic District?

10  A.   Yes.

11        MR. LANZILLO:  Your Honor, that's all I have for

12  this witness at this time.

13        THE COURT:  All right.

14        MR. LANZILLO:  Your Honor, I would move into

15  admission of exhibits -- if I haven't done so already, Exhibits

16  A and B.

17          THE COURT: They're admitted.

18          MR. LANZILLO: Thank you, Mr. Peterson, counsel will

19  have some questions for you.

20                    CROSS-EXAMINATION

21  BY MR. FRIEDMAN:

22  Q.   Mr. Peterson, I have several questions, although, I will

23  not be nearly as lengthy. I'd like to first refer you to

24  Defendant's Exhibit A, which is what you were just testifying

25  concerning, is that correct?


                         91


1  A.   Yes.

2  Q.   Do you know the dimensions of this particular sign?

3  A.   I did not measure that sign, no.

4  Q.   I want you to assume for a moment that sign is four feet

5  by four feet, it's 16 square feet; would that sign be in

6  violation of the Bradford City ordinance Section 175?

7  A.   It would if it exceeded 12 square feet, it would be in

8  violation.

9  Q.   Did you measure it?

10  A.   No, I did not.

11   Q.   Is it still standing?

12   A.   I don't believe that sign is there currently.

13   Q.   How about the sign which Mr. Lanzillo showed you as

14   Defendant's Exhibit B on the side of a building, did you

15   measure that sign?

16   A.   No, I did not.

17   Q.   So you don't know if in fact that sign exceeds 12 square

18   feet, is that correct?

19   A.   That's correct.

20        THE COURT:  Let me interrupt you if I could for a

21   second.  Just for my own clarification here.  Is it your

22   understanding that the 12 square foot requirement applies not

23   only to noncommercial signs, but also -- let me rephrase it,

24   that's a bad way to put it.  Are wall signs exempt regardless

25   of their size?


92


1         THE WITNESS:  Noncommercial wall signs?

2         THE COURT:  No, any kind of wall sign; do you

3   understand my question?

4         THE WITNESS:  No, I don't, your Honor.

5       THE COURT:  Under (I) it says "noncommercial signs",

6  I'm back on 178, I apologize for jumping around.

7  "Noncommercial signs not exceeding 12 square feet placed upon

8  private property by the owner or occupant of said property."

9  So that means if you have a noncommercial sign and if it's

10  exempt if it doesn't exceed 12 square foot, right?

11       THE WITNESS:  Correct.

12       THE COURT:  Now, look up at (C), "signs painted on

13  the exterior of a building or structure."  My question to you

14  is for signs painted on the exterior of a building or

15  structure, is there any square footage requirement like there

16  is under (I)?

17       THE WITNESS:  No, your Honor.

18       THE COURT:  All right, go ahead.

19  BY MR. FRIEDMAN:

20  Q.   Just to follow-up, it's okay to paint a sign on the side

21  of a wall of any size, but if you put it on a freestanding

22  sign, such as exists in Exhibits A, B and C, then they could be

23  in violation if they exceed the 12 square foot message, is that

24  correct, 12 square foot sign?

25  A.   Yes.

93

1  Q.   Now, Mr. Peterson, referring back to the HARB

2  ordinance -- I'll put that up in front of you, it says "no sign

3  or permanent external advertising display of any kind shall be

4  erected, altered or used in the Historic District except for

5  advertising, informing the public or service, business,

6  occupation or professional carried on, in or about the property

7  on which such sign or permanent external advertising is

8  displayed."  Have I read that correctly?

9  A.   Yes.

10  Q.   Is it your testimony here today that service advertising,

11  informing the public of a service in or about the property

12  includes a political sign "Vote for Joe"?

13  A.   Yes.

14  Q.   What service is being advertised when a person indicates

15  "Vote for Joe"?

16  A.   Sort of public information.

17  Q.   So anything that goes up as a service, it's public

18  information, is that correct?

19  A.   Yes.

20  Q.    Is there anything that's been issued in writing by the

21  City of Bradford or by HARB indicating that that definition is

22  controlling, that definition is what goes out to the public?

23  A.    I'm not aware that there's a document that exists

24  concerning that, no.

25  Q.    Has HARB or has the City or have you issued anything to

94

1  the public whatsoever advising them that political signs are a

2  service as indicated in the ordinance?

3  A.    I don't believe there's any documents to that effect.

4  Q.    Let me ask you this.  When is the first time that you

5  ever advised anyone that service included a political sign,

6  that service included a sign that says "Vote for Joe" or

7  criticizing the Mayor, that that was a service?

8  A.    I would not be in a position today to advise somebody of

9  that.

10  Q.    Why is that?

11  A.    Because I'm no longer on the HARB board.

12  Q.    So, in fact, you have never advised anyone of that,

13  correct?

14  A.   I have not, no.

15  Q.   And, to your knowledge, no one from the City has ever

16  advised anyone of that until today, is that correct?

17  A.   I can't answer that.

18  Q.   You have no knowledge?

19  A.   I have no knowledge.  I did serve on that board till

20  2000, I have no knowledge of any of the board's activities

21  since the year 2000.

22  Q.   If I understand the procedure correctly, when one has a

23  building in the HARB district, such as plaintiffs in this case,

24  and they wish to put up a political sign, they have to make

25  application to HARB, is that correct?

95

1  A.   The City of Bradford has never enforced any action

2  against political signs.

3  Q.   Well, they've cited Mr. Riel, haven't they?

4  A.   They cited Mr. Riel for not applying to the HARB board.

5  Q.   So in effect they have taken action against somebody for

6  putting up a political sign without getting HARB approval,

7  isn't that correct?

8  A.   He was cited for not applying for the sign to the HARB

9  board.

10        THE COURT:  For what?

11        THE WITNESS:  For not applying to the HARB board for

12  approval.

13  BY MR. FRIEDMAN:

14  Q.   And with a political sign, that was the subject of his

15  not applying to HARB, correct, that's the sign we're talking

16  about?

17        THE COURT:  Which sign was it, I saw three or four

18  different political signs?

19        MR. FRIEDMAN:  I have to ask the person who actually

20  cited him, your Honor, but it's one of the signs or several of

21  the signs --

22        THE COURT:  Are they all on the same property?

23        MR. FRIEDMAN:  They are, your Honor.

24        THE COURT:  And they're all in the Historical

25  District?


96


1        MR. FRIEDMAN:  They are.  They're all on one

2    building, which is located in the Historic District.

3          THE WITNESS:  I believe the first sign may have

4    referenced something concerning the Fire Chief.  Which would

5    not have been a political sign.

6          THE COURT:  Would not have been a what?

7          THE WITNESS:  A political sign, like Elect Joe

8    Smith, it referenced the Fire Chief.

9    BY MR. FRIEDMAN:

10   Q.    The first sign was critical of the Fire Chief, was it

11   not?

12   A.    I believe that -- it had a name for him and it asked him

13   to resign.

14   Q.    Let me show you what I've marked as Plaintiff's Exhibit

15   1, which is the same photograph that you previously looked at.

16   And on that it says "Fire Chief Wild Bill McCormack Resign," is

17   that correct?

18   A.    Yes, it is.

19   Q.    Is that the sign you're referencing?

20   A.    Yes.

21   Q.    And are you telling us that that is a not a political

22   sign?

23   A.    My understanding of a political sign would be a sign like

24  you referenced, "Elect Joe Smith", "Vote for Tom Riel", I don't

25  know that necessarily constitutes a political sign, the Fire


97


1  Chief is not a political figure.

2          THE COURT:  I can't tell from that photograph

3  whether it's a painted sign or a hanging sign; do you know?

4          THE WITNESS:  It's a hanging sign, your Honor,

5  attached to the front of the building.

6          MR. FRIEDMAN:  Those are all hanging signs, your

7  Honor.

8          THE COURT:  All right.

9  BY MR. FRIEDMAN:

10  Q.    You were, as I understand it, the Building Inspector, is

11  that correct?

12  A.    I was up to a certain period of time, yes.

13  Q.    You're no longer the Building Inspector?

14  A.    I serve in that capacity, I'm not active in building

15  inspections or code enforcement any longer since I moved to

16  City Hall.

17  Q.    But it's your testimony then, that the City of Bradford

18  would not enforce political signs within the HARB, the

19  Historical District, correct?

20  A.    The City of Bradford I don't believe has ever issued a

21  citation against any political candidate that has erected a

22  political sign in the City.

23  Q.    Who would make the determination as to what is or what is

24  not a political sign?

25  A.    I would assume that would be the Building Inspector that

98

1  is involved in that process.

2  Q.    So somebody in the building inspection process made the

3  decision that these particular signs were not political signs

4  and, therefore, elected to cite Mr. Riel, is that correct?

5  A.    Yes.

6  Q.    And, in fact, Mr. Riel was cited for failure to apply for

7  HARB approval for these particular signs, correct?

8  A.    Yes.

9      THE COURT:  What do the other two signs say, is

10  there a better picture?

11      MR. FRIEDMAN:  There is, your Honor.

12        THE COURT:  While you're looking for that --

13   Mr. Peterson, was he cited just for the sign -- it just moved

14   there, the sign involving the Fire Chief or was he cited for

15   not getting or not running the signs by, all three signs by?

16        THE WITNESS:  Your Honor, I believe he was cited

17   each time a new sign went up.  At some point in the process the

18   signs were removed, the original citations were removed from

19   the District Magistrate by the Building Inspector at that time.

20   Then the signs went back up and subsequent citations were

21   issued.

22        THE COURT:  Again?

23        THE WITNESS:  Again.

24        THE COURT:  All right, go ahead.

25   BY MR. FRIEDMAN:


99


1   Q.   If I'm reading these correctly, the signs indicate "How

2   Unethical is Mayor Henry; Can CEO," I believe that stands for

3   Code Enforcement Officer, "Corignani Work an Honest 8 Hours;

4   Fire Chief Wild Bill McCormack Resign."  Have I read those

5   correctly, sir?

6   A.   Yes.

7   Q.   These are the signs for which Mr. Riel was cited at some

8   point in time, correct?

9   A.   Yes.

10   Q.   And, in fact, as you've indicated, he was cited because

11   somebody within the City decided that these were not political

12   signs, correct?

13   A.   Yes.

14   Q.   These were protest signs, correct?

15   A.   The decision would have been made by that person, I don't

16   know that I can speak for him, I don't have that knowledge.

17   Q.   And in fact, sir, at least one of the citations was

18   issued by CEO Corignani, is that correct?

19   A.   I believe that's correct.

20   Q.   And is he related to Mayor Corignani?

21   A.   Yes, he is.

22   Q.   How is he related?

23   A.   He's her husband.

24        THE COURT:  Who is Corignani, you said he issued a

25   citation?

1        MR. FRIEDMAN:  That's correct, your Honor.

2        THE COURT:  Let me hear it from him?

3        THE WITNESS:  George Corignani is a firefighter in

4   the City of Bradford.  He's a captain on the fire department,

5   he's a Code Enforcement Officer for the City and, also, the

6   Building Inspector.  He is married to Michele Corignani, who is

7   the Mayor of the City of Bradford.

8        THE COURT:  Would he have been the one who would

9   have issued citations for all three of those signs?

10        THE WITNESS:  No, your Honor.  Code Enforcement

11   Officer Silvis, Building Inspector Silvis issued the citations,

12   issued the original citations for the Fire Chief sign, and I

13   don't know the chronology, your Honor, of how these signs went

14   up.  I believe there was a second citation issued after the

15   first sign went up, and then upon subsequent conversation

16   between Mr. Riel and the Code Enforcement Officer at that time,

17   who was not Mr. Corignani, but Mr. Silvis, the signs were

18   removed and those original citations were destroyed.  And

19   subsequently new signs were erected following the removal of

20   those signs.

21         THE COURT:  All right, go ahead.

22   BY MR. FRIEDMAN:

23   Q.    In fact, the citation that was issued against Mr. Pysher

24   was issued by Fire Chief Bill McCormack, isn't that correct?

25   A.    Correct.


                            101


1   Q.    Now, sir, according to what you've testified, Mr. Riel

2   should have sought HARB approval for each of these signs, is

3   that correct?

4   A.    Yes.

5   Q.    And that was the reason for the citation, failure to seek

6   and obtain HARB approval, correct?

7   A.    Yes.

8   Q.    Now, if I understand the process correctly, approval has

9   to be sought from the HARB board before the signs are put up,

10  is that correct?

11  A.    Yes.

12  Q.    And then after information is submitted to HARB, HARB has

13  to make a determination as to whether or not those signs can

14  get approval, correct?

15  A.    Yes.

16  Q.    Now, sir, referring you to the HARB ordinance, Section

17  125.15(E), the standards for determining whether or not

18  somebody gets approval are what is contained in subsection

19  (E)(1), is that correct?

20  A.    For the most part, yes.

21  Q.    And, in fact, that's the only thing that's in the entire

22  ordinance that has to do with standards to be applied by HARB

23  to determine whether or not a sign can be put up or not,

24  correct?

25  A.    This is the section leading to signs of the very broad

102

1  ordinance that discusses storefronts, doors, windows, facades,

2  design of a new structure.  This is the section that relates to

3  signs in my eyes.

4  Q.    But my question is, it is part of the very broad

5  ordinance, but the only thing that relates to standards for

6  signs is what's contained in subsection (E)(1), correct?

7  A.    To the most part, yes.

8  Q.    In fact, it gives HARB a great deal of discretion to

9   decide whether or not a sign is or should be given approval by

10  HARB, correct?

11  A.   I believe that if the sign meets the HARB criteria and

12  the guidelines that the HARB utilizes, that sign permit is

13  granted.

14  Q.   HARB has its own guidelines and criteria outside of

15  what's in the ordinance, is that correct?

16  A.   Yes.

17  Q.   And that's something that HARB decides on and those are

18  changed periodically, correct?

19  A.   I don't believe there's been many changes to that, other

20  that possibly the adoption of a color chart, which came about

21  following the original ordinance.  And some language about,

22  there may have been some language about sign inserts, when a

23  sign insert is changed.

24  Q.   Most of these are aesthetic requirements, is that right,

25  rather than safety requirements?


103


1   A.   Not necessarily, as it relates to signs, not necessarily.

2   HARB may not actually look at the actual design of a sign, that

3   would be looked at by someone from the Building Inspector as to

4   the adequate bracing structure and that.  HARB would be more

5   concerned with appearance, as it fits into the Historic

6   District.

7   Q.   So HARB has, if I understand correctly, 45 days in which

8   to review and make its decision as to whether or not it meets

9   HARBS requirements, correct?

10  A.   Yes.

11  Q.   And after 45 days, then HARB reports to City Council on

12  that particular sign, is that correct?

13  A.   Yes.

14  Q.   And then City Council is supposed to put that matter on

15  its next meeting agenda, correct?

16  A.   I'm not certain if the ordinance reads that way right

17  now.  I believe an amendment to that ordinance will require

18  that.  Traditionally, that occurs, our HARB meetings are

19  pre-scheduled on the third Thursday of every month.  And our

20  City Council meets on the fourth Tuesday of every month.  So

21  normally, unless there is extenuating circumstances, that is

22  acted on by City Council within five days of HARB approval.

23  Q.   According to Section 125.12 of the current ordinance, a

24  report is prepared and submitted to City Council, is that

25  correct?


104


1  A.  Yes.

2  Q.  And then City Council places that matter on its agenda

3  for a meeting, is that correct -- let me flip it back so you

4  can read the whole thing --

5  A.  Is that the existing ordinance?

6  Q.  Yes, it is.

7  A.  Okay.  You can go to the next page.

8  Q.  Okay.  And subsequent to that meeting, I'm looking at

9  subsection (J), City Council has five days after that meeting

10  to make a decision and to advise the applicant, correct?

11  A.   That's correct.  It normally has acted on that at that

12  meeting.  I've never seen an instance where Counsel has not

13  acted on it at the actual meeting.

14  Q.   So, according to that criteria, the applicant makes

15  application, the HARB board has 45 days to submit its report to

16  City Council.  City Council places it on the agenda for the

17  next meeting, and then City Council has five days after the

18  meeting to notify the applicant of approval, is that correct?

19  A.    That's the timeframes spelled out in there.  It does not

20  take that long for that process to occur.

21  Q.    And then after the applicant receives HARB approval, he

22  or she then has to make application for a permit under Section

23  178, is that correct?

24  A.    If it relates to signage issues, yes.

25  Q.    And, please, all my questions relate to signs, we're not


105


1  dealing with structures today, just signs, I don't mean to

2  confuse you.

3  A.    All right.

4  Q.    But after approval is given by City Council, then the

5  applicant can make application for a building permit under

6  Section 178, which is applicable to the Historical District and

7  to the non-Historical District, correct?

8  A.    Yes.

9  Q.    And under Section 178 as it exists, there are no time

10  lines for a decision on that particular application, correct?

11  A.    That's correct.

12  Q.    That can come in a matter of days, it can come in a

13   matter of weeks, it can come in a matter of months, correct?

14   A.    The process does not take months or even weeks.  Normally

15   a permit is turned around within to three to five days at the

16   very most.

17   Q.    That's been your practice, is that correct?

18   A.    Yes, sir.

19   Q.    But that's not what the ordinance says?

20   A.    The ordinance doesn't have a timeframe, I'm just stating

21   the traditional turnaround time within our department is three

22   to five days.

23   Q.    So if I, as a resident or building owner in the

24   Historical District of Bradford want to put up a sign such as

25   this, it can take months before I get approval?


106


1        THE COURT:  The record won't be clear on that, such

2    as what?

3    BY MR. FRIEDMAN:

4    Q.    Such as the signs placed by Mr. Riel, it can take months

5    before I go through the entire process and get approval,

6    correct?

7   A.   It could, but it wouldn't.

8   Q.   In fact, sir, if you put up a sign saying "Stop The War

9   In Iraq," the war could be over before I ever got approval to

10  put that sign up, isn't that correct?

11  A.   I believe that's incorrect.

12  Q.   What if the war only lasted for 30 days?

13  A.   Depending on the time of your application to HARB, it can

14  go to Council as quickly as five days.  If could come in the

15  day of the HARB meeting with your application and it's approved

16  that night, and five days later City Council acts on it, and

17  the Building Inspector then acts on the building permit within

18  three to five days, the timeframe could be as little as eight

19  to ten days.

20  Q.   What if the war's over in five days, I haven't had a

21  chance to express my opinion on it, have I?

22  A.   In that situation more than likely no, it could not

23  occur.

24  Q.   And in fact, if the election was in five days and it was

25  construed not to be a political sign, I wouldn't be able to

107

1  express myself on my property by a sign before the election was

2  over, would I?

3  A.    I believe I stated that the City of Bradford has not --

4  has not taken action on political signs that are erected, any

5  type of size within the City of Bradford concerning an

6  election.

7  Q.    Has the City of Bradford issued any written policy or

8  recommendation concerning what is or what is not a political

9  sign?

10  A.    I don't believe there are, sir.

11  Q.    Now, sir, if I understand the scheme under 178 all

12  encompassing sign ordinance, there is a 30-day time limit for

13  any temporary signs, is that correct?

14  A.    Correct.

15  Q.    So after 30 days I have to pull my sign, my protest sign

16  off of my building, is that correct, and get re-approval?

17  A.    If you would apply under the terms of a temporary sign

18  for a certain time, yes.  If you meet the exemption, you're

19  not, that doesn't apply at all.

20  Q.    And, in fact, under Section 178-9, that indicates, does

21  it not, Mr. Peterson, that "all rights and privileges acquired

22   under the provisions of this chapter or any amendment thereto

23   are mere licenses revocable at any time by the Building

24   Officer, and all such permits shall contain this provision."

25   Have I read that correctly?


108


1   A.   Yes.

2   Q.   So the Building Inspector has the right to revoke a

3   permit at any time, correct?

4   A.   Yes, with just cause.

5   Q.   Is that what it is for just cause?

6   A.   I don't know that we have ever revoked a sign permit for

7   any other reason than that.

8   Q.   Are there any standards in here concerning just cause?

9   A.   Just cause to me would be the sections that relate to the

10   safety considerations for the sign and that would be it alone.

11   Q.   So we're to assume that even though it doesn't even say

12   just cause in it, you say it may be revoked?

13   A.   Just as a matter of standard practice in the City of

14   Bradford, we do not remove signs for no reason.

15   Q.   Mr. Peterson, going back to political signs, you said

16  that political signs are not subject to citation in the City of

17  Bradford, correct?

18  A.    No, we have not enforced that in -- I don't know, I've

19  been with the City for 32 years, I'm not aware that City has

20  ever --

21        THE COURT:  Hang on, I'm confused.  Is the question

22  whether or not political signs are exempt under 178 or were you

23  referring to 125?

24        MR. FRIEDMAN:  I'm referring to the practice of the

25  City of Bradford.


                              109


1        THE COURT:  I apologize.  Ask the question again and

2  start the answer.

3  BY MR. FRIEDMAN:

4  Q.    In the City of Bradford, according to the practices of

5  the City of Bradford, do you cite people for putting political

6  signs up on their buildings?

7  A.    No.

8  Q.    Regardless of the size of those signs, they are not

9  cited, is that correct?

10   A.   No.  That's correct, yes.

11   Q.   That's correct.  So if I take a block of that wood out of

12   that wall and put on there "Vote For Mayor Corignani", put it

13   up on my building, that's okay?

14   A.   You would not receive a citation.

15   Q.   Regardless of how it's attached to the building, correct?

16   A.   Correct.

17   Q.   If I took that piece of block out and didn't write

18   anything on it at all and just hung it from the outside of my

19   building, would I be cited?

20   A.   That situation has never occurred, I guess I can't answer

21   that.  I don't know the intent of it.  Would that be a sign,

22   I'm not sure, there's nothing on it, I don't know it would

23   constitute being a sign.  It may be something attached to a

24   building, but if it doesn't have a message on it, I'm not

25   certain it would constitute being a sign.


110


1   Q.   So the issue to determine whether or not I can hang that

2   on my building is what message is conveyed on it?

3   A.   Not what message, if there's anything on it.

4   Q.   So it doesn't matter what it says in the message, the

5   only question is is there writing on that block?

6   A.   That would be my indication of a sign, I believe that's

7   in the sign definition.

8   Q.   What is your definition of a sign?

9   A.   Including every sign, billboard, ground sign --

10  Q.   I don't mean to interrupt you -- your Honor, I'm

11  referring to Section 178-2.  Now, sir, that section defines

12  sign as including every sign, is that correct?

13  A.   Yes.

14  Q.   So we know if we're reading that, that a sign includes

15  every sign?

16  A.   Yes.

17  Q.   Okay.  Go ahead, you can read the rest and then tell me

18  whether or not that constitutes a sign?

19  A.   "Every sign, billboard, ground sign, wall sign, roof

20  sign, illuminated sign, projecting sign, temporary sign,

21  marquee, awning, canopy and street clock, and shall include any

22  announcement, declaration, demonstration, display, illustration

23  or insignia used to advertise or promote the interests of any

24  person when the same is placed out of doors in view of the

25  general public."

111

1  Q.   So can we agree that that wood block would not constitute

2  a sign because it doesn't have anything written on it?

3  A.   Yes, I believe that does not constitute being a sign.

4  Q.   If Mr. Riel then could hang that outside of his building

5  in the Historic District of Bradford and not have to apply

6  either for HARB approval or for a sign permit under Section

7  178?

8  A.   He may -- if he's altering the external appearance of the

9  structure, then it would still need HARB approval.  It may not

10  need a permit, but HARB would need to approve it.

11  Q.   HARB has to approve everything that hangs from a

12  building?

13  A.   Anything to do with the external appearance, any change

14  to the external appearance of the building.  If he hung that,

15  that would be an external change.

16  Q.   Let's assume that that's consistent with the aesthetics

17  of the Historical District.  Then it's your testimony he does

18  not have to go further than that, he just has to get HARB

19  approval, that ends the debate on that?

20  A.    This is for a blank piece of --

21  Q.    A piece of wood which probably measures, I don't know,

22  three feet by three feet, four feet by four feet, doesn't

23  matter, does it?

24  A.    No.  In my estimation it would need to go no farther than

25  HARB approving it, for it would be external appearance of the

112

1  building and surrounding architecture.

2  Q.    So if I understand the City's position correctly, it

3  depends when one seeks a permit for a sign, it depends on what

4  is on the sign, correct?

5  A.    No.

6  Q.    It doesn't matter what message is conveyed on that sign?

7  A.    No.

8  Q.    All right.  I come to you, sir, as a building owner in

9  the City of Bradford and I have a piece of wood that I want to

10  use for a sign that's three feet by three feet, nine feet

11  square, okay?

12  A.    Yes.

13  Q.    And is it okay to have a sign in the City of Bradford

14  that is not in English?

15  A.    We have no regulation on content, other than that very

16  limited section in the traffic, relating to traffic hazards.

17  Q.    I want to hang this from my building and written on there

18  is something in Chinese.  Am I allowed to put that up or do I

19  have to get a sign permit?

20  A.    Three feet by three feet --

21  Q.    Nine square feet?

22  A.    If it was a noncommercial message, I would imagine we may

23  need to get a Chinese interpreter to see what the sign actually

24  said.  If it was obscene under the federal guidelines and what

25  that message actually was.


113


1  Q.    I want you to assume for a moment --

2  A.    We're making assumptions.

3  Q.    I want you to assume it's not obscene?

4  A.    Okay.

5  Q.    What you're telling the court is you would have to get an

6  interpreter to read that sign and determine whether or not it

7  fits within the exemptions of 178-15, is that correct?

8  A.   If it was a noncommercial message, it would be allowed.

9  If was a commercial message, then it may, it would need a

10  permit.

11  Q.   All right.  Let's say that the sign, instead of being

12  nine square feet, is 14 square feet.  Do we still have to get

13  our interpreter?

14       THE COURT:  Say that again.

15  BY MR. FRIEDMAN:

16  Q.   Sure.  If the sign is 14 square feet instead of nine

17  square feet, do we have to have an interpreter?

18  A.   I guess I would, only to make sure again it's not an

19  obscene message that's being displayed.

20  Q.   Assume for the purpose of all my questions that this not

21  obscene, okay.  If we get our interpreter in and he says to you

22  that sign says "Vote For Fred Smith," then he doesn't need a

23  permit at all, correct, because it's political?

24  A.   Correct.

25  Q.   If the interpreter says instead of that, it is a sign


114


1  that says "Get Out Of Iraq," that would need a permit because

file:///A|/RIELINJ.TXT

2    that is not political, is that correct?

3    A.    Correct.

4    Q.    If the sign said "Joe Blow Architect," then that sign

5    would be okay because under subsection (E), it's okay to have

6    the architect's name on the sign, is that correct?

7    A.    What dimensions are we talking about?

8    Q.    I said it was 14 square feet.

9    A.    Fourteen square feet -- if it was the architect involved

10    upon work a construction site?

11    Q.    Yes.

12    A.    Then it would be exempt.

13    Q.    But if it were a construction site, instead of the

14    architect's name it had my name as the owner, then it would not

15    be allowed under that, it would have to have a permit, correct?

16    A.    This allows an exemption for the architect, engineer and

17    contractors, placed at a work site.

18    Q.    If the Chinese interpreter says to you that says "Phil

19    Friedman, Owner," then that would not fit under that exemption,

20    would it?

21    A.    If Phil Friedman, Owner, was listed there along with the

22    architect and the engineer and the contractor on the project, I

23  believe it would qualify for the exemption.

24  Q.    I'm not listing anybody other than myself, I'm not

25  putting in the architect's name and the interpreter says that

115

1  sign says "Phil Friedman, Owner," the exemption doesn't apply,

2  does it?

3  A.    No, it does not.

4  Q.    So I have to get a permit, correct?

5  A.    Yes.

6  Q.    Sir, looking at the exemption (A), real estate signs,

7  eight square feet, if my sign on there and the Chinese

8  interpreter said it now says instead of "Joe Blow, Architect,"

9  it says "Real Estate For Sale," it's not exempt, is it, because

10  it's too big?

11  A.    We're at the 14 square feet sign?

12  Q.    Yes.

13  A.    It would not be exempt.

14  Q.    Are the real estate signs that you're referring to the

15  type that we see out in the neighborhoods that are stuck in the

16  ground that says "House For Sale?"

17  A.    I believe that was the intent of this section of the

18  ordinance, yes.

19  Q.    Does it only apply to professionally printed or signs

20  that come from professional realtors?

21  A.    No.

22  Q.    So it applies to anybody who writes on that sign

23  "Building For Sale, Lot For Sale," is that correct?

24  A.    As long as it's on a sign of the premises that's for

25  sale, yes.


116


1  Q.    What if on that sign instead of "House For Sale," it says

2  "House Contents For Sale," would a permit have to be obtained,

3  would that be exempt, also?

4  A.    That's not a real estate sign, it's not advertising the

5  sale or rental or lease of the premise.

6  Q.    So a permit would have to be obtained?

7  A.    Yes.

8      THE COURT:  Excuse me, somebody is saying yes back

9  there, I don't know where that's coming from, don't do it.

10  BY MR. FRIEDMAN:

11  Q.    If we go to exemption two, which says "professional

12  nameplates not exceeding one square foot in area," is that

13  correct?

14  A.    Yes.

15  Q.    If I bring you in a one foot square sign in Chinese again

16  and the interpreter says that says "Phil Friedman, Lawyer,"

17  that would be exempt, would it not?

18  A.    Yes.

19        THE COURT:  Mr. Friedman, we're going to take a

20  short break.

21        (Recess from 2:40 p.m.; until 3:00 p.m.)

22        THE COURT:  All right, Mr. Friedman.

23        MR. FRIEDMAN:  Thank you, your Honor.

24  BY MR. FRIEDMAN:

25  Q.    Mr. Peterson, the bottom line on this is the exemptions


                                117


1  from the permitting scheme throughout the City of Bradford are

2  based upon what is in, what is on the sign, the message that's

3  on the sign, correct?

4  A.    To a degree.

5  Q.    And, in fact, regardless of the size of the sign and the

6  location, as long as it is a political sign as defined by the

7  City of Bradford, that is an exemption, also, correct?

8         THE COURT:  Say that again.

9  BY MR. FRIEDMAN:

10  Q.   That was probably a little unclear.  A political sign as

11  you've defined it for us in the City of Bradford, is exempt

12  from the permitting requirements regardless of where it's

13  located and how large it is, correct?

14  A.   Yes, there are provisions within the City of Bradford's

15  Zoning Code that exempt political signs.

16  Q.   But it's exempt under the permitting scheme of Section

17  178, correct?

18  A.   It would be exempt under, the Zoning Code would make

19  those types of signs exempt.

20         THE COURT:  Let me ask a question here if I could

21  jump in.  I'm confused on this point.  Under 178(I), the

22  exemption for noncommercial signs not exceeding 12 foot square

23  placed upon private property by the owner or occupant of said

24  property.  Aren't political signs merely a subset of

25  noncommercial signs; in other words, otherwise stated, does the

118

1  term noncommercial sign suck up, in your estimation, a

2  political sign, however that may be defined?

3       THE WITNESS:  Yes.

4       THE COURT:  All right.  Go ahead.

5  BY MR. FRIEDMAN:

6  Q.   But the political signs are not subject to the 12 square

7  foot requirement of subsection (I), is that correct?

8  A.   They would not necessarily be subject to that, no.

9  Q.   And in fact, the sign that Mr. Lanzillo showed you --

10  that's Defendant's Exhibit B -- and we were having difficulty

11  reading it, but it talks about making City Council a Democratic

12  Forum again, you defined that as a political sign, correct?

13  A.   The signs states, I believe '04, Riel For Mayor --

14  political sign.

15  Q.   That's a political sign.  So even though this sign may be

16  30 square feet or more, it would be exempt from the permitting

17  requirement, correct?

18  A.   It is.  All political signs are exempted under the City

19  of Bradford Zoning Code.

20       THE COURT:  Are they exempted from 178 and 125?

21        THE WITNESS:  In enforcement issues they are, your

22    Honor, because I don't believe anybody has ever been cited for

23    the installation of political signs.  Due to the fact primarily

24    they are exempted, they are an exempted sign under the

25    provisions of our Zoning Code.


                                119


1        THE COURT:  Forgive me, so in practice, then, in

2    practice are you saying that, for instance, with respect to

3    178(I) -- let me ask a broader question.  That if you are a

4    noncommercial sign, but you are a nonpolitical sign, if you are

5    greater than 12 feet and you are placed upon private property,

6    you must go through the permitting requirements of 178, is that

7    right?

8        THE WITNESS:  Yes.

9        THE COURT:  But are you saying to me that if you are

10    a noncommercial sign, but you are a political sign, you are

11    completely outside the orbit of 178 at all and you neither need

12    to be permitted nor you need to be exempted because you're not

13    covered, in practice?

14        THE WITNESS:  In practice, that's correct.

15          THE COURT:  All right.

16   BY MR. FRIEDMAN:

17   Q.    So the reason that Mr. Riel was cited for the signs

18   critical of Bradford city government people was because the

19   City determined that that was not a political sign?

20   A.    I believe that to be correct, I believe the citation was

21   issued for failure to go to HARB for appropriate review.

22   Q.    Would you agree with me, sir, that the primary purpose of

23   HARB is aesthetic?

24   A.    Yes.

25   Q.    And the primary purpose of 178 is safety?


                              120


1   A.    Yes.

2   Q.    And would you agree with me, sir, that the safety

3   considerations are precisely the same whether the sign says

4   "Vote For Joe" or "Stop The War in Iraq," or "Hot Dogs By Joe"?

5   A.    Yes.

6   Q.    So the distinction we're making in determining what signs

7   should be given a permit and what signs are exempt, is what

8   message is on a particular sign, not really what the sign is

9  constructed of or how it's placed on the building?

10  A.    Traditionally, most political signs that are erected

11  within our municipality are the very small ground type signs

12  that you punch into the ground with your foot, constructed of

13  wire and some type of fabric cardboard, whatever, those are the

14  traditional political signs.  Political signs, also,

15  traditionally are very short-lived in nature.  They crop up and

16  they disappear.

17  Q.    That wasn't my question.  My question was you're basing

18  the determination as to what is exempt or not exempt by what is

19  on a particular sign, correct; "Vote For Joe," exempt.  "Joe's

20  Hot Dogs," nonexempt.  "Stop The War In Iraq," nonexempt.  "Joe

21  For City Council," exempt, correct?

22  A.    Political signs are exempt under our Zoning Code,

23  correct.

24  Q.    So the question I just asked you the answer is correct?

25  A.    Yes.


121


1  Q.    What provision of the Zoning Code are you referring to?

2  A.    I don't have the Zoning Code here in front of me.  There

3  are definitions contained within the City of Bradford Zoning

4  Code.

5  Q.    Did somebody suggest the Zoning Code to you during the

6  recess?

7  A.    No, they did not.

8  Q.    Sir, I want to show you what's previously been marked as

9  Defendant's Exhibit R, which is the carwash; that is not within

10  the Historical District, is that correct?

11  A.    Correct.

12  Q.    Has Moonan's obtained a permit for that particular sign?

13  A.    I'm not certain.

14  Q.    So if I told you that they had not, you would not know

15  whether to agree or disagree with me, is that correct, you

16  don't know?

17  A.    I don't know without looking through City records.

18  Q.    Do you have those records with you today?

19  A.    No, I do not.

20  Q.    The first people that were ever cited for failure to

21  obtain HARB okay or authorization were the plaintiffs in this

22  case, is that correct?

23  A.    That's correct.

24  Q.    And, in fact, Mr. Riel received five citations, is that

25  correct?


122


1  A.    I don't have the actual count in front of me.

2  Q.    And the citations were based upon the signs, which you

3  you've already referred to, criticizing people in government,

4  correct?

5  A.    I believe it was in regard to signs that were erected on

6  his building without HARB approval.

7  Q.    Those were the signs that we've already taken a look at,

8  correct?

9  A.    Yes.

10  Q.    If I were to show you various signs throughout the

11  Historical District, would you know whether or not these signs

12  had permits?

13  A.    Some I may be familiar with, some I may not.  I don't

14  have that information in front of me.

15  Q.    Let me show you what I've marked as Plaintiff's

16  Exhibit 3, are you familiar with that building at 22 Congress

17  Street?

18  A.   Yes, I am.

19  Q.   Do you know whether or not the owner of that building has

20  obtained permits for those signs?

21  A.   No, I do not.

22  Q.   That's within the Historical District, is that correct?

23  A.   Yes.

24  Q.   Do you know whether or not the owner of that building

25  obtained HARB approval?

123

1  A.   I do not know that.

2  Q.   Who would know that?

3  A.   That would need to be researched through the HARB

4  chairman and the secretary of the HARB board.

5  Q.   That would be information that would be available to the

6  public, correct?

7  A.   Correct.

8  Q.   Let me show you what I've marked as Plaintiff's Exhibit

9  16, this is a building at 153 Main Street, are you familiar

10  with that building?

11  A.   Yes, I am.

12  Q.   Do you know whether or not permits were obtained for

13  those signs?

14  A.   No, I do not.

15  Q.   Those are signs advertising beer, the cost of beer?

16  A.   Yes.

17  Q.   And these are signs located in the Historic District of

18  the City of Bradford, is that correct?

19  A.   There have been changes to the historic map, I'm not

20  certain if that structure is in or out currently without seeing

21  the map.

22  Q.   Does that help you at all?

23  A.   It appears that it's in, that it's within the Historic

24  District.

25  Q.   Okay.  If you don't know, that's fine.  You said it was

124

1  within the Historic District?

2  A.   I said it would appear to be here, correct.

3  Q.   I'm sorry, I didn't hear you.

4       THE COURT:  Mr. Friedman, I don't know how many more

5  of these you have, is it your intention by way of proffer to

6   offer evidence through some other witness or exhibits that

7   these other properties in fact are not permitted?

8          MR. FRIEDMAN:  I will do that, your Honor.  I

9   thought we might be able to save time, but he doesn't know.

10         THE COURT:  He doesn't know.

11         MR. FRIEDMAN:  Exactly.

12  BY MR. FRIEDMAN:

13  Q.    The one final question that I have, sir, is you spoke on

14  direct examination about negotiations with the American Civil

15  Liberties Union regarding modification of the sign ordinances,

16  is that correct?

17  A.    Yes.

18  Q.    Did you have any involvement at all with those

19  negotiations?

20  A.    I was involved at the time in the original letter that

21  went to Mr. Riel at the time concerning his sign.  Beyond that,

22  all negotiations were handled through our Solicitor.

23  Q.    So the solicitor and counsel for the ACLU worked on those

24  particular amendments, is that correct?

25  A.    I believe that's correct, yes.

125

1  Q.   You had no particular involvement with the attorney for

2  the ACLU?

3  A.   I don't believe so, I'm not sure of any correspondence

4  that may have been directed to me.  If it was, it would have

5  been turned over to our Solicitor.

6       MR. FRIEDMAN:  Thank you, sir, those are all the

7  questions I have, your Honor.

8       THE COURT:  All right.  Mr. Lanzillo.

9            REDIRECT EXAMINATION

10  BY MR. LANZILLO:

11  Q.   Mr. Peterson, I have just a few follow-up questions.  I

12  want to understand your answers regarding political signs here.

13  You mentioned a Zoning Ordinance, is that correct?

14  A.   Yes, I did.

15  Q.   And it's your understanding that political signs are

16  exempt under the Zoning Ordinance?

17  A.   Yes.

18  Q.   Is it your interpretation that somehow the Zoning

19  Ordinance trumps these two sign ordinances or takes precedent

20  over the two sign ordinances?

21  A.   I'm not really certain what trumps what.

22  Q.    As you read the sign ordinances themselves, Chapter 178

23  and Section 125.15(E) of HARB ordinance, are political signs

24  exempted from the requirements?

25  A.    They are not exempted in those two ordinances, no.  My

126

1  knowledge of the exemption would come from serving as the

2  Zoning Officer for the City and knowing they're exempt under

3  zoning provisions.

4  Q.    And in practice, as I understand your testimony, these

5  political signs that are punched in the ground, temporary

6  signs, have not been the subject of enforcement action, to your

7  knowledge?

8  A.    To the best of my knowledge, no.

9  Q.    There were some questions regarding properties within the

10  Historic District and whether they have received HARB approval

11  and a permit.  Did the City recently receive a request for

12  information under the public records law regarding properties

13  and sign permits within the Historic District?

14  A.    Yes.

15  Q.    What period of time was requested by the request?

16   A.   It was a five-year timeframe, some date in April of 1999

17   through April of 2004.

18   Q.   Does that capture all of the sign permits?

19   A.   It would not necessarily capture a sign permit that may

20   have been issued as part of an actual building construction

21   permit as well.  That's a general computerized printout of sign

22   permits.  If it was incorporated into a new construction of a

23   building and particularly one outside of the Historic District,

24   it may be referenced on the building permit application as

25   well, I'm just not certain regarding that.


                                    127


1   Q.   Focus on the Historic District because that's what we're

2   talking about here.  Other than appearing with respect to a

3   permit in the HARB files, is there anyplace else you would find

4   permits regarding signs; you mentioned the building permits, is

5   that or is that not an area where you would find references to

6   signs?

7   A.   A sign could be incorporated within an application

8   received for an actual building permit for construction

9   purposes.  And it may not be designated or spit out of the

10  computer so to say by category XO8 or whatever it is that

11  prints out a sign permit if it's incorporated as part of an

12  actual building permit that was issued.  I'm just not certain

13  in that situation, the one sign in reference is a new

14  construction.

15  Q.    The request for information, what specifically was

16  requested, was it the actual permits or something else?

17  A.    A record of sign permits that were generated by the City

18  of Bradford for that five-year timeframe.  And I explained to

19  the requester, you know, this a computerized list and there are

20  certain situations that that would not apply to.

21  Q.    And who requested the information?

22  A.    Mr. Pysher.

23  Q.    How do you handle a situation where a sign has an insert?

24  A.    Sign inserts do not require a new permit to be issued,

25  and a paint over of a sign does not require a permit, new


128


1  permit to be issued.  However, if it would be a paint over of a

2  sign in the Historic District, that would need to go to HARB

3  for a certificate of appropriateness.  But outside of the

4   Historic District, if a sign is repainted, that doesn't require

5   a permit, they're not doing anything to the sign.

6   Q.   Now, is it possible that there are signs erected within

7   the Historic District that have not received HARB approval or a

8   permit?

9   A.   Yes, it's possible.  It's possible that there are signs

10  all over the City of Bradford that may have been erected

11  without a permit.  Unfortunately, we're basically a complaint

12  driven municipality as practically any municipality is today.

13  Faced with limited means of enforcement.  I mean, we use to

14  have sidewalk inspectors, we used to have various inspectors to

15  do this.  Our Code Enforcement people and Building Inspectors

16  cover a lot of ground in the course of a day.  So their eyes

17  and ears are limited, and they may or may not see a new sign go

18  up.  Oftentimes we rely on a complaint from somebody that has

19  seen something going on and calls in to Code Enforcement or to

20  City Hall to check on it.

21  Q.   Do you know if anyone complained about Mr. Riel's signs?

22  A.   Yes, they did.

23  Q.   Who?

24  A.   I believe it was the chairman of the HARB board.

25        THE COURT:  Chairman of who?

129

1          THE WITNESS:  Chairman of the HARB board.

2  BY MR. LANZILLO:

3  Q.    Now, you mentioned Code Enforcement people have a lot of

4  responsibilities.  In addition to the sign ordinances, what do

5  the Code Enforcement personnel have responsibility for?

6  A.    They enforce all building construction codes, they handle

7  inspections of rental properties, inspection of properties for

8  sale.  They respond to every complaint generated within the

9  City.  Be it tall grass to dog feces, to anything else, any

10  complaint that comes into any department of the City is handled

11  through our Code Enforcement office.  And we cover not only the

12  City of Bradford, but Bradford Township, and we have two Code

13  Enforcement officers.

14          MR. LANZILLO:  That's all I have, thank you.

15          THE COURT:  Hang on one second, I've got a couple

16  questions.

17          THE COURT:  Mr. Peterson, so I'm clear again, it's

18  your position and I take it the City's position that political

19    signs, however you define that term, political signs are not

20    covered at all under 178 or 125, is that right?

21        THE WITNESS:  Yes.

22        THE COURT:  All right.  And do I understand that to

23    the extent that Bradford imposes any restrictions on political

24    signage, one must look to the Zoning Ordinance for those

25    restrictions, is that right?


130


1        THE WITNESS:  Correct.

2        THE COURT:  With respect to, and by the way I

3    haven't looked at the Zoning Ordinance because I didn't frankly

4    know it was going to be part of this matter, is the term

5    political signage or political sign defined under the

6    ordinance, do you know?

7        THE WITNESS:  I don't believe there's an actual

8    definition, your Honor.

9        THE COURT:  All right.  In any event, with respect

10    to political signage, as you understand what that might be, is

11    there anything in the Zoning Ordinance that would restrict, for

12    instance, the size or placement of political signs on private

13  property?

14      THE WITNESS:  There are size restrictions listed

15  within the Zoning Code, your Honor.

16      THE COURT:  All right.  Do you know off the top of

17  your head, are they similar, for instance, the 12 square foot

18  signage or noncommercial signs here, can you give me some

19  summary or flavor as to what it's all about?

20      THE WITNESS:  I believe the regulations get into

21  more detail on square footage of signs, say signs in commercial

22  districts, manufacturing districts, signs in some residential

23  districts.  Again, referencing setbacks, maximum size, height,

24  visibility issues for the motoring public and stuff like that.

25      THE COURT:  Thank you.  All right, go ahead, Mr.


131


1  Friedman.

2      MR. FRIEDMAN:  Just to follow-up on that.

3          RECROSS-EXAMINATION

4  BY MR. FRIEDMAN:

5  Q.   Are there special rules in the Zoning Ordinance for

6  political signs?

7   A.    Zoning Ordinance exempts political signs.

8   Q.    So under the Zoning Ordinance political signs are not

9   covered at all?

10   A.    They're exempted.

11   Q.    So they're exempt under all the ordinances of the City of

12   Bradford?

13   A.    They're technically not exempt under the other two

14   ordinances.  They are exempt under our Zoning Ordinance.

15   Q.    So when you say technically, by practical application

16   they are exempt under the other two ordinances?

17   A.    We have not enforced any action against political signs.

18   Q.    And your definition of political sign is campaigning for

19   public office?

20   A.    That's my interpretation, yes, sir.

21   Q.    Is that the City's interpretation?

22   A.    I believe that would be the interpretation of our

23   Building Inspectors as well.

24   Q.    Would that decision be made by the Building Inspector

25   handling that particular sign?

132

1   A.   Yes.

2   Q.   You said that you're basically complaint driven, is that

3   correct?

4   A.   We are to a large degree complaint driven, yes.  The Code

5   Enforcement officers are out in the community on a daily basis.

6   They see what they can see.  But we do receive a number of

7   complaints about any given situation.  Be it a pothole or

8   anything else, that's the nature of being involved in municipal

9   government.  We do receive a number of complaints daily, not

10  just relating to that.

11  Q.   The head of government in Bradford is the Mayor, is that

12  correct?

13  A.   That is correct.

14  Q.   That is Mayor Corignani, correct?

15  A.   Corignani, yes.

16  Q.   And her husband is the Code Enforcement officer, correct?

17  A.   Yes, he is.

18  Q.   He's also employed by the City?

19  A.   He's been employed by the City of Bradford for in excess

20  of 30 years.

21  Q.   And the Fire Chief, Mr. McCormack, is employed by the

22  City, correct?

23  A.   Yes.

24  Q.   And Mayor, excuse me, Attorney Greg Henry, he's not the

25  Mayor anymore, correct?


133


1  A.   He hasn't been the Mayor for quite sometime.

2  Q.   But he is also employed by the City as an assistant City

3  Solicitor, is he not?

4  A.   He has the title, I believe he's special assistant to the

5  Solicitor.

6  Q.   Special assistant to the Mayor?

7  A.   No.

8  Q.   To the Solicitor?

9  A.   Yes, special counsel.

10  Q.   So the first person to be charged under this ordinance

11  was the person who put up signs criticizing Mayor Henry, CEO

12  Corignani and Chief McCormack, is that correct?

13  A.   I'm not certain of the timeframes, sir.  I believe

14  actually Mr. Pysher may have been cited before Mr. Riel.  I

15  don't have the chronology of that in front of me.  But I

16  believe that may have been the situation.  And that

17  precipitated the sign concerning the Fire Chief.  I'm not

18  certain, I don't have that information.

19  Q.   Mr. Riel and Ms. Thompson are cited for these particular

20  signs criticizing those officials, correct?

21  A.   They're cited for the signs in that building that they

22  did not get HARB approval for.

23       MR. FRIEDMAN:  Thank you, sir, that's all I have,

24  your Honor.

25       THE COURT:  Do you have anything else?


                            134


1        MR. LANZILLO:  Nothing further, your Honor.

2        THE COURT:  I have one or two other questions, I

3  guess I'm still confused.  I thought you told me that political

4  signage was controlled by certain provisions of the Zoning

5  Ordinance?

6        THE WITNESS:  Yes.

7        THE COURT:  And somewhere within the Zoning

8  Ordinance does it tell a perspective sign putter upper who's

9  going to put up a political sign, how big the sign may be and

10  where he or she may place it?

11          THE WITNESS:  I'm not exactly certain on that, your

12     Honor.  If it gets into that because it exempts those signs,

13     I'm not certain then.

14          THE COURT:  See that's what I'm confused on.  If the

15     Zoning Ordinance exempts political signage and if 178 and 125

16     exempt, in your view, political signage, then nothing covers

17     political signage, is that right?

18          THE WITNESS:  As a practical matter of application,

19     political signs have not been cited or regulated by the City.

20          THE COURT:  I don't know if this is true or not, but

21     is that because, to your knowledge, there is no ordinance code

22     or body of regulations that would specifically address them,

23     like 178 and 125 addresses exempted and nonexempted signs?

24          THE WITNESS:  Correct.

25          THE COURT:  And with expect to those three signs we


                                   135


1     had up on the screen here a minute ago, one involved Mr. Henry,

2     the other one involved I think the Fire Chief, I can't remember

3     what the other one involved.  Tell me if I have this right.  If

4     instead of those three signs -- who does the record reflect put

5    those up?

6          MR. FRIEDMAN:  Mr. Riel.

7          THE COURT:  If instead of those three signs, the

8    three signs were Mr. Riel is going to run for Mayor, vote for

9    me.  And then a second similar sign and a third similar sign,

10   all directed at promoting a Riel candidacy, would he have been

11   cited?

12         THE WITNESS:  No.  He was not -- I'm not certain if

13   there were actually Riel for Mayor signs on that building.

14         THE COURT:  I'm not saying that there were, I'm

15   trying to get a sense as to how would you envision the

16   enforcement of the statute, would that have been a political

17   sign?

18         THE WITNESS:  Yes.

19         THE COURT:  My last question is, so I'm clear on the

20   concept -- that the City has for a political sign.  In your

21   view, in order to qualify as a political sign, does the sign

22   have to espouse the political interests or hopes of -- let me

23   say it again.  Is a political sign only a sign that espouses a

24   particular person for office, is it that narrow?

25         THE WITNESS:  The exemption does not get into that

136

1  criteria.  That would be the criteria that I would apply to a

2  political sign.  That would be somebody with a candidacy for

3  office.

4        THE COURT:  Someone that is an active candidate for

5  office?

6        THE WITNESS:  For an office.

7        THE COURT:  Whereas, if someone who was not an

8  active candidate for office was criticized a sitting member of

9  City Council or the Mayor or someone else as to their political

10  performance, that in your view would not be a political sign?

11        THE WITNESS:  Correct.

12        THE COURT:  All right.  That's all I have, thank

13  you.

14        MR. LANZILLO:  Your Honor, we call Merle Silvis to

15  the stand.

16        THE CLERK:  All right.  Sir, would you please state

17  your name and spell it for the record?

18        THE WITNESS:  Merle, M-e-r-l-e, Silvis, S-i-l-v-i-s.

19        MERLE SILVIS, DEFENSE WITNESS, SWORN

20          DIRECT EXAMINATION

21  BY MR. LANZILLO:

22  Q.    Mr. Silvis, would you state your full name and address

23  for the record?

24  A.    Merle Silvis, 21 Harrisburg Run, Bradford, Pennsylvania.

25  Q.    Are you employed, sir?

137

1  A.    I'm employed by the City of Bradford.

2  Q.    In what capacity?

3  A.    As a firefighter, I've been a firefighter for 31 years.

4  I have been the current Code Administrator for two-and-a-half

5  years.

6  Q.    What is a Code Administrator?

7  A.    It's a Code Enforcement officer, Building Inspector.

8  Inspect around property, disclose housing sales.

9  Q.    How many Code Enforcement officers are there in the City

10  of Bradford?

11  A.    Two.

12  Q.    And what are your responsibilities, what ordinances are

13  you charged with enforcing, what responsibilities do you have

14   in general?

15   A.   Basically, City ordinances, code ordinances, property and

16   maintenance ordinances.  International construction code

17   ordinances.

18   Q.   Do you have any special training in Code Enforcement?

19   A.   Yes.

20   Q.   What is that?

21   A.   I've attended schools to be certified and --

22         THE COURT:  You've got to keep your voice up just a

23   little bit.

24         THE WITNESS:  Also, on-the-job training.

25   BY MR. LANZILLO:


                                138


1   Q.   Now, did you issue some of the citations --

2   A.   Yes, I did.

3   Q.   That are at issue in this case in question.  Those

4   citations were issued to the three plaintiffs?

5   A.   I only issued to the two plaintiffs.

6   Q.   Okay.  And who were they?

7   A.   Thomas Riel and Diane Thompson.

8  Q.   Why did you issue the citations to Mr. Riel and Ms.

9  Thompson?

10  A.   Our office received a complaint on the signs being posted

11  by the HARB board chairman, I investigated and I did find a

12  sign on the building.  At which time I sent Mr. Riel and Ms.

13  Thompson a letter notifying them, gave them a copy of the

14  ordinance, that they would need to apply to the HARB board in

15  order to put these signs up.  They were given a time limit, the

16  time limit expired and they were issued a citation.

17  Q.   Is each sign a separate violation?

18  A.   Can be, yes.

19  Q.   Let me show you what we've marked as Defendant's Exhibit

20  G --

21  A.   That was the sign that was on the building on February

22  25th when we received the complaint when I went to look at it.

23  Q.   It reads "Fire Chief Wild Bill McCormack Resign?"

24  A.   Yes.

25  Q.   You received a complaint from the HARB board chairman

139

1  about that sign?

2    A.    Yes, we did.

3    Q.    And I believe you testified that you sent the letter to

4    Mr. Riel and Ms. Thompson?

5    A.    At that time, yes.

6    Q.    The second page of Exhibit G is a copy of a letter dated

7    February 25, 2004, it appears to be signed by you, is this the

8    letter that you're talking about?

9    A.    Yes, it is.

10        MR. LANZILLO:  For the record it states "this letter

11    serves as notification to you that the sign that had been

12    installed on the above-referenced property is in violation of

13    the Bradford City Ordinances 2866.1, Historic Preservation and

14    specifically Section 125-15(E)(1), copy attached."  Did you in

15    fact attach a copy of the ordinance?

16    A.    Yes, I did.

17    Q.    The second paragraph states that "this property is

18    located within the boundaries of the City of Bradford Historic

19    District and prior to erection of any sign HARB board approval

20    must be obtained and a certificate of appropriateness issued by

21    Bradford City Council to allow the Building Inspector to issue

22    the necessary sign permit."  It goes on to state "you hereby

23    are directed to immediately remove the above-mentioned sign

24   until such required approval and permits are obtained."  It

25   goes on to explain the consequences.  Also notes where HARB

140

1   applications may be obtained at City Hall, correct?

2   A.   Correct.

3   Q.   Now, after you sent this letter, did you have any further

4   contact directly with Mr. Riel?

5   A.   I had contact on the 5th of March.

6   Q.   Tell me what happened after you sent this letter, and

7   just so the record is clear, did you send an identical letter

8   to Ms. Thompson?

9   A.   That identical letter, yes.

10   Q.   Other than the addressee, of course.  Now, tell me what

11   happened after you sent this letter?

12   A.   Okay, the time limit that they were given expired.  And

13   on the 5th of March they were issued citations, but Mr. Riel

14   had took the signs down the 5th of March.  So I withdrew the

15   citations and on that day I talked to him, he informed me he

16   had taken the sign down.  I thanked him for his cooperation,

17   and I had withdrawn the citations.  And at that time he asked

18  me possibly if he would be allowed to put the signs inside the

19  building.  I said I would check on it.  I reread the ordinance,

20  I said it says externally, in my opinion you would be able to

21  put the signs inside your window.

22  Q.    So you told him that he could display the sign lawfully

23  if it was inside the window?

24  A.    Yes, I did.

25        THE COURT:  What happens with each citation, I don't

141

1   remember, is there a fine?

2         THE WITNESS:  There is a fine.

3         THE COURT:  Per citation?

4         THE WITNESS:  Per citation.

5         THE COURT:  Okay, go ahead.

6   BY MR. LANZILLO:

7   Q.    And each sign is a separate violation?

8   A.    Yes.

9   Q.    What happened after you issued and then withdrew the

10  first citation?

11  A.    After our conversation on Monday the 8th, the signs were

12    reinstalled, that was over a weekend, I again issued a

13    citation.  Those I left stand.

14    Q.    And what happened after that?

15    A.    There were additional signs put up, there were additional

16    citations issued, I was out of town at the time.  Mr. Corignani

17    issued some and I issued again another one, where additional

18    signs were added.

19    Q.    Did Mr. Corignani or his wife, the Mayor, Mrs. Corignani,

20    initiate this activity?

21    A.    No, they did not.

22    Q.    Now, you were here for Mr. Peterson's testimony earlier?

23    A.    Yes, I was.

24    Q.    There was testimony regarding political signs being

25    treated as exempt under the HARB ordinance.  What is your


142


1    understanding concerning political signs, are they generally

2    exempt under the HARB ordinance?

3    A.    It would be my understanding, I assumed because I had

4    received a complaint from the HARB board chairman, that these

5    signs did not fall under that category or there wouldn't have

6  been a complaint.

7  Q.   What about political signs in general?

8  A.   I'm not familiar with that part of the Zoning Ordinance,

9  but they say they're not.

10      THE COURT:  You've got to keep your voice up.  Run

11  that by me one more time.

12  BY MR. LANZILLO:

13  Q.   Is it your understanding, and I'm asking for your

14  understanding, or whether political signs, campaign signs are

15  exempt or nonexempt under --

16  A.   It's my understanding they're exempt.

17  Q.   They are exempt.

18      THE COURT:  Can I ask you a clarification here.  The

19  term exempt is a term of art under the statute.  And it means,

20  it could mean, for instance, if you're part of that

21  noncommercial signage, it can't be bigger than 12 feet.  The

22  question is, I don't want to tell you what to ask him, so I'll

23  ask him.  To your understanding, you heard the testimony from

24  the other fellow over there, Mr. Peterson, are candidacy signs

25  covered at all under 178 such that they don't even have to be

1   specially exempted because the statute, nor 125, doesn't cover

2   them at all, what's your understanding of that?

3        THE WITNESS:  My understanding it would be exempt,

4   political signs, the signs put in your yard to vote for so and

5   so, that would be my understanding of political signs.  I think

6   you look at a safety issue.  I would look at, size wise and

7   where they're placed and how they're attached, that would be

8   the only thing I would look at.

9   BY MR. LANZILLO:

10  Q.   Do you know whether in either of the ordinances at issue

11  here there's any reference whatsoever to political signs or

12  candidacy signs as exempt or otherwise?

13  A.   No, it just says externally affixed sign has to be

14  approved by HARB.  If he applied for an application and they

15  deemed the sign was all right, as far as I was concerned that's

16  fine.

17       MR. LANZILLO:  That's all the questions I have,

18  thank you.

19       THE COURT:  Mr. Friedman.

20                  CROSS-EXAMINATION

21  BY MR. FRIEDMAN:

22  Q.    Mr. Silvis, you said that the chairman of the HARB board

23  is the one that told you to cite Mr. Riel, is that correct?

24  A.    No, it's not correct.

25  Q.    He's the one that filed the complaint?


144


1  A.    He called our office with the complaint, yes.

2  Q.    And his complaint was what?

3  A.    That there had been a sign affixed to the building

4  without their approval.

5  Q.    Did he talk to you?

6  A.    No, he talked to our secretary.

7  Q.    Did you have any conversations with him at all about

8  this?

9  A.    I did not.

10  Q.    Now, you said that you felt that this was not a political

11  sign because the HARB chairman was the one that told you to

12  cite him, is that correct?

13  A.    He did not tell me to cite him, he told me that they had

14  not received an application to affix the sign to the building.

15  Q.    You assumed because he said that, that it must not be in

16  that exempt category of political signs, is that right?

17  A.    I wouldn't take that myself, if they decided that it was

18  okay, then it would be fine.  I just notified them that he

19  needed HARB board approval to attach the sign to the building.

20  Q.    So your only involvement in this whole thing was you

21  filled out the piece of paper, it said you need HARB approval,

22  whether he needs it or not is something for somebody else to

23  decide, is that right?

24  A.    I would say if they determined that he didn't, that's as

25  far as I would go with it.


                                145


1  Q.    In fact, violations of the HARB statute carries not only

2  a fine but potential jail time, is that correct?

3  A.    It does say that, yes.

4  Q.    It says up to 90 days in jail?

5  A.    It does say that.

6  Q.    And with each sign the penalty goes up, doesn't it?

7  A.    It can, yes.

8        MR. FRIEDMAN:  Thank you, that's all I have.

9         THE COURT:  Before you sit down, put on the screen

10   the hanging sign, the three hanging signs.

11         MR. FRIEDMAN:  These ones, judge?

12         THE COURT:  Yes.  Those are the signs that generated

13   the citations, right?

14         THE WITNESS:  Correct.

15         THE COURT:  I'm only asking for your opinion, how

16   you understand things to work there.  If instead of those signs

17   saying what they said, each of those signs, same dimensions,

18   same placement, said "Vote Riel For Mayor," would you be giving

19   him a citation?

20         THE WITNESS:  I would assume that would be a

21   political sign.

22         THE COURT:  It would be by your definition, but

23   would you then give him a citation?

24         THE WITNESS:  I wouldn't give him a citation, no.

25   If he went through the proper procedure and they determined it


146


1   was a political sign and it was legal, I wouldn't give him a

2   citation, no.

3        THE COURT:  Here's my question, I'm trying to

4   understand this.  Is it your understanding that if he put "Vote

5   For Riel" up there three times, that he would have been

6   required, prior to doing that, to obtain the permission of

7   HARB?

8        THE WITNESS:  As I read the HARB board ordinance, he

9   would have.

10        THE COURT:  He would have?

11        THE WITNESS:  As I read it, he would have, yes.

12        THE COURT:  All right.

13   BY MR. FRIEDMAN:

14   Q.   It is the practice, though, of the City of Bradford, that

15   political signs like that are exempt from HARB approval, you

16   don't have to get HARB approval?

17   A.   To affix them to the building permanently, those are

18   affixed permanently in my opinion.

19   Q.   Do you know?

20   A.   I don't know.

21        MR. FRIEDMAN:  Thank you.

22        THE COURT:  Thank you, sir.  Do have anything else,

23   Mr. Lanzillo?

24        MR. LANZILLO:  No, your Honor.

25          THE COURT:  All right, call your first witness.


147


1          MR. FRIEDMAN:  Mr. Pysher.

2          THE CLERK:  Please state and spell your full name,

3   sir?

4          THE WITNESS:  Frederick, F-r-e-d-e-r-i-c-k, A,

5   middle initial, Pysher, P-y-s-h-e-r.

6          FREDERICK PYSHER, PLAINTIFF HEREIN, SWORN

7              DIRECT EXAMINATION

8   BY MR. FRIEDMAN:

9   Q.   Mr. Pysher, would you please give us your full name and

10  address?

11  A.   Frederick Allen Pysher, 1001 South Avenue, Custer City,

12  PA.

13  Q.   What is your occupation, sir?

14  A.   I am a full-time real estate broker and owner of Upper

15  Allegany Realty located at 39-43 Mechanic Street.

16  Q.   How long have you been a realtor, sir?

17  A.   I have been involved in real estate for three years as a

18  salesperson, and then 21 years as a broker/owner.

19  Q.   Are you licensed in the Commonwealth of Pennsylvania?

20  A.   Yes, I am.

21  Q.   How long have you been licensed?

22  A.   For 24 years.

23  Q.   Do you own property in the City of Bradford?

24  A.   Yes.

25  Q.   What is the address of that property?

148

1   A.   39-43 Mechanic Street.

2   Q.   Is that your realtor office?

3   A.   43 Mechanic, yes.

4   Q.   Is that located within the Historical District of the

5   City of Bradford?

6   A.   Yes, it is.

7   Q.   Were you cited for a violation of HARB, sir?

8   A.   Yes, I was.

9   Q.   Tell the court how you were cited, under what

10  circumstances?

11  A.   I ordered a sign to be done by a professional sign

12  painter to go inside the inside of my window. But once I

13   received it, I placed it on the outside to see if it would

14   garner more attention and then to determine whether it should

15   be on the outside or the inside.  I was issued a citation on

16   February 25th.  Two days later, on the 27th of February, I

17   moved the sign inside where it's been ever since.  And I've

18   been in compliance ever since then.

19   Q.    And are you interested in posting signs on your business

20   in the future?

21   A.    As a business owner, I am promoting my business, yes, I

22   would.

23   Q.    Now --

24   A.    Potentially.

25   Q.    Did you have occasion to determine whether or not other

149

1   businesses located within the Historical District of the City

2   of Bradford had obtained permits for their signs?

3   A.    Yes.

4   Q.    How did you go about doing that?

5   A.    On April the 8th I requested from the City Clerk's office

6   a list of all sign permits issued in the City of Bradford

7    dating back from March 8, 2004 to March 8, 1999.

8    Q.    And would this have covered all signs placed between 1999

9    and the present, as far as you know?

10   A.    That was my assumption, yes.

11   Q.    Now, there was testimony that they could have also

12   authorized signs pursuant to building permits within that time

13   period.  Were you aware of any buildings going up within that

14   last five-year period in the Historical District?

15   A.    In the Historical District?

16   Q.    I'm only speaking about the Historical District?

17   A.    No, I'm not.

18   Q.    But as far as you were able to determine, the records

19   provided to you by the City of Bradford included all signs that

20   were posted during that five-year period, is that correct?

21   A.    Yes.

22   Q.    And at my request did you go through the Historic

23   District and take photographs?

24   A.    Yes, I did.

25   Q.    Of those various signs?

150

1   A.   Yes, I did.

2        MR. FRIEDMAN:  Your Honor, Mr. Pysher prepared a

3   large map, I have a small map which I can put on the display,

4   but it's very difficult to see.  This may be easier.

5        THE COURT:  Why don't you bring it up here.

6        MR. FRIEDMAN:  Why don't you, if you will, hold this

7   up so the judge can see it.

8        THE COURT:  Mr. Lanzillo, you might want to come up

9   to get a better view.  Go ahead.

10   BY MR. FRIEDMAN:

11   Q.   Mr. Pysher, why don't you go ahead, first of all, and

12   just show us on the map the location of -- let me start over

13   again.  I'm placing on the overhead projector what we've marked

14   as block A, can you indicate on there where block A is located?

15   A.   Block A would be right here (indicating).  2 Main Street

16   called the Seneca Building.

17   Q.   Are there signs on the Seneca Building, sir?

18   A.   Yes, there are.

19   Q.   Can you tell us were you able to determine whether or not

20   the signs on the Seneca Building had permits?

21        MR. LANZILLO:  Your Honor, if I could enter an

22  objection for the record.  This testimony is a compilation of

23  information based upon other records, which is improper without

24  the underlying substantive materials present in the courtroom.

25          THE COURT:  Well, it's a foundational objection?


                              151


1          MR. LANZILLO:  It is.

2          THE COURT:  Well, ask what's the foundation for his

3  knowledge.

4          MR. FRIEDMAN:  I can do that again, your Honor.

5  BY MR. FRIEDMAN:

6  Q.   Mr. Pysher, did you obtain reports from the City of

7  Bradford concerning permits issued for signs in the Historic

8  District?

9  A.   Yes, I did, within a five-year period.

10  Q.   Let me show you what I'll mark as Plaintiff's Exhibit 20,

11  and are those the reports that were supplied to you by the City

12  of Bradford?

13  A.   Yes.

14  Q.   And do those reports in fact indicate which signs had

15  permits issued for them during that five-year period from 1999

16  to the present?

17  A.    Yes, sir.

18          THE COURT:  All right, the objection is overruled.

19  BY MR. FRIEDMAN:

20  Q.    Are those the documents that you relied upon in preparing

21  your exhibit?

22  A.    Yes, sir.

23  Q.    Now, sir, going back to block A, you've indicated to the

24  court the location, and that is 2 Main Street, Bradford, the

25  Seneca Building, is that correct?


                          152


1  A.    Yes, it is.

2  Q.    Were you able to determine -- first of all, are there

3  signs located on the building at that location?

4  A.    Yes, there are eight signs.

5  Q.    Show those to us?

6  A.    Pardon me.

7  Q.    Do you have a hearing problem, Mr. Pysher?

8  A.    Yes, I do, I have two hearing aids, and I apologize for

9  whispering earlier.  This is the Seneca Building.  There are

10  two Main Street manager signs.  Two Bradford Chamber of

11  Commerce signs.  Two downtown Bradford signs.  And two Bradford

12  Cool Town and Warren Parts signs.  And there was only one wall

13  sign permit.

14  Q.    So of all the signs at that location, how many had

15  permits and how many did not?

16  A.    One permit, seven did not.

17        THE COURT:  Sir, tell you what, why don't you sit

18  down and just kind of lay it on the side there.

19        MR. FRIEDMAN:  Judge, these are actually copies of

20  all photographs, they might be easier to see for you if you can

21  disregard the commentary on there.

22        MR. LANZILLO:  Your Honor, if I may, I will renew my

23  objection.

24        THE COURT:  Let me ask you this, by way of following

25  up, are these things marked as exhibits?


153


1        MR. FRIEDMAN:  I have marked them, your Honor.  I

2  have not marked the copies that you have.  The ones on the

3  overhead are marked.

file:///A|/RIELINJ.TXT

4         THE COURT:  Are these the same?

5         MR. FRIEDMAN:  They are the same, I provided them to

6   counsel.

7         THE COURT:  Let's see if we can save some time, if

8   we can.  Is it the City's position that the properties that he

9   has testified to and is about to testify to, I assume you've

10   seen the packet of materials here, as a matter of fact are

11   permitted contrary to his present belief?

12         MR. LANZILLO:  The problem is, your Honor, I don't

13   know.  I would have to go through those materials, have someone

14   inspect these signs.  More to the point, they requested a

15   summary, not the permits themselves, I don't know what's

16   covered by these permits.  I literally would have to have

17   someone go through to respond to this testimony.

18         THE COURT:  Put it this way.  At the risk of further

19   prolonging the hearing, I will leave open the possibility of

20   some rebuttal on this point if you come to the conclusion that

21   it is inaccurate.  All right, go ahead.

22         MR. FRIEDMAN:  Your Honor, not to prolong this

23   matter, my intent was to go through each set of signs and have

24   Mr. Pysher testify as to the signs --

25         THE COURT:  For our purposes, it's sufficient to

154

1  say, one, the pictures speak for themselves; two, are they all

2  within the Historical District?

3          THE WITNESS:  A through K.

4          THE COURT:  All right.  And, three, it is the

5  plaintiffs' contention, based on his investigation, that they

6  are non-permitted, is that right?

7          THE WITNESS:  Correct.

8          THE COURT:  All right.

9          MR. FRIEDMAN:  With that, your Honor, I would just

10  move for the admission of Plaintiff's Exhibits 2 through 17

11  without having to go through each one.

12          THE COURT:  Are those all pictures?

13          MR. FRIEDMAN:  They are, your Honor.

14          THE COURT:  What do you want say, Mr. Lanzillo?

15          MR. LANZILLO:  Only, your Honor, by way of my

16  earlier foundation objection, I would have no further

17  objection.

18          THE COURT:  There's no waiver construed, but they're

19  admitted.

20        MR. LANZILLO:  One question, if I may, to facilitate

21  our view of them, is there a copy of those available for me.

22        MR. FRIEDMAN:  Yes.  With that, your Honor, I have

23  no further questions.

24        THE COURT:  I have one.  You know the sign you said

25  you put up?


155


1        THE WITNESS:  Yes.

2        THE COURT:  And then you put inside your business?

3        THE WITNESS:  Yes, sir.

4        THE COURT:  Is that one of the signs I saw on the

5  screen today?

6        THE WITNESS:  No, you did not.  The sign measures 81

7  inches in width or length, about 28 inches high, fits exactly

8  inside my window and it says "We Get Results, Don't Hesitate,

9  List With Us Today."

10        MR. FRIEDMAN:  I was looking for that, your Honor.

11  That's actually the sign, your Honor.

12        THE COURT:  Where is that now?

13        THE WITNESS:  It's on the inside of the front

14  window, it used to be directly to the right above my entrance

15  to the door.  That was exterior, now it's interior.  It was two

16  days after my courtesy call from Mr. McCormack.

17          THE COURT:  I apologize, you did or did not get

18  cited for that?

19          THE WITNESS:  I was the first person to be cited for

20  violating the sign ordinance in the history of Bradford since

21  1971.

22          THE COURT:  But for this sign you were cited?

23          THE WITNESS:  Yes.

24          THE COURT:  And then you put that sign inside --

25          THE WITNESS:  I put the sign in two days after a

156

1  courtesy call, I received a citation in the mail, it was

2  formally cited April 8th -- I'm sorry, it was formally cited

3  March 8th, it was postmarked March 9th, I received it March

4  12th.

5          THE COURT:  What happened to the citation?

6          THE WITNESS:  It's still outstanding, I'm held

7  accountable to it.

8        THE COURT:  All right.

9        MR. FRIEDMAN:  Your Honor, for the record I will

10   mark that photograph as Plaintiff's Exhibit 21, I would move

11   for its admission.

12        THE COURT:  It's admitted.  All right, Mr. Lanzillo,

13   has the opportunity to cross-examine you.

14        MR. LANZILLO:  I'll be brief at this time, your

15   Honor.

16                CROSS-EXAMINATION

17   BY MR. LANZILLO:

18   Q.   Mr. Pysher, you mentioned that you moved the sign from

19   its exterior-mounted location to the inside of a window, is

20   that correct?

21   A.   Yes, sir.

22   Q.   Isn't your understanding that signs mounted inside

23   windows and doors are not subject to the sign ordinances?

24   A.   Correct.

25   Q.   And for signs that are displayed in windows and doors on

157

1   your premises, no one has asked you to get a permit or anything

2   else?

3   A.   There's no need for the permit.

4   Q.   Now, has anyone from the HARB board or the City or the

5   Building Inspector's office for that matter ever tried to tell

6   you what you could or could not say in your signs?

7   A.   On my signs, no.

8   Q.   Am I correct that in 2002 you decided to put up a new

9   sign at your place of business, I think you mentioned 43

10   Mechanic Street?

11   A.   Yes.

12   Q.   Is that correct, you did place a sign?

13   A.   Yes, I did.

14   Q.   Did you submit an application for HARB board approval?

15   A.   No, I did not.

16   Q.   You did not submit an application for HARB board

17   approval?

18   A.   Not prior to being maligned in the newspaper two days on

19   the front page.

20   Q.   But --

21   A.   I did eventually, yes.

22   Q.   So you did apply to HARB on or about July 18, 2002?

23  A.   Yes.

24  Q.   And you promptly received HARB approval, did you not?

25  A.   Yes, I did.


158


1  Q.   And very shortly thereafter, by July 23, 2002, City

2  Council voted to issue a certificate of appropriateness?

3  A.   It had already been up for two weeks or three weeks or

4  something.

5  Q.   Your sign?

6  A.   Oh, yeah, the sign had been in place.

7  Q.   But my question is, within a week of applying to the HARB

8  for approval, you had City Council approval of the sign?

9  A.   Yes.

10  Q.   Do you believe the creation of the Historic District has

11  been good for the City of Bradford?

12  A.   I don't know, it has yet to be determined.

13  Q.   Now, you didn't find the HARB approval process to be

14  burdensome, did you?

15  A.   It was more than what I expected to have to do on my own

16  private property.

17  Q.    From start to finish, it took less than a week to get

18  HARB approval and a certificate of appropriateness, is that

19  correct?

20  A.    Something like that, it was several years ago.

21  Q.    Are you aware of any instance where an application for a

22  sign permit by HARB or a certificate of appropriateness under

23  HARB has ever been denied based upon the content of the sign?

24  A.    I wouldn't have that knowledge.

25  Q.    Now, on February 24, 2004, did you write to the HARB


159


1  requesting information regarding HARB procedures?

2  A.    On February 25th, the day that I was issued the courtesy

3  call by Mr. McCormack, I responded immediately by writing a

4  letter to the HARB board addressing my concerns and including a

5  check for $30, $10 more than what the required fee was.

6  Q.    Okay.  Now, you mentioned a courtesy call from Mr.

7  McCormack?

8  A.    Yes.

9  Q.    Could you tell me what was said in that call?

10  A.    He called and said are you aware, Mr. Pysher, that your

11  sign above your entrance is in violation of the current sign

12  ordinance; my response was yes.

13  Q.   So it truly was a courtesy call to make sure that you

14  weren't unaware of the requirements of the law?

15  A.   Absolutely.

16  Q.   And you then wrote a letter to the HARB board inquiring

17  about the process and standards?

18  A.   No, I expressed my concerns.  I wanted to exchange or

19  engage in dialogue.

20  Q.   And how quickly did the HARB board respond?

21  A.   The date on the letter that was sent by certified mail

22  from Mark Luciano, the president of the board, was dated March

23  27th.  The day that I had already had the sign in compliance,

24  did not receive it for about 10 or 12 days later.  I was not

25  present at lunchtime when the postal delivery person brought

160

1  the letter in, left a little note that I had something to pick

2  up at the post office.

3  Q.   So they attempted delivery earlier, it took you a while

4  to go pick it up?

5   A.   Yes.

6   Q.   Just for the record, can you tell me is this the letter

7   that you received in response to your inquiry?

8   A.   I can't read it real well.

9        THE COURT:  Just bring it up.

10  BY MR. LANZILLO:

11  Q.   This is marked as Defendant's Exhibit M --

12  A.   The date on this letter is the exact date that I was in

13  compliance by moving the sign inside and it has been there ever

14  since.  I don't know what date I received it, but it was about

15  10 days later.

16  Q.   Thank you, sir.  My only question is, is this the letter?

17  A.   Yes, it is.

18  Q.   And attached as the second page for context is?

19  A.   My six comments to the board dated February 25th.

20  Q.   And a copy of the check?

21  A.   Absolutely.

22  Q.   You understand that there is no fee for HARB approval or

23  a HARB permit?

24  A.   Pardon me.

25  Q.   Do you understand that there is no fee for a HARB

1   certificate of appropriateness, that the fee is under the other

2   ordinance, Section 178?

3   A.   I do now.

4        THE COURT:  I'm confused.  You sent a check for how

5   much?

6        THE WITNESS:  $30.

7        THE COURT:  What did you think that was for?

8        THE WITNESS:  Two years ago they had charged me $30

9   for my large sign on the outside of the building.  I didn't

10  want them thinking I was trying to cheat them out of any money.

11       THE COURT:  Did they cash your check?

12       THE WITNESS:  No, they did not, they sent it back.

13       THE COURT:  Okay.  Go ahead.

14       MR. LANZILLO:  I would move into evidence Exhibit M.

15       THE COURT:  It's admitted.

16       MR. LANZILLO:  Your Honor, that's all I have at this

17  time subject to my earlier request to review and verify the

18  information conveyed.

19       THE COURT:  All right.  Do you have anything else of

20  this man?

21        MR. FRIEDMAN:  Nothing further, your Honor.

22        THE COURT:  Thank you, sir.  Call your next witness.

23        MR. WALCZAK:  Plaintiffs would call Tom Riel.

24        THE CLERK:  State your name and spell it for the

25   record, sir?


162


1        THE WITNESS:  Thomas Riel, R-i-e-l.

2            THOMAS RIEL, PLAINTIFF HEREIN, SWORN

3                DIRECT EXAMINATION

4   BY MR. WALCZAK:

5   Q.    Would you state your name?

6   A.    Thomas Riel.

7   Q.    Where do you live, Mr. Riel?

8   A.    I live at 56 Mechanic Street in the City of Bradford.

9   Q.    Do you live within the Historic District?

10   A.    I do live in the Historic District, yes.

11   Q.    The property that we've been discussing, one of the

12   properties we've been discussing where there are signs posted

13   saying "How Unethical is Mayor Henry", is that property you

14   own?

15  A.    That's property that I jointly own with Diane Thompson.

16  Q.    And that is in fact located in the Historic District?

17  A.    It is located in the Historic District, two doors from

18  where I live.

19  Q.    You've had problems with your signs in the City of

20  Bradford for quite sometime?

21  A.    Yes, dating back to I believe February 1, 2001, is when

22  it started, when Mr. Peterson had sent me a letter demanding I

23  take down signs that were similar to the ones shown on Seward

24  Avenue, not in the Historic District.  They were the red signs

25  with white lettering.

163

1  Q.    Sir, if I show you what's been marked as Exhibit A-5,

2  would that be an example of a sign you had up several years

3  ago?

4  A.    Yes, those are signs I was kind of putting up a few years

5  ago, putting them up on my property owned just by me.  One sign

6  at a time.

7  Q.    And it's a sign that is currently up under Exhibit A-5,

8  that's one of the signs you had up?

9   A.   That's one, yes.  I had many but only one at a time.

10        THE COURT:  Mr. Riel, two things.  Don't talk over

11  him because this guy has to get down what you're saying, and

12  you're one of these folks who talk fast, so try to slow down.

13        THE WITNESS:  I'll slow down, your Honor, I'm sorry.

14  BY MR. WALCZAK:

15  Q.   Is the sign depicted in Exhibit A-5 located on property

16  that you own?

17  A.   It was located on property that I own.

18  Q.   And is that property within the City of Bradford?

19  A.   Yes.

20  Q.   Is it within the Historic District?

21  A.   No.

22  Q.   So it's your understanding it's subject to Chapter 178

23  but not 125?

24  A.   Yes, according to Mr. Peterson at the time.

25  Q.   How big was that sign "What Is A Political Prostitute?"


164


1   A.   All of the signs I placed at that location were four foot

2   by four foot for a total of 16 square feet.

3  Q.   And are those signs still up?

4  A.   There is no sign presently up at that location, there

5  hasn't been for a month or two.

6  Q.   When is the last time you put up a sign on that property?

7  A.   Oh, the last time I put up a sign on that property was --

8  would be last fall prior to the November election, maybe in

9  October.

10  Q.   What did the sign say?

11  A.   The sign said "Stop The City Hall Puppet Show."  "Vote

12  Riel For Mayor."

13  Q.   How big was that sign?

14  A.   Initially, four foot by four feet.  But after the

15  election I cut off across the bottom where it says "Vote Riel

16  For Mayor" because the election was over.

17  Q.   So that sign actually promoted your candidacy?

18  A.   Initially, yes.

19  Q.   And it was 16 square feet?

20  A.   Initially, yes.

21  Q.   And did anybody tell you that you had to take it down?

22  A.   No.  I had not been told I had to take down any signs at

23  that location since Mr. Peterson had told me I had to back in

24  2001.

25  Q.   Tell us what happened back in 2001, you were asked to


165


1  take down a sign similar to this, four feet by four feet,

2  located on your private property outside the Historical

3  District, what happened after that?

4  A.   I placed the sign up February 1, 2001.  Later that day a

5  registered letter was mailed to me from Mr. John Peterson,

6  telling me that the sign was in violation, I don't off the top

7  of my head recall, but essentially saying I needed to have a

8  permit or a permit to put it there.  Giving me three days to

9  take the sign down.  At the time I spoke to Mr. Peterson about

10  it on a Saturday, I called him at home and talked to him.  And

11  he said he wouldn't count the weekend as three days and I

12  initially did take the sign down, but I did put others back up.

13  Q.   Eventually through negotiations with --

14  A.   Yes, eventually.

15  Q.   Why don't you wait until I finish.

16  A.   I'm sorry.

17  Q    Eventually -- I want to me try to short circuit this a

18  little bit, negotiations took place between the American Civil

19  Liberties Union and the City of Bradford and you were allowed

20  to keep those signs up?

21  A.   Yes, the City of Bradford agreed to amend their sign

22  ordinance to make it constitutional, which they drugged that

23  out over the course of a year and a half to two years, I don't

24  believe they have did make it constitutional as they said they

25  would.


166


1          THE COURT:  Well, I'll decide that.

2          THE WITNESS:  Yes, your Honor.

3          THE COURT:  Go ahead.

4  BY MR. WALCZAK:

5  Q.   Are you aware of whether or not the ACLU said to the City

6  of Bradford that you had to allow commercial signs up to 12

7  square feet?

8  A.   I'm not aware that the ACLU had done that.

9  Q.   I'll show you what's been marked as Defendant's Exhibit

10  B, is that a sign that you posted?

11  A.   Yes, that's the sign I put up in October of 2003.

12   Q.   And what does that sign say?

13   A.   That signs says make "City Council A Democratic Forum

14   Again, Vote Riel For Mayor."

15        THE COURT:  I'm sorry, sir, can you do that one more

16   time?

17        THE WITNESS:  "Make City Council A Democratic Forum

18   Again, Vote Riel For Mayor."

19        THE COURT:  All right.

20   BY MR. WALCZAK:

21   Q.   Where is that building located?

22   A.   That building is on at the intersection of, I believe

23   it's Interstate Parkway and North Bennett Street.

24   Q.   Is that in the Historic District?

25   A.   No.


                              167


1   Q.   But it is within the City of Bradford?

2   A.   Yes.

3   Q.   How big is that sign?

4   A.   That sign is four foot by eight foot for a total of 32

5   square feet.

6   Q.   Is that a fairly well-traveled area?

7   A.   Yes, you can see the road widens right there.

8   Q.   Is it considered downtown Bradford?

9   A.   It's in the City of Bradford.

10  Q.   How long was that up, I'm sorry?

11  A.   I put that sign up in early October of 2003, and I just

12  took it down about a week ago.

13  Q.   Were you given any notice by City of Bradford officials

14  that that sign was in violation of any ordinance?

15  A.   No.

16        THE COURT:  Sir, is that hanging or is that painted?

17        THE WITNESS:  That's a hanging sign.

18        THE COURT:  From the side of the building?

19        THE WITNESS:  Yes, sir.

20  BY MR. WALCZAK:

21  Q.   What's that made of?

22  A.   It's made of a material, I believe it's called corplast,

23  it's like a weather resistant cardboard, so to speak, with

24  vinyl leathering on it.

25  Q.   Is that sign fairly heavy?

168

1  A.    Probably only weighs two or three pounds.  The screws to

2  hold it in probably weigh more than the sign.

3  Q.    And whose building is that?

4  A.    That is a friend of mine's building.

5  Q.    So you posted that with his permission?

6  A.    Yes.

7  Q.    The signs for which you were cited in February or March

8  of this year, those aren't the first ones you've displayed on

9  that property, is it?

10  A.    No.

11  Q.    What's the address of that property?

12  A.    52 Mechanic Street in the City of Bradford.

13  Q.    Did you display some signs on that property last year?

14  A.    Yes.

15  Q.    And how many?

16  A.    I don't know, maybe a total of eight or so.

17  Q.    And do you remember were those signs expressing a

18  message?

19  A.    Yes.

20  Q.    Do you remember what the messages were on those signs?

21  A.    I didn't write them all down, but I know some of them

22  were political, said "Two Mayors, Two Lawyers Too Much Money."

23  They were all political actually.  "Happy Election Year.  The

24  Future of City Hall?"  Things like that.

25  Q.    And what were those signs made of?


169


1  A.    Plywood primarily and corplast.

2  Q.    What are the signs you've been cited for made of?

3  A.    The signs that I was cited for at the time I believe were

4  all plywood, except one was corplast.

5  Q.    The signs for which you were cited are made of the same

6  thing as the signs you had up last year?

7  A.    Yes.

8  Q.    And how were the signs last year affixed?

9  A.    To the building the same.

10  Q.    And did you get cited for the signs last year?

11  A.    I didn't get cited, but I was sent a letter from the

12  chairman of HARB board asking me to take them down.

13        THE COURT:  Excuse me, let me interrupt.  The

14  picture that's up there right now, first of all, how is that

15  identified as an exhibit -- is it identified as an exhibit?

16          MR. WALCZAK:  It's identified as Defendant's Exhibit

17  B.

18          THE COURT:  All right.

19          MR. WALCZAK:  It's the second page of Defendant's

20  Exhibit B.

21          THE COURT:  Two questions.  Have we identified and

22  do we have in the record by way of photograph the signs that he

23  just testified to that he got a letter on but was not cited

24  for?

25          MR. WALCZAK:  We don't have a picture of that.  Do

                                170

1  you have a picture of those signs, Mr. Riel?

2          THE WITNESS:  No, but the City probably does.

3          THE COURT:  My question is, the photograph that's up

4  there, that's your friend's property, is that right?

5          THE WITNESS:  Yes.

6          THE COURT:  Is that where, did you put the signs

7  that you generated the letter in the same place where the sign

8  is up there right now?

9          THE WITNESS:  No.

10        THE COURT:  Where did you put them?

11        THE WITNESS:  The building at 52 Mechanic Street,

12  where there were multiple signs in one location.

13        THE COURT:  Who owns 52 Mechanic Street?

14        THE WITNESS:  I own 52 Mechanic Street with Diane

15  Thompson.

16        THE COURT:  Okay.  But this picture up here is owned

17  by your friend, is that right?

18        THE WITNESS:  Yes.

19        THE COURT:  That's not where the signs were that

20  generated the letter from the City, that was on your own

21  property and her property?

22        THE WITNESS:  Yes.  Right here in this picture

23  that's up there now.

24  BY MR. WALCZAK:

25  Q.   Plaintiff's Exhibit 1.  And that is the building that has

171

1  the hand-lettered signs outside, is that 52 Mechanic Street?

2  A.   Yes.

3  Q.   And that's the building you own?

4   A.   Yes, I own with Diane Thompson, yes.

5   Q.   Are the signs that are up there are the ones you received

6   a citation for?

7   A.   Initially, I put up a couple more and got a couple more

8   citations after those three were up.

9   Q.   And last year the signs about which you just testified

10  were hanging on the same building?

11  A.   Yes, on the outside of the building above the door in the

12  center, and some of them were upstairs on the outside of the

13  building on the second floor.

14  Q.   They were made of the same material?

15  A.   Yes.

16  Q.   Were they also hand lettered?

17  A.   Primarily, yes.  I may have put up one corplast.

18       THE COURT:  That's in the Historic District, is that

19  right?

20       THE WITNESS:  Yes, that's in the Historical

21  District.

22       THE COURT:  I apologize, but we got a lot of signs

23  flying here.  We're a long ways from those signs, do we have a

24  closeup of them somewhere, do we have a closeup of those?

25        MR. WALCZAK:  This document -- if we could mark this


172


1  as Plaintiff's Exhibit 22.

2        THE COURT:  So I'm clear, Mr. Pysher, that is

3  property owned by you and Ms. Thompson?

4        THE WITNESS:  Mr. Pysher is back there, I'm Mr.

5  Riel.

6        THE COURT:  I apologize, Mr. Riel.

7        THE WITNESS:  This is the property that I co-owned

8  with Diane Thompson, those are my political signs that I put

9  up, Ms. Thompson did not.

10        THE COURT:  All right.  Those are the political

11  signs that generated citations, let me put it this way.  Those

12  are the signs that generated the citations, is that right?

13        THE WITNESS:  Yes.

14        THE COURT:  Go ahead.

15  BY MR. WALCZAK:

16  Q.    You were also cited for two other signs, is that right?

17  A.    Yes, I was cited for additional signs after those.

18  Q.    Do you remember what those signs said?

19  A.    Those signs said -- the signs that are up there now I

20  received a total of two citations for all three of those signs.

21  Then I got three more additional signs, which there's a photo

22  there somewhere, one of them said "Stop The City Hall Puppet

23  Show," then I had the Mayor Henry sign underneath.

24  Q.    The top sign said?

25  A.    The top sign said "Stop The City Hall Puppet Show, Mayor

173

1  Henry."

2  Q.    And the next sign?

3  A.    The next sign said -- I'm trying to think here.

4        THE COURT:  Is it fair to say they were all

5  similarly themed?

6        THE WITNESS:  They were all similar political signs,

7  yes.

8        THE COURT:  All right.

9        MR. WALCZAK:  I have nothing further, your Honor.

10            CROSS-EXAMINATION

11  BY MR. LANZILLO:

12  Q.    I want to make sure I have the properties we're talking

13  about straight here.  We're really talking about three

14  properties where you have posted signs.  One is the vacant lot

15  located on Seward Avenue.  The other is the building owned by

16  your friend at the intersection of Interstate Parkway and

17  another street.  And, finally, there is your property that you

18  co-own with Ms. Thompson at 53 Mechanic Street, is that

19  correct?

20  A.    So far, yes.

21  Q.    I take it from that you have other locations where you

22  post signs?

23  A.    I placed them in many locations around the City.

24  Q.    But the ones we've talked about today, the ones the court

25  had asked about, those are three locations?


174


1  A.    So far, yes.

2  Q.    Now, I want to make sure I follow this.  This is the

3  Interstate Parkway intersection location?

4  A.    Yes.

5  Q.    Is it your testimony that based on your understanding,

6  this sign did not comply with Sction 178, it's too big?

7  A.   I'm not ready to -- my feeling was the sign was exempt

8  because it was political.

9  Q.   Now, you testified earlier this was larger you believe

10  than the 12 square feet?

11  A.   It was exactly 32 square feet.

12  Q.   And this sign was posted at a time when you were running

13  against Ms. Corignani for Mayor?

14  A.   Mrs. Corignani?

15  Q.   That's correct.

16  A.   Yes.

17  Q.   And no one from the City gave you any difficulty with

18  respect to this sign, is that correct?

19  A.   Not until a couple months ago.

20  Q.   A couple months ago.  Have you ever been cited for this

21  sign?

22  A.   No.

23  Q.   Did you receive a warning letter?

24  A.   Mr. McCormack, the Fire Chief, called the owner of the

25  building and asked him about having the sign taken down.

175

1  Q.  Were you a party to that conversation?

2  A.  No, that would have been a third party.

3       MR. LANZILLO:  Move to strike as hearsay,

4  unresponsive.

5       THE COURT:  I struck it.

6  BY MR. LANZILLO:

7  Q.  So during the time that you were running against --

8       THE COURT:  Let me rephrase that, it's late, there's

9  no such word as struck it, it's struck.  Go ahead.

10  BY MR. LANZILLO:

11  Q.  When you were running against Mrs. Corignani, no effort

12  was made to have you take your sign down or make you get a

13  permit at Interstate Parkway, is that correct?

14  A.  No.

15  Q.  No that's not correct?

16  A.  No effort was made for me to take the sign down.

17  Q.  Thank you.  You were asked about some of the photos that

18  I previously marked as Defendant's Exhibit A -- by the way,

19  while this sign was up here in Defendant's Exhibit B, did you

20  see anyone climb up with a tape ruler or measurer and try to

21  ascertain its precise size, composition?

22  A.  No, it was obvious it was 25, 30 square feet.  But they

23   may have, I don't know.  They have a bucket truck.

24   Q.   You didn't see that, though?

25   A.   No, I wasn't watching.


                              176


1   Q.   Now, I was unclear in your testimony, was this sign up on

2   Seward before or after the ordinance was amended, to include

3   the exemption for noncommercial signs up to 12 square feet?

4   A.   I'm not sure whether that particular sign was before or

5   after, but I had similar signs up both before and after it was

6   amended at that location.

7   Q.   Didn't you represent to members of the City that all of

8   the signs that you had placed after the amendment of the

9   ordinance were in fact 12 square feet or less, they were

10   compliant?

11   A.   I don't believe I ever took that stance, no.  Most of

12   them were 16 square feet.

13   Q.   So what you're saying is that they may have missed some

14   that were noncompliant?

15   A.   Depends on how you determine whether they were in

16   compliance, what I'm saying is the signs were almost all 16

17  square feet.

18  Q.    Do you know if anyone went out and measured?

19  A.    I know at the time initially when the controversy started

20  with the signs, Greg Henry, who is now special counsel to the

21  City, talked to me about the size of the signs.

22  Q.    That wasn't my question.  Do you know if anyone went out

23  and measured them?

24  A.    I would believe that someone would have because Mr. Henry

25  apparently had knowledge of the size of sign, that led me to


177


1  believe that someone had gotten a measurement.

2  Q.    Well --

3  A.    I didn't see anybody measure the sign, no.

4  Q.    Do you believe that the City is going after you based on

5  the content of your signs?

6  A.    I'm not sure, I believe that they're trying to keep me

7  from putting up politically expressive signs, yes.

8  Q.    What you're saying here is they knew that you believed

9  that someone, Mr. Henry knew they had a noncompliant sign on

10  their hand expressing negative comments about the Mayor, and

11  they decided not to take advantage of an opportunity to cite

12  you or proceed against you in enforcement?

13  A.    No, I'm saying the signs were up for several years and

14  all of a sudden now I'm being cited.  Similar signs have been

15  up for years.

16  Q.    And it's fair to say that since the amendment of the

17  ordinance, that added the exemption for noncommercial signs up

18  to 12 square feet, there had been no enforcement taken against

19  with you respect to any of the signs that you've posted on

20  Seward Avenue, is that correct?

21  A.    That's correct.

22  Q.    And no enforcement action has been taken against you with

23  respect to any signs, political or otherwise, that you've

24  posted on your friend's property on Interstate Parkway, is that

25  correct?

178

1  A.    Not yet, that's correct.

2  Q.    The only signs where there have been any action against

3  you are in the Historic District, and that was based upon your

4  failure to obtain a HARB permit?

5   A.   Only recently, yes.

6   Q.   Now, last year, 2003, you had noncompliant signs or signs

7   that under the ordinance would require a permit and you were

8   contacted by the chairman of the HARB board, were you not?

9   A.   Yes, I was contacted by him.

10  Q.   So at this point in time, the citations at issue are not

11  the first time that there's been this issue concerning your

12  signs that have been raised in the Historic District, right?

13  A.   No, it's not the first time.

14  Q.   Did you remove your signs at that time in 2003?

15  A.   I've taken the signs down and put other ones up,

16  sometimes there's no signs, there was usually only one up at

17  this location, sometimes two.

18  Q.   Now, you understand that the City has no objection, does

19  not consider it to be a problem under its ordinances if you

20  place your signs inside of the windows of your building, is

21  that correct?

22  A.   I understand that that's the City's interpretation,

23  that's not my interpretation.

24  Q.   In fact, though, you have placed signs in windows at 53

25  Mechanic Street and no one has taken any enforcement action

1  against you, is that correct?

2  A.   I didn't keep track of which signs I put inside and

3  outside, but I was not cited for any inside the window, that I

4  recall.

5  Q.   And signs you placed in the windows have been critical of

6  Mayor Corignani and other public officials, have they not?

7  A.   I only put a couple in the windows for convenience sake,

8  but yes, they were probably somewhat critical of her before

9  they started citing me.

10  Q.   Let me show you what I've marked as Defendant's Exhibit

11  C; tell me is that a sign that you placed on the interior of

12  the building facing out through the window?

13  A.   Looks like it.

14  Q.   And reference to Madam Mayor, it to Mayor Corignani?

15  A.   Signs are up to a matter of interpretation.

16  Q.   You're the author of this sign, are you not?

17  A.   Yes.

18  Q.   Was your reference to Mayor Corignani?

19  A.   I would think so, yes.

20      THE COURT:  How many female mayors do you have?

21      THE WITNESS:  We only have one elected female mayor.

22  BY  MR. LANZILLO:

23  Q.    Was any enforcement action taken against you with respect

24  to this sign?

25  A.    I don't remember exactly when I put that sign up.  But it

180

1  was before they started citing me, yes, it was before.

2  Q.    So the answer is no enforcement action was taken with

3  respect to the sign placed inside the window?

4  A.    No, not at that time.

5  Q.    Or any other sign you ever placed inside a window, is

6  that correct?

7  A.    Yes.

8  Q.    And your understanding is that you were cited for failing

9  to obtain a HARB certificate of appropriateness or a HARB

10  recommendation with respect to your exterior signs?

11  A.    That's what they claim, yes.

12  Q.    Now, you had utilized the HARB procedure before, haven't

13  you?

14  A.   Only once.

15  Q.   Okay.

16  A.   Not in relation to signs.

17  Q.   Right, it was with respect to an application for a

18  demolition permit?

19  A.   Yes.

20  Q.   You applied for a demolition permit, which is also

21  covered by the HARB ordinance on or about August 18, 2003?

22  A.   Yes.

23  Q.   And you received the preliminary approval from HARB on or

24  about August 21, 2003?

25  A.   I don't have it in front of me, but that sounds close.


181


1  Q.   It was within a few days, wasn't it?

2  A.   I had waited to apply until the third Thursday of the

3  month when they had the meeting.

4  Q.   My question is after you applied, you got prompt

5  treatment from the HARB board, did you not, within a matter of

6  days?

7  A.   Fairly prompt, yes.

8          THE COURT:  Mr. Lanzillo, we're going to have to be

9  finishing up here pretty quick because my reporter is needed in

10  another chambers and we are going to have to continue this to

11  another day anyways.

12          MR. LANZILLO:  Your Honor, since we will be coming

13  back, I'd suggest that we simply break at this point.

14          THE COURT:  All right.

15          MR. WALCZAK:  One housekeeping matter that is quite

16  important.  The consent order that we signed back in March,

17  went until the date of the presumed hearing, which I believe

18  was April 20th.  If counsel will simply stipulate to extend the

19  consent order.

20          THE COURT:  I think that's a fair point.  It seems

21  to me, but I will be guided by what the consensus of opinion

22  is, doesn't it make sense to continue the stipulation until

23  such time as I rule on the merits?

24          MR. LANZILLO:  Yes, your Honor.

25          THE COURT:  All right.  And on that subject, it

182

1  seems to me, although this is styled as a preliminary

2  injunction hearing, I can see no reason, particularly since

3  we're going to go another day at least and everybody is going

4  to get a chance to say everything, that this should not be

5  converted into a final hearing on the merits, do you agree?

6        MR. WALCZAK:  Plaintiffs agree, your Honor.

7        THE COURT:  Do you agree with that, too, Mr.

8  Lanzillo?

9        MR. LANZILLO:  Yes, your Honor.

10        THE COURT:  All right.

11        MR. LANZILLO:  Your Honor, quick question, if I may.

12  With respect to converting this to a final hearing on the

13  merits, if we're going to do that, we will have some latitude

14  with respect to evidence, any additional evidence that may be

15  presented at the next hearing.  This obviously has been

16  presented in abbreviated fashion, I do anticipate some

17  rebuttal.

18        THE COURT:  I'm going to give everybody sufficient

19  opportunity by way of leeway to get their story out so that you

20  won't be trying to do more than you can reasonably get done.

21        MR. LANZILLO:  Your Honor, I would move for the

22  admission of Defendant's Exhibit C.

23        THE COURT:  Exhibit C is admitted.  Let's talk

24  about -- before we talk about rescheduling, let me talk about

25  an event that is about to occur in the future and how it's

183

1  going to impact on what I'm doing here.  When these statutes or

2  ordinances or portions of them are amended, I'm going to be

3  faced with -- I'm tilting at the right windmill right now.  But

4  when you come back, whenever it is, within a week or so, I

5  won't be.  And that raises all kinds of questions in my mind.

6  In other words, we may have all been tilling ground that

7  becomes moot, at least in part, by the time I see this new

8  ordinance.  Frankly, there's been no briefing on it, all the

9  objections have been directed at this present ordinance.  What

10  is your sense of this, Mr. Walczak?

11          MR. WALCZAK:  We, your Honor, in fact our clients

12  were tentative enough to see that was going on at City Council,

13  they sent us a copy of what was preliminarily approved this

14  week.  And as we read it, there are essentially two

15  semi-significant changes to what is presently before the court.

16          THE COURT:  Not to interrupt you, but in the

17  interest of time, this is what I'm going to do.  First of all,

18  let's get a date here. Go a little bit farther down there next

19  week. Does everybody have their schedules available?

20       MR. FRIEDMAN: I do not, your Honor.

21       MR. LANZILLO: I do not, your Honor.

22       THE COURT: All right. I'm going to have my deputy

23  clerk contact you about your availability of the week of May

24  10th, which the week preceding my trial term. When does the

25  statute become operative?


                              184


1        MR. LANZILLO: The 11th, your Honor.

2        THE COURT: I'll have him contact you concerning a

3  new date, the 11th or thereafter, during that week. But then

4  prior to that time, I'm going to have a telephonic status

5  conference. First of all, I want the defendant to send me a

6  copy of the new ordinance that it is intending to pass. I only

7  need 125 and 178. Secondly, I'm going to schedule a telephonic

8  status conference in the nature of a pretrial conference so I

9  can streamline this next hearing so I know what the real

10  remaining issues are or are not. All right, that's all I have,

11  anything from anybody else?

12          MR. FRIEDMAN:  Nothing further, your Honor.

13          MR. LANZILLO:  No, your Honor.

14

15          (Whereupon, at 4:40 p.m., the proceedings were

16   concluded.)

17

18                    - - -

19

20

21

22

23

24

25

                              185

1              C E R T I F I C A T E
               – – – – – – – – – –

2

3

4

5

6      I, Ronald J. Bench, certify that the foregoing is a

7   correct transcript from the record of proceedings in the

8   above-entitled matter.

9

10

11

12

13   _____

14   Ronald J. Bench

15

16

17

18

19

20

21

22

23

24

25