PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-4425
_____

THOMAS RIEL; DIANE THOMPSON;
FRED PYSHER,

Appellants

v.

CITY OF BRADFORD
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 04-cv-00090)
District Judge:  Honorable Sean J. McLaughlin
_____

Argued December 12, 2006
Before:  FISHER and CHAGARES, *Circuit Judges*,
and BUCKWALTER,* *District Judge*.

_____

*The Honorable Ronald L. Buckwalter, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

(Filed: May 3, 2007)

Philip B. Friedman
Ambrose, Friedman & Weichler
319 West 8th Street
Erie, PA  16502-1495

Witold J. Walczak (Argued)
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA  15213
        *Attorneys for Appellants*

Richard A. Lanzillo (Argued)
Knox, McLaughlin, Gornall & Sennett
120 West Tenth Street
Erie, PA  16501
        *Attorney for Appellee*

————

OPINION OF THE COURT
————

FISHER, *Circuit Judge*.

The Appellants are home and business owners who were issued criminal citations by the City of Bradford, Pennsylvania ("City" or "Bradford") for displaying commercial and noncommercial signs on their private property without first obtaining a permit.  They argue that the City's sign ordinances,

2

which have now been amended, violate the First Amendment because they are impermissibly content-based, overbroad, vague, and allow too much time to process permit requests. The United States District Court for the Western District of Pennsylvania held that the ordinances, as amended, are in fact content-neutral and permissible under the First Amendment based in part on our holding in *Rappa v. New Castle County*, 18 F.3d 1043 (3d Cir. 1994). For the reasons that follow, we will affirm the holding of the District Court.

## I.

Appellants Thomas Riel, Diane Thompson, and Fred Pysher are residents of the City of Bradford. The properties at issue are Riel's residence, and Thompson's and Pysher's commercial establishments in downtown Bradford. In March 2004, the City issued more than ten citations to the Appellants for displaying signs on their private property without first receiving approval and a permit from the Historical Architecture Review Board ("HARB"), as required by section 125-15(E) of the Bradford Code. Riel's and Thompson's signs were hand-made cardboard and plywood signs containing criticisms of City officials. Some of the signs included: "How unethical is Mayor Henry?", "Can CEO Corignani work an honest 8 hours?", "Stop the City Hall Puppet Show, Mayor Henry", and "Fire Chief Wild Bill McCormack, Resign!". Pysher, on the other hand, was cited for a commercial sign advertising his realty business.

On March 24, 2004, the Appellants filed this action challenging the constitutionality of Bradford Code Chapter 125, section 125-15(E), which regulates signs in Bradford's historic

3

district, and Chapter 178, which regulates signs in all of Bradford. Consent orders entered on March 24, 2004, and June 9, 2004, stayed enforcement of the challenged provisions. On May 14, 2004, and July 13, 2004, the City amended the two ordinances. The parties then filed cross-motions for summary judgment disputing the facial validity of the new laws.

### A.  Chapter 178

The first provision that the Appellants challenge is Chapter 178 of the City of Bradford Code, which applies to any outdoor sign or display within the City that can be seen by the general public. It makes it illegal for "any person to erect, repair, alter, relocate or maintain within the City of Bradford any sign" without first obtaining a permit from the Building Inspector, paying a $20 annual permit fee, and filing with the Building Inspector a $10,000 bond or liability insurance policy. Bradford, Pa., Code § 178-3 (2003). In order to obtain a permit, an applicant must disclose personal information, and provide descriptions of the location where the sign will be displayed and of the sign itself, including drawings and specification plans. *Id.* § 178-4.

The standard governing approval is contained in section 178-6, which directs the Building Inspector to

> examine such plans and specifications and other data and the premises upon which it is proposed to erect the sign or other advertising structure, and if it shall appear that the proposed structure is in compliance with all the requirements of this

4

chapter and all other laws and ordinances of the
City of Bradford, he shall then issue the erection
permit.

*Id.* § 178-6.  Although the original ordinance did not limit the
amount of time in which such decisions could be made, the
amended rule requires the Building Inspector to act within thirty
days of receiving the application.  *See id.*

   The ordinance also contains many provisions regulating
a sign's appearance and placement.  For example, there are size
limits that vary depending on location of the sign.  There is no
size limit for ground signs, which are defined as "any sign
supported by uprights or braces placed upon the ground and not
attached to any building." *Id.* § 178-2.  Wall signs may be up to
500 square feet in area, roof signs 300 square feet, and
temporary signs 100 square feet.  *Id.* §§ 178-24(B), 178-25(B),
178-27(A).

   In addition, the ordinance requires that signs comply with
Bradford's electrical code.  *Id.* § 178-5.  It also prohibits signs
that are unsafe, *id.* § 178-10, that obstruct doors, windows, or
fire escapes, *id.* § 178-17, or that pose a traffic hazard, *id.* § 178-
18.  And it regulates the construction, placement, and erection
of different types of signs.  *Id.* §§ 178-23 – 178-30.[1]  All
approved signs must "have painted in a conspicuous place
thereon, in letters not less than one inch in height, the date of
erection [and] the permit number." *Id.* § 178-11.  The ordinance

_____

   [1]The Appellants view these requirements as content-
neutral and thus do not challenge them in this lawsuit.

5

characterizes permits as "mere licenses revocable at any time by the Building Officer." *Id.* § 178-9.

Finally, Chapter 178 provides a series of exemptions from the permit, fee, and bond requirements. *Id.* § 178-15. They include temporary signs, identification signs, signs related to the activities being conducted on the property where they are located, traffic and municipal signs, and noncommercial signs placed on private property by the owner or occupant.[2] *Id.* These exemptions are the main focus of the Appellants' constitutional attack on the ordinance.

Each violation of Chapter 178 is punishable by a fine not exceeding $300 and a prison sentence not exceeding ninety days. Each day the sign is displayed constitutes a separate violation. *Id.* § 178-34.

## B. Chapter 125

The other ordinance challenged by the Appellants is Chapter 125 of the Bradford Code, which delineates the City's historic districts and sets rules and procedures to "protect the distinctive historical character of these districts." Bradford, Pa., Code § 125-1 (2001). Specifically, the Appellants challenge the

---

[2]These exemptions were also amended after the Appellants filed this lawsuit. The net effect of the changes was to eliminate an exemption for real estate and architect/engineer/contractor signs and replace it with an exemption for temporary signs up to twelve square feet in area that can be displayed for up to sixty days.

constitutionality of section 125-15(E), which regulates signs and awnings within historic districts.

When this case was filed, section 125-15(E) prohibited all signs in the historic districts "except for advertising informing the public of a service, business, occupation or profession[] carried on, in or about the property on which such sign or permanent external advertising is displayed." *Id.* § 125-15(E). Such signs could only be displayed after obtaining a permit from the HARB. *Id.* The Board's decisions were based on whether the sign was in "conformity [with] exterior material composition, exterior structural design, external appearance and size with similar advertising or information media used in the architectural period of the district." *Id.*

On May 14, 2004, Bradford amended section 125-15(E) in response to the filing of the Appellants' lawsuit. Now, "noncommercial" and "temporary" (those displayed less than sixty days) signs smaller than twelve square feet are allowed without a permit. Bradford, Pa., Code §§ 125-15(E)(3) & (E)(4) (2004). Residents wishing to display noncommercial signs larger than that must obtain a permit from the HARB. *Id.* § 125-15(E)(2). All non-temporary commercial signs, regardless of size, must have a permit. *Id.* § 125-15(E)(1).

The May 14 amendments also imposed time limits on the permit application process. Section 125-10(D) requires the HARB to issue a recommendation to the City Council on a permit application "no later than 30 days after [its next] meeting." *Id.* § 125-10(D). The City Council must then act on the application "at the council meeting immediately succeeding

7

the receipt of the recommendation from HARB." *Id.* If the City Council fails to act within this time period, the HARB recommendation is "deemed approved by the council." *Id.*

A subsequent amendment to Chapter 125, passed on July 13, 2004, slightly altered the standards governing the HARB's decisions. It provided that the review must be "[i]n accordance with the Resource Inventory of building architectural styles of the Bradford Historic District." *Id.* § 125-15(E)(2). This Inventory lists buildings in the historic district by address, and gives their architectural style, construction material, roof type, building height, and construction date, as well as a brief narrative description of the building. In addition to consulting this Inventory, the HARB's decision about whether or not to issue a permit must be based on "conformity in exterior material composition, exterior structural design, external appearance and size of similar advertising or information media used in the architectural period of the district." *Id.*

The penalties for violating section 125-15 were untouched by the amendments. The first violation is punished by a fine between $25 and $1000, and possible imprisonment for up to ninety days. *Id.* § 125-18. The second violation carries a minimum $100 penalty, and subsequent violations carry a minimum $500 penalty, all with the same maximum fines and prison sentence as the first violation. *Id.* Each day that a sign is displayed after a violation notice is issued is considered a separate offense. *Id.*

*C.  District Court Decision*

8

On August 31, 2005, the District Court entered an order denying the Appellants' motion for summary judgment, and granting the City's motion. *Riel v. City of Bradford*, No. Civ. A. 04-90, 2005 WL 2106554, *1 (W.D. Pa. Aug. 31, 2005). The Court determined that the challenged ordinances were not content-based and thus not subject to strict scrutiny. *Id.* at *20. It also believed that they were not overbroad because they did not ban signs, but merely required permits. *Id.* at *9. Finally, the District Court determined that the standards governing permit approval were not unduly vague, and that the review period was not too great because of the many factors City officials had to consider. *Id.* at *23.

This appeal followed. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

II.

*A. Content Neutrality*

As we explained in *Rappa v. New Castle County*, "[e]ver since the Supreme Court invalidated an ordinance that prohibited all picketing near a school except for peaceful labor picketing on the basis that 'the ordinance . . . describe[d] impermissible picketing not in terms of time, place, and manner, but in terms of subject matter,' the first step in First Amendment analysis has been to determine whether a statute is content-neutral or content-based." 18 F.3d at 1053 (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 99 (1972)). This determination is vital because it dictates how we will analyze

9

the ordinance at issue.  If the ordinance is content-based, "then the [government] is required 'to show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'"  *Id.* (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)).  If, on the other hand, we determine that the statute is content-neutral in that it "merely restricts the total quantity of speech by regulating the time, the place or the manner in which one can speak, a very different test applies."  *Id.*  In such cases, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided [1] the restrictions 'are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for communication of the information.'"  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

Here, the parties disagree over which framework we should use to analyze the exceptions embodied in the sign ordinances, which the Appellants challenge as impermissibly content-based.[3]  The Appellants argue that because some of the exceptions distinguish between speech on the basis of its

---

[3]Both parties in this case correctly recognize that, for the purpose of our First Amendment analysis, there is no distinction between a law that bans speech and one that burdens it, as do the ordinances here by requiring a permit.  *See U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812 (2000) ("The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.").

10

content, we should employ the strict scrutiny test for content-based regulations. The City, on the other hand, contends that under our decision in *Rappa* the proper framework is that of a content-neutral time, place, and manner restriction.

This disagreement reflects the fact that determining whether a statute is content-based or content-neutral has not been entirely straightforward. On their face, Chapters 178 and 125 of the Bradford Code seem to distinguish between certain speech on the basis of its content. Chapter 178, for example, exempts from its permitting requirement signs that identify the name and profession of an owner or occupant of a building, signs that are cut into the masonry and contain identifying information about the building or its date of construction, and noncommercial signs not exceeding twelve square feet. Bradford, Pa., Code § 178-15 (2004). As we explained in *Rappa*, this law "indisputably distinguishes between, and allows the posting of certain signs based on the subject matter the sign conveys . . . . Under a literal understanding of 'content-based,' that fact makes the statute content-based." 18 F.3d at 1054. But we went on in *Rappa* to set forth a more nuanced understanding of what makes a statute content-based for the purpose of First Amendment analysis.

*Rappa* involved a First Amendment challenge to a set of sign ordinances similar to the ones in the present case. It is important not just because of this similarity, but because it is the only case in which we have spoken on the issue since the Supreme Court's major ruling on point in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981). In *Rappa*, a politician who had lost his party's primary for Delaware's seat in the

11

House of Representatives brought suit challenging the statutes and ordinances that had prevented him from advertising his candidacy. Specifically, the challenge involved two provisions: Subchapters I and II of Delaware Code Chapter 11. Subchapter I prohibited all signs in the right-of-way and within twenty-five feet of the right-of-way of any state highway. However, just as with the permitting scheme in the instant case, this general provision was limited by several exceptions. These exceptions included "direction or warning signs and official signs or notices," "signs advertising the sale or lease of the real property on which they are located," "signs advertising activities conducted on the real property" on which they are located, "beautification/landscape planting sponsorship signs," "danger and precautionary signs that relate to the premises," and "signs announcing a town, village, or city and advertising itself or its local industries." *Id.* at 1051-52. Subchapter II was Delaware's response to the federal Highway Beautification Act and applied to advertising within 660 feet of a right-of-way. Like Subchapter I, it contained a general prohibition on outdoor advertising in the regulated area along with a series of exceptions. Among other things, it excepted "direction and other official signs and notices," "signs, displays and devices advertising the sale or lease of the real property on which they are located," and "signs, displays and devices advertising activities conducted on the real property upon which they are located." *Id.* at 1052-53.

In reviewing the constitutionality of Delaware's statutory scheme, we first turned to the Supreme Court's splintered decision in *Metromedia*. There, the Court addressed an ordinance that generally prohibited "outdoor advertising display

12

signs," but provided exceptions for on-site signs and signs falling within twelve specified categories, including those identifying the premises and those advertising goods or services provided on the premises. 453 U.S. at 493 (plurality opinion). Justice White delivered the opinion for a plurality of four justices. He analyzed the constitutionality of the ordinance through the lens of its exceptions. First, the plurality held that the exception for on-site commercial speech coupled with a general ban on commercial advertising was not constitutionally suspect because commercial speech enjoys less protection than noncommercial speech. *Id.* at 503-12. However, it went on to invalidate the ordinance because it afforded more protection to commercial speech than to noncommercial speech in other ways, such as its allowance for on-site commercial advertising, but not for the posting of on-site noncommercial messages. *Id.* at 512-17.

Writing for himself and Justice Blackmun, Justice Brennan concurred in the judgment. Unlike the plurality, he viewed the ordinance as essentially eliminating the billboard as an effective medium of communication for many types of noncommercial messages. *Id.* at 525-26 (Brennan, J., concurring in the judgment). Consequently, he would have employed "the tests [the Supreme] Court has developed to analyze content-neutral prohibitions of particular media of communication." *Id.* at 526-27. Under those tests, he would have struck down the ordinance because the city "failed to provide adequate justification for its substantial restriction on protected activity." *Id.* at 528.

13

Because of this split result with very different reasoning, we were unable to glean any governing standard from *Metromedia*: "Simply stated, the plurality and the concurrence [in *Metromedia*] took such markedly different approaches to the San Diego ordinance that there is no common denominator between them." *Rappa*, 18 F.3d at 1058. Instead, we proposed a "new test" for sorting content-neutral and content-based restrictions on speech in situations like the one we now face. *Id.* at 1062. As we explained:

> The *Metromedia* concurrence . . . is correct that when government has a significant interest in limiting speech that is unrelated to the content of that speech, government should not be left with a choice of enacting a regulation banning all signs in a particular geographic area or none. Some signs are more important than others not because of a determination that they are generally more important than other signs, but because they are more related to the particular location than are other signs. Allowing such "context-sensitive" signs while banning others is not discriminating in favor of the content of these signs; rather, it is accommodating the special nature of such signs so that the messages they contain have an equal chance to be communicated.

*Id.* at 1064. On this reasoning, we announced the following test:

> [W]hen there is a significant relationship between the content of particular speech and a specific

14

location or its use, the state can exempt from a general ban speech having that content so long as the state did not make the distinction in an attempt to censor certain viewpoints or to control what issues are appropriate for public debate and so long as the exception also survives the test proposed by the *Metromedia* concurrence: i.e. the state must show that the exception is substantially related to advancing an important state interest that is at least as important as the interests advanced by the underlying regulation, that the exception is no broader than necessary to advance the special goal, and that the exception is narrowly drawn so as to impinge as little as possible on the overall goal.

*Id.* at 1065 (internal footnotes omitted).  We further explained that "[t]he requirement that a sign be significantly related to the property can be met in either of two ways.  First, the state can show that a sign is particularly important to travellers on the nearby road – for example, a directional sign, or a sign conveying the nearest location of food.  Second, the state can show that a sign better conveys its information in its particular location than it could anywhere else – for example, an address sign . . . ."  *Id.*

Applying this test, we found that most of the exceptions in the laws at issue in *Rappa* were constitutional, although we concluded that the statute must be struck down as facially unconstitutional based on our refusal to sever the provisions we did find to violate the First Amendment.  The particular holdings

15

are discussed below in relation to the specific exceptions in the ordinances at issue here. But we note at the outset that the important aspect of this holding is that exceptions like the ones at issue in the instant case were not analyzed as content-based restrictions under a strict scrutiny framework even though they appeared to distinguish between certain types of speech based on its content. Rather, we employed a more flexible, context-specific approach.

### B. Rappa*'s Reach*

The Appellants forcefully argue that the context-specific view we adopted in *Rappa* only applies to ordinances regulating signs on public property. They support this argument in two ways. First, they discuss the four primary Supreme Court "sign" cases and attempt to create a split between those involving bans on private and public property. Second, they contend that *Rappa*'s reasoning applies only to ordinances regulating public property.

Turning to the Supreme Court cases on point, the Appellants first address *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), in which the Supreme Court struck down as overbroad "Ladue's near-total prohibition of residential signs." *Id.* at 53. While this was a prohibition that applied to residential signs and was struck down, it was not analyzed under a content-based framework, as the Appellants would like us to do here. Rather, the *Gilleo* Court explicitly elected to "assume, *arguendo*, the validity of the City's submission that the various exemptions are free of impermissible content or viewpoint discrimination." *Id.* at 53. In other words, the Supreme Court in *Gilleo* did not find,

16

as the Appellants urge us to do here, that the regulation was impermissibly content-based because it applied to private property. Rather, viewing it under a content-neutral framework, the Court found that it swept in too much protected speech, such as the war protest sign at issue. The only discussion of the public-private property distinction was in balancing the interests – a step that comes *after* determining under which framework the statute will be viewed.[4]

Similarly, the Appellants urge us to find support for their view in *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85 (1977), which they describe simply as a case refusing to allow commercial speech to be banned on private property. There, the Supreme Court struck down a municipal ordinance banning real estate signs, which the Township had enacted to promote "stable, racially integrated housing." *Id.* at 94. In doing so, the Court did not apply a different framework because the ordinance applied to private property. Rather, the Supreme Court analyzed the law under the general framework applicable to commercial speech and simply found "that respondents failed to establish that this ordinance is needed to assure that Willingboro remains an integrated community." *Id.* at 95. Thus, we do not read *Linmark* as suggesting that a

---

[4]For example, in *Gilleo*, the Court discussed the importance of residential signs when considering whether there was any adequate substitute for the prohibited communication, not in determining the applicable framework. Specifically, the Court noted that "[r]esidential signs are an unusually cheap and convenient form of communication" that "may have no practical substitute." 512 U.S. at 57.

17

different framework is required when considering the constitutionality of an ordinance that applies to private, rather than public, property.

Next, the Appellants turn to *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984), where the Supreme Court upheld a content-neutral ordinance that banned the posting of all signs on public property. *Id.* at 817. Like *Gilleo* and *Linmark*, the Court in *Vincent* touched on the distinction between ordinances that apply only to public property and those that reach private property as well. But also like those cases, this discussion was not in relation to selecting a framework. Rather, it was in applying the chosen framework. Specifically, in discussing the tailoring of the ordinance at issue, the *Vincent* Court observed that "the validity of the esthetic interest in the elimination of signs on public property is not compromised by failing to extend the ban to private property. The private citizen's interest in controlling the use of his own property justifies the disparate treatment." *Id.* at 811.

Finally, the Appellants look to *Metromedia*, the final of the four Supreme Court cases on point, and to our analysis in *Rappa* to support their public-private distinction. The immediately troubling aspect of this argument is that neither the scheme in *Metromedia* nor the scheme in *Rappa* applied exclusively to public or private property. Both, for example, contained exceptions for signs advertising the goods or services offered on the property where the sign is displayed. *Rappa*, 18 F.3d at 1051; *Metromedia*, 453 U.S. at 510-11. Certainly this is not referring to public property. Indeed, we specifically noted

18

in *Rappa* that "the statutes regulate a private party's speech on his or her own property." 18 F.3d at 1071. In addition, nowhere in our discussion of the context-specific framework laid out in *Rappa* do we mention any distinction between public and private property. As in all of the discussed cases, any mention of the special nature of private property comes when weighing the interests at stake, not when selecting an analytical framework.

In sum, while several of these cases may mention the important interests at stake when regulating signs on private property, none of them suggest that regulations that apply to private versus public property should be subjected to a different standard. To the extent that the issue of private property came into play, it was during the balancing of interests. Thus, there is no basis for limiting *Rappa*'s context-specific framework to ordinances regulating signs on public property, and we will apply our rule from that case where it is relevant here.

### C. Application of Law to Bradford Ordinances

Having established the relevant precedent, we turn to the provisions that the Appellants challenge as impermissibly content-based. They claim that the exceptions embodied in sections 178-15 and 125-15(E) are invalid under the First Amendment because they distinguish between speech on the basis of its content. Section 178-15 instructs that the following signs are not required to comply with the permitting rules found in Chapter 178:

19

A.   Temporary signs not exceeding twelve (12) square feet, provided each such sign is removed within sixty (60) days of its erection.

B.   Identification signs not exceeding three (3) square feet denoting only the name and profession of an owner or occupant.

C.   Signs painted on the exterior surface of a building structure.

D.   Bulletin boards not exceeding eight (8) square feet in area advertising or informing of a service, business, occupation or profession carried on, in or about the property in which such bulletin board is displayed.

E.   Signs cut into any masonry surface or [] construct[ed] of bronze or other incombustible materials denoting the name or other identifying information concerning a building or its date of construction.

F.   Traffic or other municipal signs, legal notices, railroad crossing signs, danger and such emergency or nonadvertising signs as may be approved by City Council.

20

> G.     Noncommercial signs not exceeding twelve (12) square feet in area placed upon private property by the owner or occupant of said property.

Bradford, Pa., Code § 178-15 (2004).

Similarly, section 125-15(E) contains the following exceptions from the general requirements of Chapter 125:

> (1)     No commercial sign or permanent external advertising display of any kind shall be erected, altered or used in the historic district except for advertising informing the public of a service, business, occupation or profession carried on, in or about the property on which such sign or permanent external advertising is displayed.

> . . . .

> (3)     Noncommercial signs not exceeding twelve (12) square feet in area placed upon private property by the owner or occupant of said property are exempt from the permitting requirement of this ordinance.

> (4)     Temporary signs not exceeding twelve (12) square feet are exempt from the permitting requirement of this ordinance,

21

provided that each such sign is removed within sixty (60) days of its erection.

*Id.* § 125-15(E).

As an initial matter, several of these challenged provisions are either nearly identical to provisions we found permissible in *Rappa* or clearly permissible under the rule we laid out in that case. Under that rule, "when there is a significant relationship between the content of particular speech and a specific location, the state can exempt speech having that content from a general ban so long as the exemption is substantially related to serving an interest that is at least as important as that served by the ban," "the exception is no broader than necessary to advance the special goal, and . . . the exception is narrowly drawn so as to impinge as little as possible on the overall goal."[5]  *Rappa*, 18 F.3d at 1065-66.

Section 178-15(F) exempts "[t]raffic or other municipal signs, legal notices, railroad crossing signs, danger and such emergency or nonadvertising signs as may be approved by City

---

[5]As noted above, we also emphasized in *Rappa* that it must also be clear that "the state did not make the distinction in an attempt to censor certain viewpoints or to control what issues are appropriate for public debate." *Rappa*, 18 F.3d at 1065. The Appellants do not argue that this component of the test is implicated here.

22

Council."[6]   Bradford, Pa., Code § 178-15(F) (2004).   This

---

[6]Although this issue was not directly raised by the Appellants, we note that the portion of this provision that exempts "such emergency or nonadvertising signs as may be approved by City Council," if interpreted without context, may be unconstitutionally vague.   "A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'"   *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130-31 (1992) (quoting *Heffron v. Intl. Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)).   However, as we noted in *Stretton v. Disciplinary Board of Supreme Court of Pennsylvania*, 944 F.2d 137 (3d Cir. 1991), "[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."   *Id.* at 144 (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895))) (internal quotation marks omitted).   Here, we observe that section 178-15(F) is readily susceptible to a construction that limits "such emergency or nonadvertising signs as may be approved by the City Council" in light of the section as a whole, which exempts "[t]raffic or other municipal signs, legal notices, railroad crossing signs, [and] danger" signs.   *See* Bradford, Pa., Code § 178-15(F) (2004).   That is, we read that section as not endowing the City Council with standardless discretion to exempt any sign it wishes from the regulations embodied in Chapter 178.   Rather, we interpret the language at issue as applying only to those signs that are necessary for the

23

provision is strikingly similar to one we approved in *Rappa*. There, the Delaware provision excepted "[d]irectional or warning signs and official signs or notices, danger and precautionary signs that relate to the premises, and signs or notices of a railroad, other transportation, or communication company that are necessary for direction, information or safety of the public." 18 F.3d at 1066 (internal citations omitted). In that case, we determined that these exceptions were "all [for] regulatory signs directly related to the functioning of the roads and property on which they are located."[7] *Id.* In addition, "these exceptions certainly survive the intermediate scrutiny component of the test adopted [in *Rappa*] – the state's interest in these signs is greater than the state's aesthetic and safety interest in banning these signs, and the exemption is narrowly tailored to serve the state interest." *Id.* Section 178-15(F) therefore survives constitutional scrutiny for these same reasons.

---

direction, information, or safety of the public. *See Rappa*, 18 F.3d at 1066. This provision is also subject to the limitation discussed *infra* in footnote 7.

[7]In *Rappa*, however, we noted that "[t]o be constitutional, the exception for official signs and notices must be interpreted as limited to signs relating to the property on which they stand, such as directional signs." 18 F.3d at 1066 n.41. The District Court in this case similarly interpreted the language "as limiting the exemption to signs relating to the property on which they stand, such as 'no trespassing' signs, 'DUI enforcement zone' signs, or the like." *Riel*, 2005 WL 2106554, at *12 n.13. We continue here to emphasize such a limitation.

24

Similarly, sections 125-15(E)(1) and 178-15(D) are functionally equivalent to a provision we found constitutionally permissible in *Rappa*. Section 125-15(E)(1) provides an exemption from the permitting scheme for "advertising informing the public of a service, business, occupation or profession carried on, in or about the property on which such sign or permanent external advertising is displayed." Bradford, Pa., Code § 125-15(E)(1) (2004). Section 178-15(D) exempts "[b]ulletin boards not exceeding eight (8) square feet in area advertising or informing of a service, business, occupation or profession carried on, in or about the property in which such bulletin board is displayed." *Id.* § 178-15(D). In considering a similar provision in *Rappa* that allowed signs "advertising activities conducted on the premises," we noted that such a provision "is not a content-based exception at all . . . ; it merely establishes the appropriate relationship between the location and the use of an outdoor sign to convey a particular message." 18 F.3d at 1067. In addition, we are not concerned that these provisions violate the Supreme Court's holding in *Metromedia*, which struck down an ordinance that preferred commercial speech over noncommercial speech. *See* 453 U.S. at 512-17 (plurality opinion). Sections 125-15(E)(3) and 178-15(G) exempt all noncommercial signs that do not exceed twelve square feet that are placed on private property by the owner or occupant. *See* Bradford, Pa., Code §§ 125-15(E)(3) & 178-15(G) (2004). Thus, aside from the size restriction, which the Appellants do not contend is unreasonable, there is no commercial speech that is allowed where similar noncommercial speech is not. Thus, sections 125-15(E)(1) and 178-15(D) cannot be viewed as creating impermissible content-based distinctions.

25

The next provision that directly implicates *Rappa* is section 178-15(B), which exempts "[i]dentification signs not exceeding three (3) square feet denoting only the name and profession of an owner or occupant." *Id.* § 178-15(B). Although this appears on its face to distinguish between speech on the basis of its content, this is a classic application of *Rappa*'s context-specific rule. As we emphasized in *Rappa*, the state may exempt from a general prohibition certain types of signs when it "can show that a sign better conveys its information in its particular location than it could anywhere else – for example, an address sign performs its function better when it is actually on the property with that address than if it is anywhere else." 18 F.3d at 1065. Like an address sign, a sign denoting the name and profession of a building's owner or occupant better conveys its information in that location than it could anywhere else. As such, *Rappa* "allow[s] the state to constitutionally exempt from a time, place, and manner restriction signs for which there may be alternative channels of communication, but for which the alternatives are inferior because of the context specific nature of the signs." *Id.* at 1065 n.36. In addition, this provision passes the intermediate scrutiny portion of the *Rappa* test. As the District Court noted, "this exemption serves important civic interests in promoting order and apprising the public as to where particular professional services may be obtained. Such information is best conveyed on the property where the services are rendered." *Riel*, 2005 WL 2106554, at *13. Because of the size limit, it is narrowly tailored to meet this need without compromising the goals of safety and aesthetics. Thus, section 178-15(B) is not impermissibly content-based under *Rappa*.

26

A similar analysis applies to section 178-15(E), which exempts "[s]igns cut into any masonry surface or [] construct[ed] of bronze or other incombustible materials denoting the name or other identifying information concerning a building or its date of construction." Bradford, Pa., Code § 178-15(E) (2004). It is the last part of this exception, which defines the excepted speech in terms of the information conveyed on the sign, that raises questions as it is the only arguably content-based element of the provision. Again, however, this is precisely the type of context-specific exception that we allowed in *Rappa*. Like section 178-15(B), such a sign "better conveys its information in its particular location than it could anywhere else," and the "exemption is substantially related to serving an interest that is at least as important as that served by the ban." *Rappa*, 18 F.3d at 1065-66. Such signs promote public order by providing information about the buildings and inform the public about historically significant details. In addition, the size and composition restrictions narrowly tailor this exception without compromising the overall goals of the scheme. As such, we find that section 178-15(E) is permissible under *Rappa*.

Next, there are several provisions of the ordinances that the parties agree are facially content-neutral. Sections 125-15(E)(4) and 178-15(A) both exempt "[t]emporary signs not exceeding twelve (12) square feet, provided each such sign is removed within sixty (60) days of its erection." Bradford, Pa., Code §§ 125-15(E)(4) & 178-15(A) (2004). Because such an exemption is not even arguably based on the content of the speech, it is subject to the general test for time, place, and manner restrictions. *See Rappa*, 18 F.3d at 1053. That is, such

27

restrictions are valid "provided [1] the restrictions 'are justified
without reference to the content of the regulated speech, [2] that
they are narrowly tailored to serve a significant governmental
interest, and [3] that they leave open ample alternative channels
for communication of the information.'" *Ward*, 491 U.S. at 791
(quoting *Clark*, 468 U.S. at 293).

Here, the restriction is justified without reference to the
content of speech. The sign must simply be temporary; it does
not matter what it says. The government interests asserted to
justify the regulation are aesthetics and public safety. In *Gilleo*,
the Supreme Court emphasized that "[w]hile signs are a form of
expression protected by the Free Speech Clause, they pose
distinctive problems that are subject to municipalities' police
powers. Unlike oral speech, signs take up space and may
obstruct views, distract motorists, displace alternative uses for
land, and pose other problems that legitimately call for
regulation." 512 U.S. at 48. Further, the Supreme Court has
recognized that the goals of "traffic safety and the appearance of
the city[] are substantial governmental goals." *Metromedia*, 453
U.S. at 507-08 (plurality opinion); *see also Vincent*, 466 U.S. at
805 ("It is well settled that the state may legitimately exercise its
police powers to advance esthetic values."). The interest is even
stronger in an historic district. *See Vincent*, 466 U.S. at 805.
Finally, there are ample alternative channels of communication
for signs that do not fall within this exception. A resident or
business owner may simply apply for a permit to display the
sign longer, or may attempt to fall within one of the other
exceptions in the ordinances. Thus, sections 125-15(E)(4) and
178-15(A) are valid time, place, and manner restrictions.

28

Similarly, the Appellants do not challenge the fact that section 178-15(C) is a content-neutral time, place, and manner restriction. It exempts from the permitting scheme "[s]igns painted on the exterior surface of a building structure." Bradford, Pa., Code § 178-15(C) (2004). As such, the same analysis that applied to sections 125-15(E)(4) and 178-15(A) applies here. *See Ward*, 491 U.S. at 791. The provision does not relate to the content of the regulated speech. In addition, it is narrowly tailored to meet the asserted goal of safety: such signs are rightfully exempted from the general permitting scheme because they carry a greatly reduced chance of harming a pedestrian – they are literally attached to the building. Finally, just as with section 178-15(A), there are ample alternative channels of communication for those whose signs do not fall within this provision. Thus, we conclude that section 178-15(C) is a valid time, place, and manner regulation under the First Amendment.

Finally, there are two challenged provisions that distinguish between speech based on its content to the extent that they distinguish between commercial and noncommercial speech. Sections 125-15(E)(3) and 178-15(G) exempt from the general permitting scheme "[n]oncommercial signs not exceeding twelve (12) square feet in area placed upon private property by the owner or occupant of said property."[8] Bradford,

---

[8]While we are discussing these provisions, it is worth pausing to note their impact on another argument that runs throughout this case. The Appellants repeatedly argue that we should strike down the ordinances here under the Supreme Court's *Gilleo* decision, which they contend is more applicable

Pa., Code §§ 125-15(E)(3) & 178-15(G) (2004). When viewed in conjunction with sections 125-15(E)(1) and 178-15(D), which allow the advertising of on-site goods and services, the effect of these provisions is to draw a distinction between commercial and noncommercial speech. That is, signs regarding off-site commercial activities are burdened whereas those regarding off-site noncommercial activities are not. Because this is properly viewed as a burden on commercial speech, the Supreme Court's jurisprudence on that subject is the appropriate framework under which to consider the constitutional validity of these provisions.

The Supreme Court has repeatedly emphasized that "'[c]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.'" *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 623 (1995) (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989)). The prevailing framework under which restrictions on commercial speech are considered was laid

---

to the case before us than *Rappa* because it involved private property. However, the Supreme Court's decision to strike down the ordinance at issue in *Gilleo* was premised on the fact that it was "a near-total prohibition of residential signs" that did not allow homeowners to post political signs on their own property. *See* 512 U.S. at 45, 53. Here, the exceptions embodied in sections 125-15(E)(3) and 178-15(G), which allow a resident to freely place noncommercial signs on his or her property, remove any concern that the ordinances at issue here violate *Gilleo* for the reasons claimed by the Appellants.

30

down in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). There, the Supreme Court explained the framework as follows:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566.

Applying this test to the provisions at issue here, the first prong is satisfied in that at least some of the off-site commercial advertising would concern lawful activity and not be misleading. Under the second prong, as previously discussed, the governmental interests here in aesthetics and safety are substantial. *See Metromedia*, 453 U.S. at 507-08 (plurality opinion) ("[T]raffic safety and the appearance of the city [] are substantial governmental goals.").

As to the third *Central Hudson* prong, the Appellants attempt to rely on the Supreme Court's decision in *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993). There, the Court struck down an ordinance that prohibited

31

commercial news racks on public property but allowed noncommercial news racks. It based its result on a finding that the ordinance did not satisfy this third prong because only a "paltry" 62 of the 1,500 – 2,000 news racks within the city were commercial and thus subject to the regulation. *Id.* at 417-18. As such, the Court questioned the "'fit' between the city's goal [of dealing with the eyesore of news racks] and its method of achieving it" that left 96% of the news racks in place. *Id.* at 418. There is not a similar fit problem in the instant case. As the City has explained, "the vast majority of signs within the City and the Historic District are commercial signs, and such signs tend to be erected for longer periods of time and tend to be larger and more elaborate in design." Thus, regulating those signs directly advances the interests asserted by the City, and the provisions do not fall because of the holding in *Discovery Network*. *See, e.g.*, *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 100 F.3d 175, 190 (1st Cir. 1996) (upholding a regulation prohibiting commercial news racks in an historic Boston neighborhood because the benefit was not "minute" and "paltry" as it was in *Discovery Network*); *Infinity Outdoor, Inc. v. City of New York*, 165 F. Supp. 2d 403, 420 (E.D.N.Y. 2001) (holding that a billboard regulation that distinguished between off-site commercial signs and off-site noncommercial signs did not fall under *Discovery Network* because the regulation had "more than a minimal impact on the overall number of billboards").

As to the fourth prong of the *Central Hudson* test, we conclude that the burden on commercial signs is not more extensive than necessary. The provisions in sections 125-15(E) and 178-15 allow both temporary signs and on-site commercial signs without a permit. The only type of commercial signs

burdened by the ordinances are those the City claims are most likely to implicate the issues of safety, aesthetics, and historic preservation. Thus, all that the City has burdened is the category of signs that has enjoyed the least amount of First Amendment protection: off-site commercial signs. *See Metromedia*, 453 U.S. at 512 (plurality opinion); *Rappa*, 18 F.3d at 1067.

Based on the foregoing analysis, we conclude that none of the challenged provisions of Chapters 125 or 178 constitute an impermissible content-based regulation under the First Amendment. As we emphasized in *Rappa*, "when government has a significant interest in limiting speech that is unrelated to the content of that speech, government should not be left with a choice of enacting a regulation banning [or burdening] all signs in a particular geographic area or none." 18 F.3d at 1064. The City of Bradford has concluded that "[s]ome signs are more important than others not because of a determination that they are generally more important than other signs, but because they are more related to the particular location than are other signs." *Id.* Because we conclude that the City has complied with the First Amendment in making these determinations, the District Court did not err by refusing to strike down the ordinances because of their seemingly content-based distinctions.

### III.

The Appellants next argue that, even if the Bradford ordinances are content-neutral, they violate the First Amendment because they are overbroad. The Supreme Court has explained that legislation can be invalid under this theory if

33

"it sweeps protected activity within its proscription." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).   Specifically, the Appellants here argue that the permitting system is overbroad because it regulates expression on private property, rather than just on public property.

As an initial observation, we implicitly determined that this alone did not violate the First Amendment in *Rappa* when we approved sections of a sign ordinance that applied to private property. *See* 18 F.3d at 1071 (noting that "the statutes regulate a private party's speech on his or her own property" after concluding that several of the statutes' provisions were permissible under the First Amendment).   However, the Appellants argue that *Gilleo*, which was decided by the Supreme Court after *Rappa*, should change our view.  But *Gilleo* did not find that all restrictions that applied to private property were invalid.  Rather, it struck down a particular ordinance because it constituted a "near-total prohibition of residential signs."  512 U.S. at 53.   The ordinances at issue here do not begin to approach that level:  they explicitly and clearly allow all temporary signs and noncommercial signs smaller than twelve square feet.

Notwithstanding these observations, the Appellants attempt to rely on *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002).  There, the Supreme Court struck down a law requiring a permit for door-to-door canvassing in order to "protect[] [the city's] residents from fraud and undue annoyance" and "criminals posing as canvassers."  *Id.* at 159.  The Appellants argue that *Watchtower* supports their view of regulations applying to

34

private property. But the decision in *Watchtower* was not based on whether the law applied to public or private property. Rather, the Supreme Court struck down the ordinance because, although the governmental interests involved were important, the ordinance was not likely to advance those interests. As the Court explained, "it seems unlikely that the absence of a permit would preclude criminals from knocking on doors and engaging in conversations not covered by the ordinance." *Id.* at 169. In addition, in the process of attempting to deal with the harm of criminal canvassers, the ordinance swept within its ambit a great deal of ordinary and harmless speech, such as conversations between neighbors. *Id.* at 165-66. In sum, *Watchtower* was a very fact-specific decision that simply does not stand for the broad proposition the Appellants urge. In the case before us, the extensive exemptions allow the City to specifically target the speech it wishes to regulate, while leaving private property owners free to engage in activity at the core of the First Amendment. Thus, the District Court did not err by failing to strike down the ordinances on overbreadth grounds.[9]

IV.

---

[9]The Appellants mention in passing a concern that the Bradford ordinances could chill protected speech, even where such speech is not actually burdened under the provisions. Although the chilling effect of such ordinances is a valid concern under the First Amendment, it does not appear to be a problem here given the clear exceptions for temporary and noncommercial signs.

35

The Appellants next argue that Chapter 125's permit standards endow government officials with too much discretion, rendering the ordinance unconstitutionally vague. Even for facially content-neutral provisions, the Supreme Court has recognized that "[a] government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130-31 (1992) (quoting *Heffron v. Intl. Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)). "To curtail that risk, 'a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must contain 'narrow, objective, and definite standards to guide the licensing authority.'" *Id.* at 131 (quoting *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150-151 (1969)).

In *Shuttlesworth*, the Supreme Court invalidated a parade permitting scheme that contained the following standard:

> The commission shall grant a written permit for such parade, procession or other public demonstration, prescribing the streets or other public ways which may be used therefor, unless in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused.

394 U.S. at 149-50. As the Court explained, "[t]here can be no doubt that the Birmingham ordinance, as it was written, conferred upon the City Commission virtually unbridled and

36

absolute power to prohibit any 'parade,' 'procession,' or 'demonstration' on the city's streets or public ways. For in deciding whether or not to withhold a permit, the members of the Commission were to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.'" *Id.* at 150.

The standard in the instant case is very different. Under Chapter 125, the HARB is charged in the following manner:

> Except as provided in subsections (3) and (4) of this Ordinance [which exempt noncommercial signs not exceeding twelve square feet placed on private property and temporary signs not exceeding twelve square feet, respectively], no sign or display of any kind or for any purpose shall be erected or altered, notwithstanding zoning sign approval, until an application for permit to make such erection or alteration has been reviewed by HARB *for conformity in exterior material composition, exterior structural design, external appearance and size of similar advertising or information media used in the architectural period of the district in accordance with the Resource Inventory of building architectural styles of the Bradford Historic District* (which is available in the Office of the City Clerk), and a permit granted thereon.

Bradford, Pa., Code § 125-15(E)(2) (2004) (emphasis added). Thus, far from enjoying unbridled discretion, the HARB is

37

limited in its review to considering exterior material composition, exterior structural design, and the appearance and size of similar media used in the architectural period. To aid in this undertaking, sections 125-15(E)(5), (E)(6), and (E)(7) incorporate an Historic Color Chart and establish objective material, border, and typeface standards. Furthermore, the fact that the HARB is comprised of nine individuals, including at least one real estate broker, one architect, the City Inspector, and other individuals knowledgeable about historic preservation, guards against applicants being subjected to the whim or caprice of one single official.

Certainly, the Appellants are correct that the HARB is left with some room for subjective judgment, which can be dangerous to First Amendment interests. But the First Amendment does not require the complete absence of such judgment. In *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064 (9th Cir. 2006), for instance, the United States Court of Appeals for the Ninth Circuit considered the constitutionality of a sign permit ordinance that allowed the City of Oswego to take into account, among other criteria, whether or not a sign is "compatible with the surrounding environment." *Id.* at 1083. The court concluded that the ordinance did not leave city officials with an impermissible level of discretion, explaining that "[a]lthough the design review criteria are somewhat elastic and require reasonable discretion to be exercised by the permitting authority, this alone does not make the Sign Code an unconstitutional prior restraint." *Id.* at 1084 (citing *Ward*, 491 U.S. at 794 ("While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been

38

required even of regulations that restrict expressive activity.")).
Thus, we conclude that the discretion embodied in Chapter 125
is not constitutionally impermissible.

V.

Finally, the Appellants argue that the Bradford
ordinances fail to require sufficiently prompt decisions on
permit applications. As the Supreme Court has emphasized, "[a]
scheme that fails to set reasonable time limits on the decision
maker creates the risk of indefinitely suppressing permissible
speech." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227
(1990). However, the concern has generally been with
prolonged or indefinite time periods. In *FW/PBS*, for instance,
the Supreme Court explained that "[w]here a licensor has
unlimited time within which to issue a license, the risk of
arbitrary suppression is as great as the provision of unbridled
discretion." *Id.*

Here, under Chapter 178 the Building Inspector must act
on "any application within 30 days of receipt thereof."
Bradford, Pa., Code § 178-6 (2004). Under Chapter 125, the
HARB must issue a recommendation to the City Council on a
permit application "no later than 30 days after [the next of their
monthly] meeting[s]." *Id.* § 125-10(D). The City Council must
then act on the application "at the council meeting immediately
succeeding the receipt of the recommendation from HARB." *Id.*
If the Council fails to act in that time period, the HARB's
recommendation is deemed adopted. *Id.*

39

In light of the detailed factors the review boards must take into account and the alternative avenues for protected expression – that is, the exemptions for temporary and noncommercial signs – these time periods do not rise to the level of those that offend the First Amendment.

## VI.

For the foregoing reasons, we will affirm the ruling of the District Court.